CASE NO. 14-30067

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE,

*Plaintiffs-Appellees,*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS; BURL CAIN, WARDEN,
LOUISIANA STATE PENITENTIARY; ANGELIA NORWOOD,
Warden of Death Row; LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS,

*Defendants-Appellants.*

———————————

Appeal from The United States District Court,
Middle District of Louisiana, Case No. 3:13-cv-00368
Hon. Brian A. Jackson

———————————

## APPELLEE'S OPPOSITION TO MOTION TO EXTEND BRIEFING DEADLINES
## PURSUANT TO FED. R. APP. P. 26(B)(2) AND FIFTH CIRCUIT RULE 26.2

———————————

Mercedes Montagnes, LA Bar
No. 33287 (Lead Counsel)
Elizabeth Compa, LA Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org


Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com

Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490
Nilay U. Vora, CA Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.1875 Century
Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110
mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

1. *PLAINTIFFS-APPELLEES*: ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE;

2. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*: MERCEDES MONTAGNES, ELIZABETH COMPA, AND THE PROMISE OF JUSTICE INITIATIVE;

3. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*: MITCHELL A. KAMIN, JESSICA KORNBERG, NILAY U. VORA, AND THE LAW FIRM OF BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS & LINCENBERG, P.C.;

4. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*: STEVEN SCHECKMAN AND THE LAW FIRM OF SCHIFF, SCHECKMAN & WHITE, LLP;

5. *DEFENDANTS-APPELLANTS*: JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY; ANGELA NORWOOD, WARDEN OF DEATH ROW; AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS;

6. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*: E. WADE SHOWS, JAMES L. HILBURN, AMY L. MCINNIS, JACQUELINE B. WILSON, AND THE LAW FIRM OF SHOWS, CALI & WALSH, LLP;

7. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*: THOMAS E. BALHOFF, JUDITH R. ATKINSON, CARLTON JONES III, AND THE LAW FIRM OF ROEDEL, PARSONS, KOCH, BLACHE, BALHOFF & MCCOLLISTER.

Respectfully Submitted:

*s/ Nilay U. Vora*

Mercedes Montagnes, LA Bar No. 33287
(Lead Counsel)
Elizabeth Compa, LA Bar No. 35004

The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org

Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490
Nilay U. Vora, CA Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim, Drooks
& Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110
mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com

Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com

*Attorneys for Plaintiffs-Appellees*

**OPPOSITION TO DEFENDANTS-APPELLANTS'**
**MOTION TO EXTEND BRIEFING DEADLINES**

**MAY IT PLEASE THE COURT:**

Plaintiffs-Appellees Elzie Ball, Nathaniel Code, and James Magee (together, "Appellees") respectfully submit this Opposition to Defendants-Appellants' ("Appellants") Motion to Extend the Briefing Deadlines for their appeal.  For the reasons set forth below, Appellants' Motion should be denied.

**I.    Factual and Procedural Background**

**A.    The proceedings before the district court.**

Appellees filed their complaint in this matter on June 10, 2013, alleging, *inter alia*, violations of Appellees' constitutional and statutory rights resulting from the extreme heat that Appellees endure for 23 hours each day of the summer. Ex. 1.  A bench trial was held before the district court from August 5-7, 2013.

**B.    The district court's Order requiring that Appellants prepare a plan to maintain a heat index lower than 88 degrees.**

Following the conclusion of the trial, the district court issued a 102-page Ruling and Order on December 19, 2013 (the "district court's Order"), requiring Appellants to submit a plan to cool the death row tiers to a heat index of 88 degrees or below by February 17, 2013.  Ex. 2.  On that date, Appellants submitted their plan to install equipment that would remedy the Eighth Amendment violation found by the district court.  Ex. 3.  Appellees submitted their response to the plan,

generally finding that Appellants' proposed plan was adequate. Ex. 4. The district

court has yet to issue any order requiring implementation of the plans.

### C. Appellants' Notice of Appeal and related Motion for Stay of the Order.

Appellants filed their Notice of Appeal in this matter on January 21, 2014.

Ex. 5. The Notice indicated that Appellants were seeking interlocutory appeal of

the district court's Order. *Id* (citing 28 U.S.C. § 1292(a)(1)). Appellants also filed

a Motion to Stay of the district court's Order on January 24, 2014 (the "Motion to

Stay") and a Petition for Mandamus (the "Petition"). Exs. 6-7 (exhibits to the

Motion to Stay and Petition excluded). This Court denied Appellants' Motion for

Stay on February 13, 2014, stating in part that "any action requiring

implementation of relief . . . before the state has a reasonable chance to appeal and

seek a stay, will be deemed an appealable final order," at which time "Defendants

may re-urge their stay request." Ex. 8. In a letter dated February 24, 2014, the

Clerk of this Court ordered that Appellants file their brief by April 7, 2014—*i.e.*,

42 days after receiving the letter providing the briefing date and 76 days after

Appellants originally filed the Notice of Appeal. Ex. 9.

## II. LEGAL STANDARD

It is well-established that, in the Fifth Circuit, extensions are granted

sparingly and are greatly disfavored and that Appellants must show an exceptional

circumstance demonstrating that "good cause" exists for an extension. *See, e.g.*,

5th Cir. L.R. 27 & I.O.P. ("Motions for extension of time to file briefs are

disfavored and should be made only in exceptional instances where 'good cause'

exists."); February 24, 2014, Letter from Fifth Circuit Office of Clerk to

Mr. Hilburn at 1 ("The court grants extensions sparingly and under the criteria of

5th Cir. R. 31.4."); 5th Cir. Practitioners' Guide at 61 ("As a general rule, the court

expects briefs to be filed timely and without extensions.").  This Court also

requires that extensions be sought "as soon as it is reasonably possible to foresee

the need for the extension."  5th Cir. L.R. 31.4(a).  Additionally, this Court's rules

state that "as justification for extensions, generalities, such as that the purpose of

the motion is not for delay or that counsel is too busy, are not sufficient."  5th Cir.

L.R. 31.4.2.

Appellants' request for an indefinite extension can only properly be viewed

as a "Level 2" extension by this Court.[1]  5th Cir. L.R. 31.4.3 ("There are two levels

of extensions: a Level 1 extension of 1-30 days from the original due date; and

a Level 2 extension of more than 30 days from the original due date.").  "More

than ordinary good cause is required for a Level 2 extension, and Level 2

---

[1] Appellants do not explicitly state that the extension they seek will be longer than
30 days; rather, they seek an *indefinite* extension until such time as the district
court issues a final order.  Appellees respectfully submit that this request must be
construed as a Level 2 request for extension under Local Rule 31.4.3, as an
indefinite extension in the briefing schedule would be even more extraordinary
than an extension of 31 or more days.

extensions will be granted only under the most extraordinary of circumstances. The

movant must demonstrate diligence and substantial need." *Id.*

Further, this Court's rules make specific requirements as to why an

extension should be granted where, as here, an extension beyond 30 days is sought:

> Grounds that may merit consideration for extensions are, without limitation, the following, which must be set forth if claimed as a reason in any motion for an extension beyond 30 days:
> (a) Engagement of counsel in other litigation, provided such litigation is identified by caption, number, and court, and there is set forth:
> (1) A description of any effort taken to defer the other litigation and of any ruling thereon;
> (2) An explanation of why other litigation should receive priority over the case at hand; and
> (3) Other relevant circumstances, including why other associated counsel cannot prepare the brief or relieve the movant's counsel of the other litigation.
> (b) The matter is so complex that an adequate brief cannot reasonably be prepared when due.
> (c) Extreme hardship will result unless an extension is granted, in which event the nature of the hardship must be set forth in detail.

## III. Appellants' Motion meets neither the procedural nor legal requirements to support such an extraordinary, indefinite extension.

As a procedural matter, Appellants were required to seek this extension

immediately upon knowledge of the extraordinary circumstances justifying the

indefinite extension sought.  This they did not do, further warranting denial.[2]

---

[2]  This Court requires that any need for an extension be raised immediately upon recognition of the need for an extension.  5th Cir. L.R. 31.4(a).  Appellants' counsel Ms. Wilson has been on maternity leave since January 8, 2014, and the

But even if their Motion is considered timely, to justify such an indefinite extension of time, Appellants are required to show "extraordinary circumstances," *i.e.*, more than ordinary good cause. This Appellants have failed to do. Appellants provide two reasons to support a showing of good cause for an extension: (A) the purported risk of inefficient and duplicative briefing, and (B) the unavailability of lead counsel for Appellants. Neither of these reasons are valid justifications to show good cause, let alone the required extraordinary circumstance for an indefinite extension of briefing deadlines.

**A.    Appellants must either pursue their interlocutory appeal within the deadlines ordered by this Court, or abandon their appeal through failure to prosecute and corresponding waiver of arguments that could have been raised on appeal.**

Appellants' assertion of the potential for duplicative briefing appears to be based on two assertions: (1) that submission of a brief on their interlocutory appeal will be "premature" or duplicative given the "absence of a final order" by the district court and the need to file a "second brief" to address any further injunctive relief ordered by the district court; and (2) that "Appellants will not be able to re-urge their Motion to Stay" of any further order by the district court prior to the April 7, 2014, deadline to file their appeal brief. Mot. at 8. As discussed in detail

---

briefing schedule in this matter was set out on February 24, 2014. Appellants' Motion was filed on March 13, 2014, 14 days after receiving the briefing schedule and nearly three weeks before their brief is due. This failure to comply with this Court's rules further warrants a denial of the Motion.

below, each of these assertions is either without merit or the result of Appellants'

own misguided actions—from which they should not be permitted to profit.

> **1.    Appellants affirmatively sought an interlocutory appeal of the district court's Order and repeatedly asserted the need for an emergency stay of further proceedings.**

Appellants' assertion that their interlocutory appeal would be "premature" is

bizarre in the face of Appellants' conduct before this Court.  Appellants' Notice of

Appeal stated that Appellants were seeking an interlocutory appeal pursuant to 28

U.S.C. § 1292(a)(1) of the district court's Order.  Ex. 5.  Appellants presumably

sought interlocutory appeal because they wished to appeal the district court's

findings of fact and conclusions of law that served as a basis for the district court's

grant of injunctive relief.  Appellants' appear to have cited the same reasons for

seeking an emergency stay of further proceedings in the district court and petition

for mandamus.  Ex. 6-7.  It is plain, therefore, that Appellants sought to appeal the

district court's finding of a violation of the Eighth Amendment, with full

knowledge that the ultimate remedy for the Eighth Amendment violation has not

yet been ordered by the district court.

Indeed, Appellants affirmatively sought to prevent any further proceedings

on the appropriate remedy before the district court through their Motion to Stay—

an action flatly inconsistent with their reasons justifying delay of the proceedings

before this Court.  Ex. 6.  At the core of this case are two issues: (1) whether

Appellees' constitutional and statutory rights have been violated, and (2) the necessary remedy to cure the rights violations. Appellees acknowledge the obvious relationship between these two related but distinct issues. Appellees respectfully submit that Appellants made the deliberate choice to pursue their appeal of the first issue on an interlocutory basis—with full knowledge that no ultimate remedy had been ordered and that the second issue described above was not yet ripe for appeal. Ex. 5. To the extent that the overlap between the remedy and the rights violation causes inefficient briefing, it is a result of Appellants' conduct—conduct from which Appellants should not profit and for which they must face the consequences.

Viewed properly, Appellants' Motion appears to be an attempt to avoid the legal consequences of abandoning their appeal through a failure to prosecute and an attempt to evade waiver of the arguments that could have been raised on appeal. Appellees respectfully submit that this Court should require Appellants to pursue their interlocutory appeal within the time frame set by this Court, or otherwise to face the consequences of failure to prosecute and waiver.

2.    **Nothing bars Appellants from re-urging their Motion to Stay during the pendency of the interlocutory appeal.**

As this Court's Order denying the Motion to Stay made clear, Appellants can re-urge their Motion to Stay in the event of an order requiring implementation of a plan to maintain a heat index lower than 88 degrees. Ex. 8. Nothing about the

need to seek a Motion to Stay at some time in the future shows extraordinary

circumstance required to justify the need for an indefinite extension.

> **3.    Given Appellants' pattern of asserting emergency situations and the need for interlocutory appeal, Appellants' abandonment of the interlocutory appeal should constitute a failure to prosecute and waiver.**

Appellants' pattern of forcing this Court and all parties to expend resources

through this inefficient manner of litigation should not be permitted to continue.

This type of hurry-up-and-wait litigation caused by Appellants in proceedings

before this Court is not only a waste of this Court's judicial resources, but also an

inefficient and wasteful method of resolving the disputes between the parties.

Appellants should be forced to either adhere to the current briefing schedule

or abandon their interlocutory appeal through a failure to prosecute and waiver of

the arguments that could have been raised on interlocutory appeal.[3]  A grant of

---

[3]    To the extent that Appellants wish to challenge the district court's findings of an Eighth Amendment violation, Appellees respectfully submit that Appellants should be required to do so through their noticed appeal and within the briefing deadlines ordered by this Court.  Otherwise, Appellants should be forced to face the consequences of abandonment of their appeal through failure to prosecute and waiver of the arguments that they could have raised on appeal.  *Cf. F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 429 (6th Cir. 1987) ("Parties should not be allowed to harass their adversaries and the courts with a barrage of successive motions for extraordinary, preliminary injunctive relief, secure in the knowledge that they can take an interlocutory appeal when it becomes apparent that they cannot win their war of attrition.  The proper pretrial procedure is that when a ruling is made on a motion for preliminary injunction, an aggrieved party must either file a timely interlocutory appeal or request reconsideration on the basis of changed or otherwise unforeseen and unforeseeable circumstances.").

Appellants' motion to indefinitely extend the briefing schedule would—for all

practical purposes—allow Appellants to evade the consequences of repeatedly

claiming emergent circumstances requiring an interlocutory appeal.  Appellees

respectfully submit that for this equitable reason, as well as the legal reasons cited

above, the Motion should be denied.

### B.    Appellants provide no reason why none of Appellants' six attorneys other than Ms. Wilson could prepare the appeal brief.

Appellants' final attempt to justify their improper request for an indefinite

extension is the unavailability of Appellants' counsel, Ms. Jacqueline Wilson.

Appellants have seven attorneys in this matter: E. Wade Shows, James L. Hilburn,

Amy L. McInnis, and Jacqueline B. Wilson of Shows, Cali & Walsh, LLP, and

Thomas E. Balhoff, Judith R. Atkinson, and Carlton Jones, III, of Roedel, Parsons,

Koch, Blache, Balhoff & McCollister.

Appellants now assert for the first time before this Court that Ms. Wilson,

who is on leave until April 1, 2014, is lead counsel.  Mot. at 9.[4]  Appellees

respectfully submit that Ms. Wilson's unavailability does not, as a matter of law,

constitute good cause—let alone an extraordinary circumstance—to justify an

indefinite extension.[5]

---

[4]    Although Appellants' recent filings do not indicate lead counsel, *see, e.g.,*
Ex. 5, Appellants have previously identified Mr. Shows as the lead counsel in this
matter, *see, e.g.,* Certified Docket Sheet, Ex. 10 at 5.

[5]    Ms. Wilson has been on leave since January 8, 2014.  Mot. at 9.  Since that

## IV.    CONCLUSION

For the foregoing reasons, Appellees respectfully request that this Court

deny in its entirety Appellants' Motion to Extend Briefing Deadlines.

Respectfully submitted this 18th day of March 2014.

Respectfully Submitted:

    s/ Nilay U. Vora
Mercedes Montagnes, LA Bar No. 33287
(Lead Counsel)
Elizabeth Compa, LA Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org

Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490
Nilay U. Vora, CA Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim, Drooks
& Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110

time, Appellants filed their Notice for interlocutory appeal, Ex. 5, fully briefed an
Emergency Motion to Stay, Ex. 6, and fully briefed an Expedited Petition for
Mandamus, Ex. 7, before this Court.  Appellants have also complied with required
filings in the district court, including the submission of their proposed plan remedy
the Eighth Amendment violations.  Appellees respectfully submit that, in face of
this evidence, Appellants' six attorneys other than Ms. Wilson should provide
sufficient counsel to prepare an appeal brief.

mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com

Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com

*Attorneys for Plaintiffs-Appellees*

### CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. Rules 25.2.1 and 25.2.13, I certify that the required privacy redactions have been made; the electronic submission is an exact copy of the paper document.  Pursuant to 5th Cir. Rule 32, I certify that this opposition complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) because it is less than 20 pages in length.

This opposition complies with the typeface and type style requirements of Fed. R. App. P. 27(d) and Fed. R. App. P. 32(c) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 software in Times New Roman 14-point font.

I understand that a material misrepresentation in completing this certificate or circumvention of the type-volume limits in Fed. R. App. P. 27(d)(2) may result in the Court striking the brief and imposing sanctions against the person signing the brief.

    *s/ Nilay U. Vora*
    Nilay U. Vora

Case: 14-30067    Document: 35    Page: 17    Date Filed: 03/18/2014

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of March 2014, a copy of the foregoing has this date been served upon all parties through their respective counsel of record by operation of the Court's electronic filing system and has been filed electronically with the Clerk of the Court using the CM/ECF system. I also certify that a copy of the foregoing was served upon counsel for all parties via email and/or by depositing same in the U.S. Mail, postage prepaid, and properly addressed.

*s/ Nilay U. Vora*
Nilay U. Vora

E. Wade Shows
James L. Hilburn
Amy L. McInnis
Jacqueline B. Wilson
Shows, Cali and Walsh, LLP
628 St. Louis Street
PO Drawer 4425
Baton Rouge, LA  70821
Telephone:  (225) 346-1461
Facsimile:  (225) 346-1467
Emails:      wade@scwllp.com
             jamesh@scwllp.com
             amym@scwllp.com
             jbw@scwllp.com

Thomas E. Balhoff
Judith R. Atkinson
Carlton Jones, III
Roedel, Parsons, Koch, Blache, Balhoff
& McCollister
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809
Telephone:  (225) 929-7033
Facsimile:  (225) 928-4925

*Attorneys for Defendants-Appellants*

Exhibit 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
WEST FELICIANA DIVISION

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, | * | CIVIL ACTION NO. 13-368 |
| AND JAMES MAGEE, | * | |
| | * | |
| PLAINTIFFS | * | |
| | * | SECTION _____ |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE _____ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS, | * | |
| BURL CAIN, WARDEN OF THE | * | |
| LOUISIANA STATE PENITENTIARY, | * | MAGISTRATE JUDGE _____ |
| ANGELA NORWOOD, WARDEN  OF | * | |
| DEATH ROW, AND THE LOUISIANA | * | |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONS, | * | |
| | * | |
| DEFENDANTS | * | |

## COMPLAINT

### STATEMENT OF CLAIM

1. Plaintiffs Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee ("Magee") (collectively, "Plaintiffs") bring this civil action for declaratory and injunctive relief, seeking redress from Defendants James M. LeBlanc ("LeBlanc"), Burl Cain ("Cain"), Angela Norwood ("Norwood"), and the Louisiana Department of Public Safety and Corrections (the "DOC") (collectively, "Defendants") for the constitutional violations taking place at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").

2. Defendants LeBlanc, Cain, and Norwood are liable for the deprivation of Plaintiffs' constitutional rights under color of law and in violation of their Eighth and Fourteenth Amendment rights to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

3. Defendant DOC is liable for the deprivation of Plaintiffs' rights under Title II of the Americans with Disabilities Act (the "ADA"), and the Americans with Disabilities Act

1

Amendment Act (the "ADAAA"), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"), which require public facilities, like Angola, to make reasonable accommodations for people with disabilities, like Plaintiffs.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

5.  Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district.

## PARTIES

### A.) Plaintiffs

6.  Plaintiffs are individuals currently incarcerated at Angola's Death Row.

7.  Plaintiffs have exhausted the administrative remedies available to them at Angola.

### B.) Defendants

8.  Defendant Cain is the Warden of Angola.

    a.  He has been in that position since 1995.

    b.  In this capacity, he exercises operational control over Angola by making staffing, budget, and administrative decisions.

    c.  By law, he is responsible for protecting the constitutional rights of all persons held in Angola's custody.

    d.  At all relevant times, Cain was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola.

    e.  He is sued in his official capacity for declaratory and injunctive relief.

    f.  Since at least April of 2012, Plaintiffs have attempted, through letters and phone calls by their counsel, to engage Warden Cain in a dialogue about the risk of harm posed by excessive heat to those on Death Row and how Defendants might seek to alleviate the conditions on Angola's Death Row.

g. After numerous letters and phone calls, Defendant Cain in a terse communication dismissed Plaintiffs' concerns in a conclusory fashion and asserted that conditions on Angola's Death Row are acceptable.

h. He can be served at 17544 Tunica Trace, Angola, LA 70712.

9. Defendant Norwood is the Assistant Warden of Death Row.

a. She has been in that position since 2011.

b. In her capacity as Assistant Warden of Death Row, she exercises operational control over Death Row by making staffing, budget, and administrative decisions.

c. By law, she is responsible for protecting the constitutional rights of all persons incarcerated on Angola's Death Row.

d. At all relevant times, Norwood was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola.

e. She is sued in her official capacity for declaratory and injunctive relief.

f. Since 2012, Plaintiffs, through their counsel, have discussed the problem of extreme heat on Death Row with Defendant Norwood.

g. She has been aware of the ongoing suffering of Plaintiffs, as a result of Plaintiffs' Requests for Administrative Remedy and discussions with Plaintiffs' counsel about the conditions on Angola's Death Row.

h. She can be served at 17544 Tunica Trace, Angola, LA 70712.

10. Defendant LeBlanc is the Secretary of Louisiana's Department of Public Safety and Corrections ("DOC").

a. He was appointed to this position by Governor Piyush "Bobby" Jindal. In his capacity as Secretary, LeBlanc has control of the Louisiana Department of Public Safety and Corrections (the "DOC").

b. By law, he is responsible for protecting the constitutional rights of all persons held in the DOC's custody.

c. At all relevant times, LeBlanc was acting under color of law and as the agent, and, as a matter of law, the official representative of DOC.

d. He is sued in his official capacity for declaratory and injunctive relief.

3

    e.   He has been aware of the concerns surrounding extreme heat conditions on Angola's Death Row since at least April 2012, when Plaintiff's counsel copied him on their communication with Warden Cain.

    f.   He can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

11. Defendant DOC, the Louisiana Department of Public Safety and Corrections, is the state prison system, a division of the State of Louisiana.

    a.   It is charged with overseeing the custody and care of offenders in Louisiana.

    b.   At all relevant times, the DOC operated Angola, a public facility with programs and services.

    c.   The DOC is the recipient of federal funds.

    d.   The DOC is sued for declaratory and injunctive relief.

    e.   The DOC can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

## FACTUAL ALLEGATIONS

12. Plaintiffs' suit arises from the appalling and extreme conditions that Plaintiffs suffer each summer as a result of the extreme heat on Angola's Death Row, and the substantial risk of serious harm, including permanent injury and even death, to which these conditions expose them. Plaintiffs have no way of alleviating these conditions themselves, and what little means Defendants make available to Plaintiffs do little or nothing to alleviate the extreme heat conditions that Plaintiffs suffer.

**A.) Angola's Death Row Facility**

13. In 2008, with the use of federal funds, Angola constructed a new facility (the "Death Row Facility") designed to house individuals who had been sentenced to death and were to be incarcerated on Death Row.

14. The Death Row Facility is equipped with air ducts attached to a cooling system.

15. On information and belief, the entire Death Row Facility is outfitted with ductwork for climate control.

16. The areas of the Death Row Facility which house visitation rooms, guard towers, and administrative offices are routinely air conditioned.

17. The Death Row Facility tiers (the "Death Row tiers") that are occupied by the inmates have no climate control other than fans.

4

18. During the summer months, the temperature on the Death Row tiers regularly rises above 95°F and the relative humidity regularly exceeds 92%, according to local weather data tracked by the National Weather Service. By another measure, the heat index – i.e. the apparent temperature, which measures how hot it *feels* – was extremely high and regularly reached into the "danger" and "extreme danger" zones, according to the National Oceanic and Atmospheric Administration (the "NOAA"). At these "danger" and "extreme danger" zones, the NOAA warns of the risks of heat-related health hazards and disorders.

19. On information and belief, Angola staff do not measure or record relative humidity on-site.

20. On information and belief, in Summer 2012, the heat index on all six Death Row tiers reached into the "danger" and "extreme danger" zones – the two highest categories of NOAA's heat index table, where the perceived temperature is above 103°F – every day in August. On two of six tiers, the same was true for every day in July. Tier C, which appeared to be the hottest tier, reached the "extreme danger" zone – above 126°F – on 85 days between May and August 2012. On more than one occasion in 2011, the recorded temperature was 100°F the relative humidity 100%, putting the heat index at 195°F.

21. The heat conditions on the Death Row tiers are, simply put, extreme and unsafe.

22. Exposure to such heat conditions puts even a healthy individual at risk of heat stroke, which can precipitate permanent neurological damage and death.

23. Individuals with preexisting illnesses like hypertension, such as plaintiffs, are at greater risk of succumbing to these conditions when under heat stress.

24. Plaintiffs are forced to face these conditions virtually all of the time during the summer months because they are incarcerated in cells on the Death Row tiers for twenty-three out of twenty-four hours per day. Four times a week, as part of their one hour outside of their cells, Plaintiffs are permitted to go outside for exercise. Because of the lack of ventilation in Plaintiffs' cells, the temperature outside, while hot, is cooler than the temperature inside the cells.

25. During the summer, the bars of the cells are hot to the touch and the cinderblock walls release additional heat.

26. Plaintiffs have little to no ability to take steps to cool their bodies when heat levels on the Death Row tiers are extreme.

27. Although there are some fans on the Death Row tier, the fans merely blow hot air into Plaintiffs' cells and do not function to alleviate the high humidity levels inside the tiers. The fans feel like blow dryers blowing hot air into the cells.

5

28. During the hottest summer months, when temperatures remain uncomfortably high through the night, Plaintiffs resort to sleeping on the hard floor, in spite of the risk of bites from fire ants, because the floor is slightly cooler than their beds.

29. On information and belief, during the summer months, staff and visitors to the Death Row tier have complained about having to spend even a few minutes on the Death Row tiers where Plaintiffs are incarcerated.

30. When a door connecting a Death Row tier to the central part of the building opens, Plaintiffs rush to the front of their cells to feel the relief of just a few seconds' gust of cool air-conditioned air that quickly dissipates from the Death Row tier.

31. Showers are ineffective in alleviating Plaintiffs' suffering during the summer months because when the showers are available to Plaintiffs, the water is usually scalding hot.

32. On information and belief, water temperatures regularly exceed 115°F on the hottest days of the summer. Plaintiffs are unable to control the temperature of the water available to them in the shower facilities.

33. Drinking water within the Death Row facility is malodorous and contaminated with debris.

34. Ice is available to Plaintiffs only intermittently and can only be obtained when inmates choose to get ice for one another during the one hour, four times per week, that inmates are permitted outside of their cells. Defendants do not provide ice as a matter of course despite the extreme heat on the Death Row tiers. The ice machine regularly breaks down, further lessening Plaintiffs' capacity to obtain ice during the hottest hours of the day.

35. Even when ice is available, the ice provided to inmates, including Plaintiffs, contains debris and is infested with insects.

**B.) Health Risks of Extreme Heat and Risk Management**

36. According to the National Weather Service, heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year. On average, heat kills more people than "floods, lightning, tornadoes, and hurricanes combined."

37. Research has shown that people with age over 60 years, obesity, hypertension, pulmonary or cardiovascular disease, or long-standing diabetes are at increased risk of heat-related illness – heat cramps, heat exhaustion, and heat stroke – during prolonged heat events. Other contributing factors include homebound lifestyle, lack of contact with other people, and decreased mobility. These conditions characterize daily life on Angola's Death Row.

38. Heat-related illnesses occur when the body's temperature control system is overloaded. On information and belief, the risk for heat-related illness increases significantly when temperatures exceed 90 degrees, especially with high relative humidity.

39. Persistent heat stress can lead to heat stroke, in which the body's internal temperature rapidly increases. Heat stroke can cause organ damage, neurological damage, permanent disability, and death.

40. It is rudimentary that measures taken to control climate conditions can alleviate the risks posed by extreme heat. Plaintiffs have little if any ability to control the climate conditions posed by the extreme heat they face each summer. Defendants have failed to address Plaintiffs' needs to control the climate conditions they face on the Death Row tier.

**C.) Plaintiffs' Medical Conditions and Interactions with Extreme Heat**

41. Plaintiffs all suffer from hypertension.

42. Hypertension, or high blood pressure, is a chronic medical condition in which the blood pressure in the arteries is elevated. The high pressure of blood flow on artery walls can cause serious damage. Hypertension is a major risk factor for stroke, heart attacks, heart failure, aortic aneurysms, and peripheral arterial disease, and is a cause of chronic kidney disease. It can also cause severe headaches, fatigue, obesity, and vision problems. Even moderate elevation of arterial blood pressure is associated with a shortened life expectancy.

43. Hypertension increases susceptibility to heat stress by overloading the cardiovascular system to a point where the heart is not able to circulate blood at the rate needed to keep the body cool. Subjecting hypertensive persons to extreme heat can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier.

44. The use of antihypertensive medications including diuretics, vasodilators, and beta-blockers is necessary to protect Plaintiffs' health from their disability.

45. The use of these medications can significantly reduce heat tolerance and predispose the person taking them to severe heat-related illness because they depress cardiac function and impair cardiac output, lessening the body's ability to regulate its temperature by circulating blood to the skin.

46. Diuretic medications also increase the risk of dehydration by causing increased urination and thereby quickening the body's loss of water, electrolytes, and essential salts. Individuals taking diuretic medications need greater access to clean drinking water during periods of extreme heat in order to maintain adequate hydration.

**D.) Plaintiff Ball's Health Risk Factors and the Impact of Extreme Heat**

7

47. Plaintiff Ball is 60 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as diabetes and obesity. These medical conditions increase Mr. Ball's vulnerability to the heat.

48. Diabetes is a metabolic disease. Diabetes causes increased urination, increased thirst and increased hunger. Absent adequate treatment, diabetes can lead to cardiovascular disease, renal failure and retinal damage.

49. Hypertension exacerbates the health risks associated with diabetes.

50. Diabetes makes Mr. Ball especially susceptible to dehydration, which is particularly dangerous during extreme heat because hydration is necessary to the body's internal temperature regulation.

51. Obesity is a medical condition characterized by the excessive accumulation of body fat. Lack of physical activity and a sedentary lifestyle can contribute to obesity by preventing the body from processing calories efficiently.

52. Obesity is a risk factor for heat stroke because obese individuals have more insulation and a lower surface-area-to-volume ratio, and therefore less capacity for dissipating heat.

53. While subjected to the extreme heat on Death Row, Mr. Ball experiences the symptoms of heat exhaustion, including dizziness and lightheadedness, headaches, blurred vision, chest pain, joint pain and stiffness, profuse sweating, and inability to sleep.

54. DOC has and continues to discriminate against Mr. Ball due to disability, including hypertension and diabetes, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Mr. Ball "access" to DOC facilities under federal disability law.

**E.) Plaintiff Code's Health Risk Factors and the Impact of Extreme Heat**

55. Plaintiff Code is 57 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as obesity and hepatitis. These medical conditions increase Mr. Code's vulnerability to the heat.

56. Obesity as a medical condition and heat risk factor is described above in paragraphs 51-52.

57. Hepatitis is a condition characterized by inflammation of the liver. Mr. Code treats his hepatitis with medicine.

58. While subjected to the extreme heat on Death Row, Mr. Code experiences symptoms of heat exhaustion including dizziness and lightheadedness, headaches, sensitivity to light, profuse

8

sweating, numbness in his hands, dehydration, loss of concentration, joint pain, and inability to sleep.

59. Defendant DOC has and continues to discriminate against Mr. Code due to disability, including hypertension and hepatitis, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Mr. Code "access" to DOC facilities under federal disability law.

**F.) Plaintiff Magee's Health Risk Factors and the Impact of Extreme Heat**

60. Plaintiff Magee is 35 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as high cholesterol and depression, for both of which he also takes medication.

61. These medical conditions and treatments increase Mr. Magee's vulnerability to the heat.

62. High cholesterol is a condition that increases the risk of cardiovascular disease through the thickening, narrowing or blocking of arteries. High cholesterol may exacerbate Mr. Magee's hypertensive symptoms.

63. Depression is a mood disorder characterized by profound feelings of sadness, lethargy and dread.

64. Mr. Magee treats his depression with medicine. On information and belief, this medicine that Mr. Magee must take because of his depression can exacerbate the negative psychological effects of the extreme heat conditions.

65. While subjected to the extreme heat on Death Row, Mr. Magee experiences symptoms of heat exhaustion including dizziness and lightheadedness, loss of appetite, inability to sleep, difficulty breathing, profuse sweating, weakness, nausea, anxiety, dehydration and loss of concentration.

66. DOC has and continues to discriminate against Plaintiff Magee due to disability, including hypertension, high cholesterol and depression, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Plaintiff Magee "access" to DOC facilities under federal disability law.

**CAUSES OF ACTION**

**I.    EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT**

(Against Defendants LeBlanc, Cain, and Norwood)

9

67. By subjecting Plaintiffs to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants LeBlanc, Cain, and Norwood are acting and have acted with deliberate indifference to Plaintiffs' serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

68. The extreme temperatures Defendants allow at Angola put Plaintiffs at a substantial risk of serious harm to their health and safety.

69. Plaintiffs bring these claims through 42 U.S.C. § 1983.

## II.    AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT

(Against Defendant DOC)

70. Defendant DOC has been, and is, a recipient of federal funds, and thus is covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

71. Further, Title II of the ADA, and the ADAAA, apply to DOC and have the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq.* (2008).

72. Angola is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs are otherwise qualified to participate in the programs and services at Angola on Death Row.

73. For purposes of the ADA, ADAAA, and Rehabilitation Act, Plaintiffs are qualified individuals regarded as having physiological impairments that substantially limit one or more of their major life activities. 42 U.S.C. § 12102. Defendant DOC knows Plaintiffs suffer from hypertension and, respectively, diabetes, hepatitis, and high cholesterol, and are prescribed medications including diuretics. Despite this knowledge, DOC officers have and continue to intentionally discriminate against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that put them at substantial risk of serious harm.

74. As alleged above, DOC has failed and refuses to reasonably accommodate Plaintiffs' disabilities while in custody, in violation of the ADA, ADAAA, and Rehabilitation Act. That failure and refusal put them at substantial risk of serious harm.

10

75. As alleged above, DOC has failed and refuses to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Plaintiffs' disabilities. These failures and refusals pose the risk of more-than-minimal injury.

## ATTORNEYS' FEES AND COSTS

76. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against DOC for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §§ 12205 and 1983.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A.  Order Defendants to abate the risk of serious harm described above by taking steps including but not limited to:

    a.  Maintaining a heat index along all Death Row tiers that does not exceed 88°F (calculated using the NOAA National Weather Service heat index table);

    b.  Providing clean, uncontaminated ice and drinking water at regular intervals during the summer months;

    c.  Providing shower water of a temperature that can reasonably provide relief.

B.  Enjoin Defendants and their staff from retaliating against Plaintiffs in any manner for filing this complaint;

C.  Grant declaratory and injunctive relief, as set out in this Complaint;

D.  Find that Plaintiffs are the prevailing party in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Respectfully submitted,

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative

11

636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org


Mitchell A. Kamin, Ca. Bar No. 202788 (*Pro Hac Vice* Pending)
Jessica C. Kornberg, Ca. Bar No. 264490 (*Pro Hac Vice* Pending)
Nilay U. Vora, Ca. Bar No. 268339 (*Pro Hac Vice* Pending)
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

12

Exhibit 2

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ELZIE BALL, ET AL.**                                          **CIVIL ACTION**

**VERSUS**

**JAMES M. LEBLANC, ET AL.**                              **NO.: 13-00368-BAJ-SCR**

### RULING AND ORDER

## I.    INTRODUCTION

On August 5, 2013, this matter came before the Court for a non-jury trial on the merits and a hearing on Plaintiffs' Motion for a Preliminary Injunction (Doc. 12).[1] Having considered the parties pretrial and post-trial submissions, the evidence introduced at the trial, and the arguments presented by counsel, the Court finds that Plaintiffs have satisfied their burden of proving that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution.   The Court finds, however, that Plaintiffs did not introduce sufficient evidence to establish that Defendants have violated the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.  Accordingly, Plaintiffs' request for declaratory and injunctive relief is **GRANTED IN PART** and **DENIED IN PART**, as

---

[1] The Court initially heard Plaintiffs' Motion for a Preliminary Injunction with oral argument on July 2, 2013.  (Doc. 24.)  At the conclusion of the hearing, the Court deferred its ruling on the motion, pending the collection of essential data by a neutral third-party expert, re-set the motion hearing to August 5, 2013, and set the trial on the merits to August 5, 2013.

outlined below.  Further, Plaintiffs' Motion for a Preliminary Injunction (Doc. 12) is

**DENIED AS MOOT**.[2]  The Court's credibility findings, findings of fact and conclusions

of law are set forth below, as required by Federal Rule of Civil Procedure ("Rule") 52(a).

## II.    JURISDICTION

It is uncontested that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343, and 2201.

## III.    BACKGROUND

### A.    Plaintiffs' Claims

Plaintiffs Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee

("Magee") (collectively "Plaintiffs") are death row inmates, who are currently

incarcerated at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").

Plaintiffs filed this lawsuit against Defendants James M. LeBlanc[3] ("LeBlanc"), Nathan

Burl Cain[4] ("Cain"), Angelia[5] Norwood[6] ("Norwood"), and the Louisiana Department of

---

[2] Whether to grant or deny a request for a preliminary injunction is within the sound discretion of the district court.  *See Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  However, the purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the Court's ability to render a meaningful decision on the merits.  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985) (citing *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)).  Because the Court now issues its ruling and order on the merits, a preliminary injunction is no longer necessary.  Therefore, Plaintiffs' request is denied as moot.

[3] Defendant LeBlanc is the Secretary of the Louisiana Department of Public Safety and Corrections. (Doc. 1, ¶ 10.)  LeBlanc is sued in his official capacity for declaratory and injunctive relief.

[4] Defendant Cain is the Warden of the Louisiana State Penitentiary in Angola, Louisiana.  (Doc. 1, ¶ 8.) Cain is sued in his official capacity for declaratory and injunctive relief.

[5] Plaintiffs identified Defendant Norwood as "Angela" in their complaint.  However, Defendant Norwood's testimony at trial was that her first name is spelled as above.

[6] Defendant Norwood is the Assistant Warden in charge of death row at the Louisiana State Penitentiary in Angola, Louisiana.  (Doc. 1, ¶ 9.)  Norwood is sued in her official capacity for declaratory and injunctive relief.

Public Safety and Corrections (collectively "Defendants") pursuant to 42 U.S.C. § 1983[7]

("Section 1983"); the Eighth Amendment to the United States Constitution, U.S. Const.

amend. VIII; Fourteenth Amendment to the United States Constitution, U.S. Const.

amend. XIV, § 1; Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

§ 12101, *et seq.*, as modified by the Americans with Disabilities Act Amendment Act

(the "ADAAA"), 42 U.S.C. § 12131, *et seq.*; and Section 504 of the Rehabilitation Act of

1973 (the "Rehabilitation Act"), 29 U.S.C. § 794.    (Doc. 1.)    Plaintiffs allege that

Defendants have violated, and continue to violate, their rights under the Eighth

Amendment, ADA, ADAAA, and Rehabilitation Act by subjecting them to excessive

heat, acting with deliberate indifference to their health and safety, and discriminating

against them on the basis of their disabilities.

Plaintiffs seek a ruling and order from this Court granting their Motion for a

Preliminary Injunction (Doc. 12), and requiring Defendants to take action to decrease

and maintain the heat index in the Angola death row tiers at or below 88 degrees

Fahrenheit.[8]    Plaintiffs further seek a ruling and order: (1) declaring that Defendants

---

[7] As discussed below, the gravamen of Plaintiffs' Section 1983 claim is that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment.

[8] Plaintiffs request that Defendants be required to decrease and maintain the heat index at or below 88 degrees Fahrenheit based on the recommendations of their expert, Dr. Susan Vassallo, M.D.:

| BY MR. KAMIN: | And do you have an opinion, Dr. Vassallo, on the heat index thresholds that you would recommend for creating a safer environment for the Plaintiffs on death row? |
|---|---|
| BY DR. VASSALLO: | Well, in my report, I have put that temperature at 88 degrees.  That is probably towards the warmer side . . . none of us would tolerate being in a setting at 88 degrees heat index . . . we would get out of that and we |

3

have violated Plaintiffs' rights; (2) requiring Defendants to develop and implement a long-term plan to maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (3) appointing a monitor to oversee Defendants' implementation of such plan; (4) requiring Defendants to provide Plaintiffs clean, uncontaminated ice and drinking water at regular intervals during the summer months; (5) requiring Defendants to lower the shower temperature during the summer months; and (6) enjoining Defendants from retaliating against Plaintiffs.[9]    Plaintiffs also seek attorneys' fees, pursuant to 42 U.S.C. §§ 1988 and 12205.

Defendants oppose Plaintiffs' Motion for a Preliminary Injunction and deny all liability. (Docs. 15, 38.)  Defendants contend that Plaintiffs have not suffered, nor are they likely to suffer, adverse health effects due to the conditions of confinement at Angola's death row facility.  Defendants further contend that they have not violated Plaintiffs' rights under the ADA, ADAAA, or Rehabilitation Act.  Thus, Defendants request that the Court deny Plaintiffs' motion, rule in Defendants' favor, and deny Plaintiffs all requested relief.

---

> would go into some cooler setting. . . . I derive[d] that based on the [National Oceanic and Atmospheric Administration] charts, as well as the literature, which I have at least five or six articles behind that statement, that show this sort of a U-shape that when it's 88, 90 degrees, the morbidity and mortality from heat rises exponentially.  And those are all [in] peer review scientific articles.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

[9] At the conclusion of the trial on the merits, the Court denied Plaintiffs' request that the Court enjoin Defendants from retaliating against Plaintiffs.  Trial Transcript, Aug. 7, 2013.  Accordingly, this request for injunctive relief was denied, as Plaintiffs failed to present evidence that Defendants were likely to retaliate against them.

## B.     Procedural History

The instant litigation was filed on June 10, 2013.  (Doc. 1.)  Eight days later, Plaintiffs filed a Motion for a Preliminary Injunction.  (Doc. 12.)

On July 2, 2013, Plaintiffs' Motion for a Preliminary Injunction was heard with oral argument.  (Doc. 24.)  After considering the parties' arguments, the Court determined that it was necessary to obtain current, accurate temperature, humidity, and heat index data from Angola's death row facility before ruling on Plaintiffs' motion. Accordingly, the Court deferred its ruling, pending the collection of such data by a neutral third-party expert.  (Doc. 24.)  The Court also issued a scheduling order, and set the trial on the merits to begin on August 5, 2013.  (Docs. 24, 28.)  Subsequently, the Court ordered the parties to retain a neutral third-party expert to install the necessary equipment, and record, collect, and disseminate the required data, beginning on July 15 and ending on August 5, 2013.  (Doc. 36.)

From August 5 through August 7, 2013, the Court conducted a hearing on Plaintiffs' Motion for a Preliminary Injunction and the trial on the merits. Fed.R.Civ.P. 65(a)(2).  During the trial, the parties jointly submitted the temperature, heat index, and humidity data collected and analyzed by the neutral third-party expert, United States Risk Management, L.L.C. ("USRM"), to the Court.  During the trial, the parties also presented testimonial evidence regarding the conditions at Angola's death row facility, and Plaintiffs' underlying medical conditions and medications.  Following the trial, the undersigned toured the death row facility and observed the conditions first-hand.  As a result, the Court makes the following

credibility findings, findings of fact, and conclusions of law.

## IV. CREDIBILITY FINDINGS

1.    "In a non-jury trial, credibility choices and the resolution of conflicting testimony

are the province of the judge, subject only to Rule 52(a)'s clearly erroneous standard."

*Justiss Oil, Co., Inc. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996)

(citation omitted); *Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995) ("The trial

judge's 'unique perspective to evaluate the witnesses and to consider the entire context

of the evidence must be respected.'") (citation omitted).

2.    In making its findings of fact, the undersigned relied on the parties' written

submissions, the oral testimony presented at trial, and the evidence introduced at trial.

Due to the number of disputed facts, it was necessary to consider the demeanor of each

witness, his or her interests in the case, and the internal consistency of his or her

testimony.  *See Justiss Oil*, 75 F.3d at 1067.

3.    The following are the Court's credibility findings as to Defendant Norwood.

4.    On July 15, 2013 at 4:45 p.m., Defendant Norwood issued an email to all of the

death row supervisors regarding the monitors that were installed in the death row

tiers by USRM.  Norwood's email ordered the following:

> In order to ensure accurate and consistent temperature recording,
> all fans and windows are not to be adjusted in any manner.  In addition,
> no offender and/or employee is to tamper with the recording devices
> placed on each tier.  Only authorized persons will be allowed inside the
> cells with the recording devices.

5.    Despite Norwood's issuance of the hold order, Defendants installed awnings over

the windows in tiers C and G on or about July 26, 2013.  Such awnings remained on

6

the windows from that date until the end of the data collection period.  Defendants also

attempted to wet and/or mist the ceiling and/or outside walls of certain housing tiers

using water hoses.  Defendants took such actions without seeking the permission of the

Court.

6.     When asked by counsel for Plaintiffs about her understanding as to the purpose

of the data collection, Norwood testified as follows:

> BY MR. VORA:          Ms. Norwood, what was your understanding as
>                       to why USRM was installing those monitors?
>
> BY MS. NORWOOD:       Because the Judge wants a fair and impartial,
>                       objective reading of the temperatures.
>
> BY MR. VORA:          And you understood that it was important for
>                       you to make sure that he did get fair and
>                       impartial readings of the temperatures inside
>                       of the death row tiers, correct?
>
> BY MS. NORWOOD:       Yes.
>
> BY MR. VORA:          In fact, you understood it and you even
>                       advised the other death row supervisors to
>                       ensure that the correctional officers also
>                       understood that they were to ensure that the
>                       Judge received fair and impartial numbers for
>                       the USRM monitors, correct?
>
> BY MS. NORWOOD:       Yes.
>
>                       . . .
>
> BY MR. VORA:          The reason that you asked for all the fans and
>                       windows not to be adjusted in any manner was
>                       to ensure, in your words, accurate and
>                       consistent temperature recordings, correct?
>
> BY MS. NORWOOD:       Yes.

7

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

7.    Later, Norwood testified that she understood that: (1) the data was being

collected pursuant to a court order; (2) she had an obligation to obey the Court's order;

and (3) she had an obligation not to engage in any actions that could possibly interfere

with the collection of such data.

> BY MR. VORA:        And you understand that the USRM data was
>                     also being collected pursuant to the Court's
>                     order, correct?
>
> BY MS. NORWOOD:      Yes.
>
> BY MR. VORA:        And you understood that you had a duty to
>                     obey the Court's order and to not engage in
>                     any action that might interfere with the
>                     Court's collection of that data, correct?
>
> BY MS. NORWOOD:      Yes.
>
>                     . . .
>
> BY MR. VORA:        You understood that the Court wanted
>                     accurate and consistent temperature
>                     recordings, correct?
>
> BY MS. NORWOOD:      Yes.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

8.    Despite this testimony, Norwood proceeded to testify that it "didn't occur" to her

that Defendants' installation of window awnings and use of "soaker" hoses might

interfere with the data collection.  Trial Transcript, Testimony of Angelia Norwood,

Aug. 5, 2013.

> BY MR. VORA:        . . . [D]id it ever cross your mind that the awnings
>                     might interfere with this Court's order that the

8

temperature be accurately consistently recorded and collected?

BY MS. NORWOOD:    No, it did not.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

9.    Norwood further added that she did not see a problem with Defendants' installation of the awnings or use of the "soaker" hoses. Thus, she did not question her superiors, nor did she attempt to prevent the installation or use of such devices, after Defendant Cain ordered the installation and use of such.

10.    Norwood's credibility was further undermined by her testimony that it "didn't occur" to her that Defendants' installation and use of such devices was inconsistent with her July 15, 2013 email. Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

11.    When questioned by the Court, Norwood testified as follows:

BY THE COURT:    . . . it didn't dawn on you that [Defendants'] activity was completely inconsistent with your email, the message in your email? . . . and now you are testifying - you're telling the Court that somehow you didn't think there was any problem with the installation, even after you issued this email message to all [of] the supervisors on death row? You saw nothing wrong, no problem with the installation of the awnings? You saw no problem with the use of the misters or soaker hoses or anything else? Is that what you are telling me?

BY MS. NORWOOD:    Yes, sir. It is.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

12.    When further questioned by the Court, Norwood testified that she did not

9

believe that the awnings or "soaker" hoses would affect the temperature readings.

13.     That testimony, however, was wholly inconsistent with Norwood's later testimony, in which she admitted that the *purpose* of the awnings and "soaker" hoses was to attempt to lower the temperatures inside the death row housing tiers:

| | |
|---|---|
| BY MR. VORA: | Why were the awnings installed on the death row tiers? |
| BY MS. NORWOOD: | To see if it would make a difference as far as providing shade over the windows, to see if it would cool - to see if it would make a difference, as far as the temperature, to bring it down. |
| | . . . |
| BY MR. VORA: | Are you ever in a position to ask Warden Venoit questions? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | Did you ask him whether installing soaker hoses would affect the gathering of the data consistently and accurately pursuant to this Court's order? |
| BY MS. NORWOOD: | Not in so many words. |
| BY MR. VORA: | Did you ask him in any words? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | What did you ask him? |
| BY MS. NORWOOD: | I asked him if he seriously thought that wetting the outside of that building would impact the interior temperature. |
| BY MR. VORA: | Why did you ask him about impacting the interior temperature, but you didn't ask him |

about whether or not that would be consistent with this Court's order that accurate and consistent data be recorded?

BY MS. NORWOOD:     It didn't occur to me.

. . .

BY MR. VORA:     But your understanding as to why any of these actions with respect to soaker hoses or awnings, your understanding was that it was in order to further the settlement, correct?

BY MS. NORWOOD:     No.

BY MR. VORA:     What was your understanding as to why that was happening?

BY MS. NORWOOD:     My understanding was to - to see if there was anything that would work to reduce the temperature.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

14.     As highlighted above, Norwood's testimony was illogical and riddled with contradictions and inconsistencies.  For example, despite instructing her subordinates to not tamper with the tier windows "to ensure accurate and consistent temperature recording[s]," Norwood attempted to convince the Court that it "didn't occur" to her that Defendants' installation of the window awnings and use of "soaker" hoses may interfere with the data collection.

15.     In another example, Norwood testified that she understood that the purpose of the twenty-one day data collection period was to collect accurate and consistent data.  Yet, she testified that she never questioned Defendants' attempts to alter the temperature, and thus, the data.

16.    In another example, despite testifying that it "didn't occur" to her that Defendants' actions may alter the temperature, and thus, the data, Norwood subsequently testified that the *purpose* of the window awnings and "soaker" hoses was to alter the temperature inside the death row tiers.

17.    In sum, the Court finds that Norwood's testimony on this issue lacked the ring of truth.  Accordingly, this Court does not consider Norwood to be a credible witness, particularly as it relates to Defendants' actions during the data collection period. Accordingly, Norwood's testimony regarding Defendants' actions during the data collection period were not relied on by the undersigned.

## V.    FINDINGS OF FACT

The following findings of fact are uncontroverted or supported by the evidence in the record.  Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

### A.    Angola's Death Row

1.    In 2006, the Louisiana Department of Public Safety and Corrections constructed a new facility at Angola to house inmates who have been sentenced to death ("death row" or "death row facility").  The 25,000 square foot death row facility features four housing wings, each of which contains two housing tiers; (2) administrative offices; (3) visitation rooms; (4) a medical clinic; (5) a dental clinic; (6) a control center where the correctional officers are stationed; and (7) an execution chamber.  Air conditioning is provided in the administrative offices, visitation rooms, medical clinic, dental clinic,

12

control center, and execution chamber.  Air conditioning is not provided in the tiers where the inmates are housed.

2.    Each of the four housing wings extend from the control center like spokes on a wheel.  Each wing contains two housing tiers, for a total of eight tiers.  Each tier is assigned a letter name: A, B, C, D, E, F, G, and H.  Currently, only tiers A, B, C, F, G, and H house death row inmates.

3.    Between the housing tiers, which sit back-to-back, are a series of pipes, in which are encased the plumbing, electrical wires, and duct work for the entire wing.

4.    Each tier contains between twelve and sixteen cells, which house one inmate each, and a tier walkway.  Tiers A, B, G, and H contain sixteen cells.  Tier C contains twelve cells.  Tier F contains fourteen cells.

5.    The ceiling, floor, and walls of each housing tier are made of concrete.  Similarly, the ceiling, floor, and walls of each inmate cell are made of concrete.

6.    Each inmate cell is separated from the tier walkway by metal security bars.

7.    Approximately nine feet across from the security bars are louver windows.  The record is unclear as to how many windows are in each housing tier.  However, the record indicates that each window measures approximately two feet wide by four feet tall.

8.    Each louver window is comprised of a screen and a series of translucent, sloping, overlapping blades or slats that may be adjusted to admit varying degrees of air or

13

light.[10]  Like most louver windows, the windows do not open in the traditional method.

Rather, to open the window, one must tilt or adjust the horizontal louvers by using a

handle.  The maximum degree to which the louvers may be tilted is approximately

forty-five degrees.

9.      Above the windows are non-oscillating mounted fans that measure thirty inches

in width.[11]  Each fan is shared by two inmates (i.e., the fan services two cells).[12]  The

uncontroverted testimony at trial was that the mounted fans were not a part of the

original construction.  Rather, they were added to the death row tiers at a later date.

10.     Death row inmates are required to remain in their cells twenty-three hours a

day.

11.     Each cell includes a sink, mirror, toilet, bed, desk, and chair.  There are no

windows or fans inside the cells.  Rather, each cell contains a vent, measuring

approximately six inches by eight inches, through which air from the window on the

other side of the tier is drawn into the cell, and then into the vent, and then into the

housing wing's exhaust system, and then to the outside.

12.     During the one hour period in which inmates are permitted to leave their cells,

inmates may engage in outdoor recreation in the recreation cage[13], or spend time in the

tier walkway ("tier time"), and/or take a shower.

---

[10] It is not clear from the record whether the louvers are made of plastic, glass, or another material.

[11] The parties stipulated to the width of the death row fans.  (Doc. 70.)

[12] Mounted above the windows are televisions, which are also shared by two inmates (i.e., the television services two cells).

[13] Inmates are permitted to engage in outdoor recreation only four times per week.

14

13.     Each tier has two shower stalls, one standard shower and one handicap accessible shower.  Inmates are permitted one shower per day.  The shower water temperature is maintained between 100 and 120 degrees.[14]

14.     Each housing tier also has a portable, forty-eight ounce or sixty-eight ounce chest cooler ("ice chest") where Angola staff place ice from the death row facility's only ice machine.  The ice chest is located in the tier walkway, at the entrance of the tier. Inmates are permitted access to the ice chest during their tier time only.  Thus, during the twenty-three hours in which the inmates are confined to their cells, they do not have direct access to the ice chest.

15.     Ice is not usually distributed to the inmates by the correctional officers.  Indeed, the correctional officers are not required, and sometimes decline requests from the inmates, to distribute ice to the inmates.[15]  Rather, although they are not required to do so, the inmates who are on tier time usually distribute ice to the inmates who are confined to their cells.  As a result, the inmates who are confined to their cells must rely on other inmates to distribute ice to them during each respective inmate's tier time.

16.     If an inmate chooses to engage in outdoor recreation rather than tier time, or refuses to distribute ice to inmates who are confined to their cell, then the confined inmates do not receive ice during that hour.  Further, if an inmate exhibits habits that

---

[14] The uncontroverted testimony at trial is that the shower water temperature is required to range between 100 and 120 degrees to promote hygienic practices.

[15] During the trial, Defendant Norwood testified that "offender orderlies who are assigned to work death row" "are allowed" to distribute ice to the death row inmates, but only "if it is asked of them" by a correctional officer.  Trial Transcript, Testimony of Angelia Norwood, Aug. 7, 2013.

15

the other inmates consider to be unsanitary, the other inmates will not ask such inmate to distribute ice during his tier time.  As a result, inmates who are confined to their cells do not receive ice during that hour, unless the correctional officers agree to provide it.

17.     Inmates also do not have access to the ice chest during the overnight hours, during which the death row tiers are locked down.[16]  Further, it is uncontroverted that, over the course of a day, the ice in the ice chests, as well as the ice in the facilities' only ice machine, frequently runs out.[17]

18.     While Angola's death row has a facility-wide heating system, none of the housing wings include a mechanical cooling system by which the dry bulb[18] (i.e. ambient temperature) ("temperature"), humidity level[19], or heat index[20] can be lowered.

---

[16] The uncontroverted testimony at trial was that the housing tiers are placed on lock down beginning at 10:30 or 11:00 p.m.  It is not clear from the record what time the housing tiers are re-opened each morning.

[17] During the Court's site visit, Defendants contended that when the ice in the death row facility's only ice machine runs out, the correctional officers retrieve ice from the ice machines in a nearby housing unit.

[18] The dry bulb temperature is the temperature indicated by a dry-bulb thermometer that is the actual temperature of the air.  Merriam-Webster Dictionary (11th ed. 2009).

[19] Relative humidity is a dimensionless ratio, expressed in percent, of the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated.  National Weather Service Glossary, http://forecast.weather.gov/glossary.php (last visited Dec. 17, 2013) [hereinafter "NWS Glossary"].

[20] The heat index, or the "apparent temperature," is an accurate measure of how hot it really feels when relative humidity is factored with the actual air temperature.  NWS Glossary, *supra* note 19.

16

19.    It is uncontroverted that the housing wings were designed without a mechanical

cooling system.  Instead, each wing features a ventilation system that consists of the

above-mentioned windows and cell vents, as testified to by witness Frank Thompson.[21]

> BY MS. COMPA:              Is there any mechanism on the death row tiers
>                            to lower the temperature or humidity?
>
> BY MR. THOMPSON:           No.  Just ventilation.
>
> BY MS. COMPA:              What  is  the  relationship between the
>                            temperature and the humidity outside and the
>                            temperature  and  humidity inside the death
>                            row tiers?
>
> BY MR. THOMPSON:           The ventilation brings the air in from the back
>                            of the cells through the windows, across the -
>                            across the way - from the windows into the
>                            exhaust grill that's in the back of the cell.  So,
>                            it just brings it in from the outside.  So
>                            basically, you're using the outside air to cool or
>                            ventilate the space.

Trial Transcript, Testimony of Frank Thompson, Aug. 5, 2013.

20.    It is also uncontroverted that the ventilation system does not reduce the

temperature, humidity level, or heat index in the housing tiers.  Thus, there is no

system that will lower or limit the temperature, humidity level, or heat index in the

tiers.

> BY MS. COMPA:              And would it be any cooler inside than it is
>                            outside?
>
> BY MR. THOMPSON:           No. You would reach about the temperature in
>                            the shade would be your goal.

---

[21] During the trial, Thompson testified that his firm, Thompson, Luke & Associates, oversaw the
construction of the death row facility.

17

| BY MS. COMPA: | And humidity wise, is that also true? |
| BY MR. THOMPSON: | Humidity is similar. |
| BY MS. COMPA: | And, to your knowledge, is there an upper limit to how hot it can become on the death row tiers temperature wise? |
| BY MR. THOMPSON: | It's subject to what's outside, the outside temperature. |

Trial Transcript, Testimony of Frank Thompson, Aug. 5, 2013.

### B.    Plaintiff Elzie Ball

21.    Plaintiff Ball is sixty years old.  He has been on death row for sixteen years.

Currently, Ball lives in tier H, cell 5.[22]

22.    It is uncontroverted that Ball suffers from hypertension, diabetes, and obesity.

To treat his hypertension and diabetes, Ball takes a variety of medications that make

him more susceptible to heat-related illness.[23]

23.    It is also uncontroverted that Ball's blood pressure is uncontrolled, and that it

spikes during the summer months.  It is further uncontroverted that Defendants' staff

physician, Dr. Hal David Macmurdo, M.D. ("Macmurdo") is of the opinion that "[s]ooner

or later" Ball is "going to stroke out."  Trial Transcript, Testimony of Elzie Ball, Aug.

5, 2013.

---

[22] Ball testified that he has also lived in tiers C, F, and G.

[23] Specifically, Ball takes the following medications on a daily basis: Insulin, Glyburide (brand name: Micronase®), Meteformin Hydrochloride, Simvastatin (brand name: Zocor®), Amlodipine (brand name: Norvasc®), Clonidine (brand name: Catapres®), Losartan Potassium (brand name: Cozaar®), Furosemide (brand name: Lasix®), and Atenolol (brand name: Tenormin®).  Plaintiffs' expert, Dr. Susan Vassallo, M.D.'s uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat."  As it relates to Ball, Dr. Vassallo testified that his medication "impairs the ability of the body to cool."  Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

24.     During the trial, Ball also testified that the heat conditions in death row cause him to experience profuse sweating, swelling of his joints, hands, ankles, and keloids[24], tingling in his hands and feet, dizziness, lightheadedness, and headaches.  Ball further testified that it is difficult to sleep at night due to the heat in the housing tier.

25.     According to Ball, he copes with the heat by drinking water, lying on the cell floor, creating "cool towels" by wetting his towels or wrapping them in ice, and taking off his shirt.

26.     Ball testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

27.     Ball also testified that the lukewarm sink water, warm showers, and fans do not provide significant relief from the heat.

28.     Ball's uncontroverted testimony was that the mounted fans occasionally break, and are not always immediately fixed by Angola's maintenance staff.

### C.     Plaintiff Nathaniel Code

29.     Plaintiff Code is fifty-seven years old.  He has been on death row for twenty-two years.  Code currently lives in tier H, cell 16.[25]

---

[24] Ball testified that he has keloid scars that become inflamed and painful due to the heat.

[25] Code testified that he also lived in tier F and tier C.

30.     It is uncontroverted that Code suffers from hypertension, obesity and hepatitis. To treat his hypertension, Code takes a number of medications that make him more susceptible to heat-related illness.[26]

31.     During the trial, Code testified that during the summer months he "languishes" in the heat from sunrise until approximately 2:00 a.m. when the tier cools down. According to Code, he is subjected to direct sunlight through the window across from his cell, which prevents him from getting relief from the heat.

32.     During the trial, Code testified that he avoids overheating by lying as still as possible. However, he must avoid lying in one position for too long to prevent that part of his body from getting too hot.

33.     Code also testified that the heat causes him to sweat profusely, feel dizzy and light-headed, and experience headaches. He further testified that the heat conditions disturb his sleep patterns and disorient him, causing him to forget where he placed objects inside his cell. The heat conditions also cause Code to experience a "wave" over his body, which he described as a tingling sensation that moves from his feet to his head.

34.     Code testified that he copes with the heat by wearing light clothing, drinking water, and creating "cool towels" by wrapping ice into his towels.

_____

[26] Specifically, Code takes the following medications on a daily basis: Losartan Potassium (brand name: Cozaar®), Hydrochlorothiazide, and Amlodipine (brand name: Norvasc®). Dr. Vassallo's uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat." As it relates to Code, Dr. Vassallo testified that his medications also impair his body's ability to cool." Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

35.    Code testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined to his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

36.    According to Code, the lukewarm sink water, warm showers, and fans do not provide adequate relief from the heat.

37.    He further testified that the vent in his cell does not work, and that Angola's maintenance staff has yet to repair it.    This testimony was not contested by Defendants.

38.    According to Code, the only time he has access to air conditioned areas is when he has an attorney visit, personal visit, or when he goes to the doctor.  He testified that he goes to the doctor or has an attorney or personal visit only once every two months:

> BY MS. MONTAGNES:  . . . Any visits outside of the tier.  How long between vists?
>
> BY MR. CODE:       Oh, okay.  It's at least two months between any of those.  Even if I get some of all of them, some personal visits, doctor visits, and attorney visits, it's at least two months between them.  I can't think of any of them being close[r] than two months.

Trial Transcript, Testimony of Nathaniel Code, Aug. 5, 2013.

### D.    Plaintiff James Magee

39.    Plaintiff Magee is thirty-five years old.  He has been on death row for three years.  Magee lives in tier A, cell 13.[27]

---

[27] Magee also testified that he has also lived in tier C.

21

40.     It is uncontroverted that Magee suffers from hypertension, high cholesterol, and depression.  To treat his hypertension, high cholesterol, and depression, Magee takes a variety of medications that make him more susceptible to heat-related illnesses.[28]

41.     During the trial, Magee described his housing conditions as a "sauna" in the morning and an "oven" in the afternoon.  According to Magee, during the summer months, he is often hot and sweaty, experiences headaches, nausea, dizziness, light-headedness, and has difficulty breathing and sleeping.

42.     Magee testified that he tries to cope with the heat by wetting his t-shirt with the water from his cell sink, standing close to cell bars to get air from the mounted fan, and creating "cool towels."  He further testified that he attempts to cool down his cell by wiping the cell walls and floor with "cool towels."

43.     Magee testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined to his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

44.     Magee further testified that the lukewarm sink water, warm showers, and fans do not provide relief from the heat.

---

[28] Specifically, Magee takes the following medications on a daily basis: Amlodipine (brand name: Norvasc®), Clonidine (brand name: Catapres®), Cholestyramine, Fluoxetine (brand name: Prozac®) and Mirtazapine (brand name: Remeron®).  Dr. Vassallo's uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat."  As it relates to Magee, Dr. Vassallo testified that his medication "affects his body's ability to adjust to and tolerate the heat."  Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

### E.    The Data Collected by United States Risk Management

45.    Neither the United States Court of Appeals for the Fifth Circuit, nor any other federal court of appeals, has established a constitutionally precise temperature, humidity level, or heat index that may constitute cruel and unusual punishment, in violation of the Eighth Amendment.  Thus, this Court, like other courts, is left to establish the temperature, humidity level, heat index, and/or physical and/or medical conditions at which there has been a violation of Plaintiffs' constitutional rights.  Accordingly, the Court required the parties' to retain a neutral third-party expert to collect, analyze, and disseminate temperature, humidity, and heat index data for a period of twenty-one days.  The following is a summary of the data, which shall serve as the foundation of the Court's conclusions of law.

### 1.    The Data Collection Period

46.    On July 12, 2013, the Court ordered the parties to retain neutral third-party expert, United States Risk Management, L.L.C. ("USRM") to collect temperature and humidity data, and calculate the heat index in the death row tiers for exactly twenty-one days.[29]  (Docs. 36, 24.)  Immediately thereafter, USRM installed seven 3M QUESTemp° 46 Waterless Heat Stress Monitors in tiers A, B, C, F, G, and H.  USRM also installed an external weather station outside of the death row tiers to capture

---

[29] The Court also ordered the parties to collect the wetbulb globe temperature.  The wetbulb globe temperature ("WBGT") is a measure of heat stress in direct sunlight which takes into account temperature, humidity, wind speed, sun angle and cloud cover (solar radiation).  This differs from the heat index, which takes into consideration temperature and humidity and is calculated for shady areas.  Military agencies and the Occupational Safety Health Administration use the WBGT as a guide to managing workload in direct sunlight.  *WetBulb Globe Temperature*, National Weather Service Weather Forecast Office, http://www.srh.noaa.gov/tsa/?n=wbgt (last visited Dec. 17, 2013).  Although wetbulb globe temperature data was provided to the Court, it was not used in the Court's analysis.

23

external "weather link" data.  The USRM monitors collected data inside each of the six tiers, and outside, once per hour from July 15, 2013 through August 5, 2013 ("the data collection period").

47.     The data collected by USRM established that while the temperature, humidity, and heat index in each tier varied from day-to-day, the heat index in all of the tiers exceeded 104 degrees[30] at various times during the data collection period.

48.     Further, the data collected by USRM established that the temperature, humidity, and heat index *inside* the death row tiers were, more often than not, the same or *higher* than the temperature, humidity, and heat index recorded *outside* of the death row tiers.

### 2.     Tier A

49.     The data collected in tier A proved to be slightly less extreme than the other tiers.  However, the temperature, humidity, and heat index data recorded in tier A nonetheless presented an alarming trend.

50.     The first reading was taken on July 15, 2013 at 2:45 p.m.[31]  At that time, the monitor recorded a temperature of 84 degrees and a heat index of 89 degrees.[32]

---

[30] All temperature and heat index measurements herein are presented in degrees Fahrenheit.

[31] One monitor was installed in cell 11 of tier A.

[32] Hereinafter, "heat indices" shall refer to multiple heat index recordings.  The Court also notes that some temperatures and heat indices were recorded and produced as round numbers, while other were recorded as numbers with one or two decimal points.  All temperatures and heat indices presented herein are described in the same manner as produced by USRM.

24

51.     During the data collection period, the lowest recorded temperature was 80.42 degrees[33] while the highest recorded temperature was 90.68 degrees.[34]  In contrast, the lowest recorded heat index was 84.2 degrees[35] while the highest recorded heat index was 104.54 degrees.[36]

52.     On each day of the collection period, the heat index rose to 92 degrees or higher.  In other words, on every single day during the collection period, inmates housed in tier A were subjected to heat indices in the National Oceanic and Atmospheric Administration's ("NOAA") National Weather Service's ("NWS") "extreme caution" zone or higher.[37]  *See* Exhibit 1.

53.     Notably, the heat index in tier A was recorded at 100 degrees or higher on five days: July 29, July 30, August 2, August 3, and August 4, 2013.  Such heat indices are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

54.     Data from tier A also showed high heat indices for extended periods of time.  For example, on August 3, 2013, the heat index remained between 99.5 and 102.02 degrees for thirteen hours, or from 9:13 a.m. to 10:13 p.m.

---

[33] This temperature was recorded on July 20, 2013 at 5:17 a.m.

[34] This temperature was recorded on August 4, 2013 from 4:59 to 6:59 p.m.

[35] This heat index was also recorded on July 20, 2013 at 5:17 a.m.

[36] This heat index was recorded on August 2, 2013 at 7:13 p.m.

[37] The NWS defines heat index as "how hot weather 'feels' to the body." *Heat: A Major Killer*, NWS Office of Climate, Water, and Weather Services, http://www.nws.noaa.gov/om/heat/index.shtml (last visited Dec. 17, 2013) [hereinafter *Heat: A Major Killer*].  The NWS's Heat Index Chart uses relative humidity and air temperature to produce the "apparent temperature" or the temperature the body "feels."  According to the NWS, "[t]hese values are for shady location only.  Exposure to full sunshine can increase heat index values by up to 15 [Fahrenheit].  Also, strong winds, particularly with very hot, dry air, can be extremely hazardous as the wind adds heat to the body." *Id.*

25

55.    As noted above, the highest heat index (104.54 degrees) was recorded on August 2, 2013.  On that day, from 11:13 a.m. to 11:13 p.m., the following heat indices were consecutively recorded: 99.5, 100.4, 100.94, 101.48, 102.92, 100.4, 101.84, 102.92, 104.54, 104, 103.46, 101.48, 101.3, all of which are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

56.    In sum, based on the data collected in tier A, the Court concludes that the inmates housed in this tier were consistently subjected to heat indices in the NWS's "extreme caution" and "danger" zones, which, according to the NWS, "may cause increasingly severe heat disorders with continued exposure or physical activity."[38]  *See* Exhibit 1.

### 3.    Tier B

57.    The data collected in tier B reflected *higher* temperatures and heat indices than in tier A.  The first reading in tier B was taken on July 15, 2013 at 2:56 p.m.[39]  At that time, the recorded temperature was 83.6 degrees and the heat index was 90 degrees.

58.    During the data collection period, the lowest recorded temperature was 79.52 degrees[40] while the highest recorded temperature was 90.68 degrees.[41]  In contrast, the

---

[38] *Heat: A Major Killer*, *supra* note 37.

[39] One monitor was installed in cell 8 of tier B.

[40] This temperature was recorded on July 19, 2013 at 6:03 a.m. and again at 7:03 a.m., and on July 20, 2013 a 7:03 a.m.

[41] This temperature was recorded on August 2, 2013 at 4:50 p.m. and again at 5:50 p.m., and again on August 4, 2013 at 6:04 p.m.

lowest recorded heat index was 83.84 degrees[42] while the highest recorded heat index was 109.94 degrees.[43]

59.    On each day of the collection period, the heat index rose to 92 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier B were subjected to heat indices in the NWS's "extreme caution" zone or higher. *See* Exhibit 1.

60.    Indeed, the heat index in tier B was recorded at 100 degrees or higher on ten days: July 22, July 24, July 28, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.  Such heat indices are in the NWS's "extreme caution" and "danger" zones. *See* Exhibit 1.

61.    High heat indices for extended periods of time were typical in tier B.  For example, on July 29, 2013, the heat index remained between 98.24 and 102.2 degrees for eights hours, or from 1:23 p.m. to 9:23 p.m.  On July 30, 2013, the heat index remained between 99.14 and 103.28 degrees for nine hours, or from 11:23 a.m. to 8:51 p.m.  On August 1, 2013, the heat index remained between 100.4 and 103.82 degrees for eleven hours, or from 11:51 a.m. to 10:51 p.m.  On August 3, the heat index remained between 100.4 and 105.08 degrees for thirteen hours, or from 8:50 a.m. to 9:50 p.m.

62.    As noted above, the highest heat index (109.94 degrees) was recorded on August 2, 2013.  Indeed, one of the longest periods of heat indices reaching 100 degrees or

---

[42] This heat index was recorded on July 26, 2013 at 6:43 p.m.

[43] This heat index was recorded on August 2, 2013 at 7:50 p.m.

above was recorded on that day. Specifically, from 11:50 a.m. to 11:50 p.m., the following heat indices were consecutively recorded: 103.82; 104.54; 101.48; 105.8; 102.92; 102.92; 105.08; 107.42; 109.94; 104.36; 102.2; 102.2; and 103.28.

63.    Based on the data collected in tier B, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.

### 4.    Tier C

64.    The data collected in tier C reflected *higher* temperatures and heat indices than in any of the other tiers. The first reading was taken on July 15, 2013 at 3:05 p.m.[44] At that time, the recorded temperature was 86.4 degrees and the heat index was 92 degrees.

65.    During the data collection period, the lowest recorded temperature was 85.1 degrees[45] while the highest recorded temperature was 92.12 degrees.[46] In contrast, the lowest recorded heat index was 89.96 degrees[47] while the highest recorded heat index was 110.3 degrees[48], which is well within the NWS's "danger" zone. *See* Exhibit 1.

---

[44] One monitor was installed in cell 11 of tier C.

[45] This temperature was recorded on July 20, 2013 at 6:34 a.m., and again at 7:34 a.m.

[46] This temperature was recorded on August 4, 2013 at 6:22 p.m., and again at 7:22 p.m.

[47] This heat index was also recorded on July 20, 2013 at 4:34 a.m.

[48] This heat index was recorded on August 2, 2013 at 7:38 p.m., and again at 8:38 p.m.

28

66.    The data shows that the heat index in tier C rose to, and remained above, 100 degrees for two or more hours on thirteen of the twenty-one days in the collection period.

67.    The Court also notes that, despite Defendants' installation of awnings over the windows in tier C on or about July 26, 2013, the most alarming heat index figures were recorded between July 29 and August 5, 2013.  For example, on July 29, the heat index remained between 99.32 and 103.46 degrees for ten hours, or from 1:16 p.m. to 11:16 p.m.  On July 30, the heat index remained between 100.4 and 107.42 degrees for ten hours, or from 1:16 p.m. to 11:58 p.m.  On August 1, 2013, the heat index remained between 100.04 and 106.88 degrees for fifteen consecutive hours, or from 8:58 a.m. to 11:58 p.m.  The Court notes that, but for the awnings installed by Defendants over the windows in tier C, the heat indices recorded in tier C may have been higher.

68.    As noted above, the highest heat index (110.3 degrees) was recorded on August 2, 2013.  On that day, the heat index remained at 100 degrees or above for fifteen hours, or from 8:58 a.m. to 11:38 p.m.

69.    Further, the data shows that the heat index in tier C did not drop below 100 degrees from August 3 through August 5, 2013.  For example, on August 3, 2013, from 12:38 a.m. to 11:38 p.m., the following heat indices were consecutively recorded: 106.16, 106.16, 105.08, 104.54, 105.08, 104.54, 104, 102.56, 105.8, 105.8, 105.8, 104, 102.92, 102.56, 105.08, 104.54, 105.08, 107.24, 106.52, 108.32, 109.76, 105.62, 105.08, and 104.

Case 3:13-cv-00368-BAJ-SCR    Document 87    12/19/13    Page 29 of 102

70.    This 100+ degree heat index trend continued until the last reading on August 5, 2013 at 12:22 p.m.

71.    By comparison, on August 3, 2013 from 12:30 a.m. to 11:30 p.m., the following heat indices were recorded by the outside weather monitor: 93.4, 92.4, 90.6, 88.5, 87.6, 86.4, 82.9, 83.6, 92.6, 98.4, 98.8, 104.3, 105.5, 105.2, 110.6, 110.8, 109.2, 109.5, 108.7, 104.7, 95.3, 89.3, 86.4, and 84.3.

72.    This data established that there were multiple, consecutive hours during which inmates housed in tier C were subjected to heat indices up to twenty degrees higher than *outside* the housing tier.

73.    Based on the data collected in tier C, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.  The Court also concludes that inmates housed in tier C were subjected to heat indices up to twenty degrees higher than the heat indices recorded outside the housing tier.

### 5.    Tier F

74.    The first reading in tier F was taken on July 15, 2013 at 3:14 p.m.[49]  At that time, the recorded temperature was 81.8 degrees and the heat index was 87 degrees.

---

[49] One monitor was installed in cell 6 of tier F.

30

75. During the data collection period, the lowest recorded temperature was 80.2 degrees[50] while the highest recorded temperature was 91.04 degrees.[51] In contrast, the lowest recorded heat index was 85 degrees[52] while the highest recorded heat index was 106.16 degrees.[53]

76. On each day of the collection period, the heat index rose to 92 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier F were subjected to heat indices in the NWS's "extreme caution" zone or higher. *See* Exhibit 1.

77. Notably, the heat index in tier F was recorded at 100 degrees or higher on eight days: July 17, July 29, July 30, July 31, August 1, August 2, August 3, and August 4, 2013. Such heat indices are in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.

78. Like the data collected from the other death row tiers, the data collected from tier F showed high heat indices for extended periods of time. For example, on August 1, 2013, the heat index remained between 100.4 and 105.62 degrees for eight hours, or from 2:15 p.m. to 10:15 p.m. On August 4, 2013, the heat index remained between 101.3 and 104.54 degrees for 8 hours, or from 12:17 p.m. to 7:17 p.m. On August 3,

---

[50] This temperature was recorded on July 18, 2013 at 7:14 a.m.

[51] This temperature was recorded on August 4, 2013 at 5:17 p.m.

[52] This heat index was recorded on July 16, 2013 from 3:14 a.m. to 7:14 a.m., and again on July 18, 2013 from 4:14 a.m. to 7:14 a.m.

[53] This heat index was recorded on August 2, 2013 at 7:32 p.m.

31

2013, the heat index remained between 99.86 and 105.08 degrees for 12 hours, or from 9:32 a.m. to 9:32 p.m.

79.     As noted above, the highest heat index (106.16 degrees) was recorded on August 2, 2013.  The Court notes that one of the longest periods of heat indices reaching 100 degrees or above was also recorded on this day.  Specifically, from 11:32 a.m. to 11:32 p.m., the following heat indices were consecutively recorded: 101.84, 102.74, 101.3, 103.46, 102.38, 100.94, 102.92, 102.92, 106.16, 103.82, 102.2, 101.3, 102.74.  All of which are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

80.     Based on the data collected in tier F, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

### 6.     Tier G

81.     In their submissions to the Court and during the trial on the merits, Plaintiffs argued that the heat indices in cells closest to the tier entrance are lower than the heat indices in cells at the rear of the tier, or furthest from the tier entrance.  Thus, Plaintiffs allege that inmates who are assigned to cells at the rear of the tier are subjected to more extreme conditions of confinement than inmates who are assigned to cells that are close to the tier entrance.

82.     To determine whether Plaintiffs' allegations have merit, two monitors were placed in tier G: one approximately halfway down the tier in cell 8, and one at the very rear of the tier in cell 16.

32

83.    The data collected in both cells revealed an appreciable difference in the recorded temperatures and heat indices in cell 8 versus cell 16.

84.    The first reading in cell 8 was taken on July 15, 2013 at 3:25 p.m.  At that time, the recorded temperature was 86.4 degrees and the heat index was 91.4 degrees.  For reasons that are unknown to the Court, the first reading was not taken in cell 16 until three days later, on July 18, 2013.

85.    During the data collection period, the lowest recorded temperature in cell 8 was 80.06 degrees[54] while the highest recorded temperature was 91.04 degrees.[55]  In contrast, the lowest recorded temperature in cell 16 was 85.46 degrees[56] while the highest recorded temperature was 91.58 degrees.[57]

86.    The lowest recorded heat index in cell 8 was 84.02 degrees[58] while the highest recorded heat index was 107.42 degrees.[59]  In contrast, the lowest recorded heat index in cell 16 was 91.22 degrees[60] while the highest recorded heat index was 110.3 degrees.[61]

---

[54] This temperature was recorded on July 20, 2013 at 5:14 a.m.

[55] This temperature was recorded on August 4, 2013 at 5:11 p.m., and again at 6:11 p.m.

[56] This temperature was recorded on July 19, 2013 at 7:26 a.m.

[57] This temperature was recorded on August 3, 2013 at 6:25 p.m., 7:25 p.m., and 8:25 p.m.  This temperature was also recorded on August 4, 2013 at 5:13 p.m., 6:13 p.m., and 7:13 p.m.

[58] This heat index was recorded on July 19, 2013 at 6:14 a.m.

[59] This heat index was recorded on August 2, 2013 at 12:21 p.m.

[60] This heat index was recorded on July 19, 2013 at 3:26 a.m. and 4:26 a.m.

[61] This heat index was recorded on August 3, 2013 at 8:25 p.m.

33

87.    On each day of the collection period, the heat index rose to 93.2 degrees or higher in cell 8, and 96.44 degrees or higher in cell 16.  In other words, on every single day during the collection period, inmates housed nearer to and furthest from the tier entrance were subjected to heat indices in the NWS's "extreme caution" zone or higher. *See* Exhibit 1.

88.    However, as noted below, the data shows consistently higher heat indices in cell 16, as compared to cell 8.

89.    According to the data collected by USRM, the heat index rose to 100 degrees or above in cell 8 on twelve days: July 22, July 23, July 24, July 26, July 29, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.

90.    The data also established high heat indices for extended periods of time in cell 8.  For example, on August 2, 2013, the heat index remained between 101.84 and 107.42 degrees for twelve hours, or from 11:21 a.m. to 11:21 p.m.  In another example, on August 3, 2013, the heat index remained between 100.4 and 105.08 degrees for fourteen hours, or from 9:21 a.m. to 11:21 p.m.

91.    Even more alarming, however, are the recorded heat indices further down the tier in cell 16.

92.    In cell 16, the heat index was recorded at 100 degrees or higher on fifteen consecutive days: July 21, July 22, July 24, July 25, July 26, July 27, July 28, July 29, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.[62]

---

[62] For reasons unknown to the Court, no data was recorded in tier G, cell 16 on July 23, 2013.

34

93.     The data collected from cell 16 also shows high heat indices for extended periods of time.   For example, on five consecutive days during the data recording period (August 1 - 5, 2013), the heat index did not dip below 99.14 degrees.   In other words, inmates assigned to cells at the rear of tier G were subjected to heat indices of 99.14 degrees or above for 120 consecutive hours, while inmates housed in cells at the front of the tier experienced lower heat indices.

94.     As noted above, the highest heat index in cell 16 (110.3 degrees) was recorded on August 3, 2013.   Notably, one of the longest periods of heat indices reaching 100 degrees or above was also recorded on that day.   Specifically, from 12:25 a.m. to 11:25 p.m., the following heat indices were consecutively recorded: 108.68, 107.96, 106.88, 106.16, 103.46, 102.92, 102.56, 103.46, 105.08, 106.34, 109.4, 105.8, 107.42, 104.54, 105.08, 103.46, 104, 104.54, 105.98, 107.24, 110.3, 106.88, 105.62, and 105.08.

95.     By comparison, on August 3, 2013 from 12:30 a.m. to 11:30 p.m., the following heat indices were recorded by the outside weather monitor: 93.4, 92.4, 90.6, 88.5, 87.6, 86.4, 82.9, 83.6, 92.6, 98.4, 98.8, 104.3, 105.5, 105.2, 110.6, 110.8, 109.2, 109.5, 108.7, 104.7, 95.3, 89.3, 86.4, 84.3.

96.     This data established that there were multiple, consecutive hours during which the inmates housed in cells at that rear of tier G were subjected to heat indices that were up to twenty degrees higher than the heat indices recorded outside of the death row facility.

97.     Based on the data collected in tier G, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of

35

multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones.   *See* Exhibit 1.   The Court notes that, but for the awnings installed by Defendants over the windows in tier G on or about July 26, 2013, such temperatures and heat index recordings may have been higher.

98.   Based on the data collected in tier G, the Court further concludes that inmates who are housed in cells at the rear of the respective housing tiers, or furthest away from the tier entrance, are subjected to more extreme conditions of confinement than inmates who are housed in cells closer to the entrance of each respective tier.

### 7.   Tier H

99.   The data collected from tier H reveals slightly lower temperatures and heat indices than tiers C and G.   However, as noted below, during the undersigned's tour of tier H, the undersigned noted that the tier is partially shaded by another tier.

100.   The first reading was taken in this tier on July 15, 2013 at 3:32 p.m.[63]   At that time, the recorded temperature was 82.1 degrees and the heat index was 87 degrees.

101.   During the data collection period, the lowest recorded temperature was 78.26 degrees[64] while the highest recorded temperature was 92.66 degrees.[65]   In contrast, the lowest recorded heat index was 81.5 degrees[66] while the highest recorded heat index was 107.78 degrees.[67]

---

[63] One monitor was installed in cell 8 of tier H.

[64] This temperature was recorded on July 19, 2013 at 6:23 a.m.

[65] This temperature was recorded on August 4, 2013 5:53 p.m.

[66] This temperature was recorded on July 19, 2013 at 6:23 a.m.

[67] This heat index was recorded on August 2, 2013 at 6:43 p.m.

36

102.    On each day of the collection period, the heat index rose to 90 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier H were subjected to heat indices in the NWS's "caution" or "very warm" zone (hereinafter "caution" zone) or higher.  *See* Exhibit 1.

103.    The data also shows that the heat index rose to 100 degrees or higher on seven consecutive days: July 29, July 30, July 31, August 1, August 2, August 3, and August 4, 2013.

104.    The data further established high heat indices for extended periods of time.  For example, on August 1, 2013, the heat index remained between 99.32 and 105.08 degrees for nine hours, or from 1:41 to 10:41 p.m.  On August 3, 2013, the heat index remained between 99.5 and 104.54 degrees for nine hours, or from 1:43 to 10:43 p.m.

105.    As noted above, the highest heat index (107.78 degrees) was recorded on August 2, 2013.  Notably, one of the longest periods of heat indices reaching 100 degrees or above was also recorded on this day, and the following morning.  Specifically, from 12:43 p.m. on August 2 to 1:43 a.m. on August 3, the following heat indices were consecutively recorded: 101.3, 100.94, 104, 104, 103.64, 105.44, 107.78, 107.42, 104.54, 102.92, 100.76, 102.2, 100.4, 100.4.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

106.    Although the data collected from tier H is less alarming than the data collected from tiers C and G, based on the data, the Court concludes that the inmates housed in this tier were also consistently, and for long periods of time over the course of multiple

37

days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones.  *See*

Exhibit 1.

107.   In sum, the data collected by USRM during the data collection period

unequivocally established that inmates housed in each of the death row tiers are

consistently, and for long periods of time, subjected to high temperatures and heat

indices in the NWS's "caution," "extreme caution," and "danger" zones.  *See* Exhibit 1.

108.   The data also established that inmates in at least two of the tiers are frequently

subjected to heat indices that are up to twenty degrees higher than the heat indices

recorded outside the death row facility.

109.   Further, the data established that inmates who are housed in cells at the rear

of the respective housing tiers, or furthest away from the tier entrance, are subjected

to more extreme conditions of confinement than inmates who are housed in cells closer

to the entrance of each respective tier.

### F.    The Court's Observation of the Death Row Tiers

110.   On August 12, 2013 from approximately 2:15 p.m. to 3:00 p.m., the undersigned

observed Angola's death row facility, including the administrative offices, visitation

rooms, control center, and housing tiers A, C, G, and H.  Counsel for both parties, as

well as Defendant Norwood, accompanied the undersigned during the site visit.

111.   During the undersigned's tour of the death row facility, which was conducted

after the data collection period, the Court made factual observations which support the

Court's findings of fact.

112.    Approximately one and one half hour before the undersigned's tour, Angola, Louisiana and the surrounding areas sustained thunderstorms and heavy rain.  By 2:15 p.m., the thunderstorms and rain had ceased.  However, the sky was densely overcast and the temperature had noticeably decreased from a high of 91 degrees at 12:42 p.m.[68]

113.    During the site visit, the Court observed that despite the decreased outside temperature and overcast sky, the temperature inside the housing tiers was appreciably higher than the temperature outside.  For example, according to Defendants' mercury-in-glass thermometers[69], the temperature in tiers A, C, G, and H were 88 degrees, 89 degrees, 94 degrees, and 89 degrees, respectively.  However, weather data collected from the closest weather station indicates that the outside weather temperature was only 77 degrees at 2:00 p.m.

114.    The Court also observed that tier H is shaded by one of the other housing tiers.

115.    The Court also observed the windows, fans, and cell vents in tiers A, C, G, and H.  In the Court's observation, the windows, fans, and cell vents did not provide a cooling effect or relief from the heat conditions in the tier.

116.    During the site visit, the undersigned detected the cool air that blew into the tiers from the central corridor each time a tier entrance was opened.  The Court noted

---

[68] According to a Climatological Report obtained from National Weather Service Forecast Office, the maximum temperature recorded at the Baton Rouge Regional Airport on August 12, 2013 was 91 degrees.  That temperature was recorded at 12:42 p.m.  Climatological Report (Daily), http://www.nws.noaa.gov/view/validProds.php?prod=CLI (last visited Aug. 13, 2013).

[69] Each of Defendants' mercury-in-glass thermometers were located at the rear of each tier, or on the wall furthest away from the tier entrance.

39

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 39 of 102

that cool air could be detected for the few seconds that a tier entrance remained open, while standing near the entrance of the tier, but that the cool air could not be detected while standing at the rear of the tier.

117.    While the Court did not attempt to measure the temperature of the cold and hot water from the in-cell faucets, the undersigned noted that the cold water was lukewarm to the touch.

118.    The Court further observed that although each fan was positioned to be shared by two cells, the fans did not provide equal amounts of air flow to each cell.

119.    The undersigned did not observe dirt, debris, or insects in the ice chests or in the water from the in-cell faucets.

120.    The Court observed, however, that the walls of the housing tiers were hot to the touch, and that the security bars separating the cells from the tier walkway were very warm to the touch.

## VI.    CONCLUSIONS OF LAW

### A.    42 U.S.C. § 1983

1.    "Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' . . . [T]his provision [also] safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).

2.    Here, the gravamen of Plaintiffs' Section 1983 claim is that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth

Amendment to the United States Constitution, made applicable to the States "by reason of the Due Process Clause of the Fourteenth Amendment." *Robinson v. California*, 370 U.S. 660, 675 (1962).

3.     Specifically, Plaintiffs allege that by subjecting them to "extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants [ ] are acting and have acted with deliberate indifference to Plaintiffs' serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution." (Doc 1, ¶¶ 12, 67-68.)

### 1.     The Eighth Amendment

4.     The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

5.     It is well settled that the United States Constitution does not require comfortable prisons. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). However, it is equally well established that conditions of confinement "must not involve the wanton and unnecessary infliction of pain." *Rhodes*, 452 U.S. at 347.

6.     The Eighth Amendment's prohibition against cruel and unusual punishment requires that prisoners be afforded "humane conditions of confinement," including adequate food, clothing, shelter, and medical care. *Farmer*, 511 U.S. at 832; *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (holding that a prison official's obligation

41

includes "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care," as well as "reasonable measure[s] to ensure the safety of the inmates").

7.    Thus, "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates*, 376 F.3d at 332; *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("[C]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.").

8.    Such "conditions of confinement" that are subject to review include temperature conditions.  *Wilson*, 501 U.S. at 303 (stating that "the temperature [a prisoner] is subjected to in his cell" is "a condition of his confinement") (quotation marks omitted); *Gates*, 376 F.3d at 333 (same).

9.    An Eighth Amendment claim has two components.  *Wilson*, 501 U.S. at 298.

10.    First, the deprivation alleged must be sufficiently serious.  *Wilson*, 501 U.S. at 298.  "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave" to constitute cruel and unusual punishment.  *Id.* (quoting *Rhodes*, 452 U.S. at 347).

11.    A court must measure a prison's conditions against "'the evolving standards of decency that mark the progress of a maturing society,' and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 332-33 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  Further, the Supreme Court of the United States has noted that "the length of confinement cannot be ignored in

42

deciding whether the confinement meets the constitutional standards.  A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).

12.     Second, the prison official must have acted with a sufficiently culpable state of mind.  *See Farmer*, 511 U.S. at 838*; Wilson*, 501 U.S. at 305.  In condition of confinement cases, the Court is required to determine if the prison official acted with deliberate indifference, which the Supreme Court has defined as knowing of and disregarding an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

13.     Thus, to demonstrate that prison conditions violate the Eighth Amendment, an inmate must meet the following requirements: (1) an objective requirement showing that the condition is "so serious as to 'deprive prisoners of the minimal civilized measure of life's necessities,' as when it denies the prisoner some basic human need;" and (2) a subjective requirement, which mandates a showing that prison officials have been "'deliberately indifferent' to inmate health or safety." *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (citing *Farmer*, 511 U.S. at 834).

> **a.     The Conditions of Confinement at Angola's Death Row Constitute a Substantial Risk of Serious Harm to Plaintiffs**

14.     It is axiomatic that a prison official's failure to provide inmates relief from extreme temperatures may constitute an Eighth Amendment violation.  *Wilson*, 501

U.S. at 304 ("low cell temperature at night combined with a failure to issue blankets" could constitute an Eighth Amendment violation); *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health relief should be granted . . . .")*; Blackmon v. Garza*, 484 F. Appx. 866, 869 (5th Cir. 2012) (unpublished) ("Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment."); *Valigura v. Mendoza*, 265 F. Appx. 232, 235 (5th Cir. 2008) (unpublished) ("[T]emperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment.").

15.    Further, the Fifth Circuit has held that "extreme heat" coupled with a failure to provide cooling devices such as "fans, ice water, and daily showers" is a "condition [that] presents a substantial risk of serious harm to the inmates," particularly where such conditions are "open and obvious," and where "inmates ha[ve] complained of symptoms of heat-related illness." *Gates*, 376 F.3d at 339-40 (determining that an Eighth Amendment violation justified an "injunction direct[ing the Mississippi Department of Corrections] to provide fans, ice water, and daily showers when the *heat index* is 90 degrees or above, or alternatively to make such provisions during the months of May through September") (emphasis added).

16.    A survey of the opinions from various Circuit Courts of Appeals reveals that other courts have also recognized that a prison official's failure to provide relief from extremely high temperatures may constitute an Eighth Amendment violation.  *See*

44

*Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) ("The district court did not err . . . in concluding that dangerously high temperatures that pose a significant risk to detainee health violate the Eighth Amendment."); *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004) ("[T]he Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation.").

17.    In *Jones'El v. Berge*, 374 F.3d 541 (7th Cir. 2004), the United States Court of Appeals for the Seventh Circuit affirmed a district court's enforcement order requiring air-conditioning of plaintiffs' cells during summer heat waves following "the plaintiffs assert[ions] that they were subjected to extreme temperatures in violation of the Eighth Amendment." *Id.* at 543-45.

18.    In *Tillery v. Owens*, 907 F.2d 418 (3d Cir. 1990), the U.S. Court of Appeals for the Third Circuit affirmed a district court's determination that prison conditions were unconstitutional because, among other things, "[v]entilation [was] grossly inadequate" and "[t]here [were] no systems to control temperature or humidty, causing excessive odors, heat and humidity." *Id.* at 423.

19.    Indeed, Defendants do not contest this well established principle.

20.    The Court notes that prior to the Fifth Circuit's decision in *Gates*, the Fifth Circuit rejected a prisoner's claim that the conditions in extended lockdown at Angola were unconstitutional because, among other things, his lockdown cell was inadequately cooled and the high temperature aggravated his sinus condition. *Woods*, 51 F.3d at

45

581. In reaching its determination, the Court noted that the plaintiff "failed to present medical evidence of any significance," and went on to state: "[w]hile the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment." *Id.*

21.    The Fifth Circuit has since clarified that "[t]he *Woods* court found that Woods had not presented medical evidence sufficient to state an Eighth Amendment violation; *Woods* does not stand for the proposition that extreme heat can never constitute cruel and unusual punishment." *Gates*, 376 F.3d at 339.

22.    The Court further notes that *Woods* is distinguishable from the case at bar. As noted above, Woods did not present medical evidence. Here, Plaintiffs have introduced credible medical evidence in the form of medical records and sworn testimony. Further, in *Woods*, the plaintiff failed to provide temperature data for his lockdown cell. *Woods*, 51 F.3d at 581 (indicating that the plaintiff complained of "high temperature . . . uncomfortable in itself," but provided no data as to the actual temperatures in the extended lockdown cell). Here, temperature, humidity, and heat index data were collected, analyzed, and submitted to the Court by a neutral third-party expert.

46

### 1.)    The    Uncontroverted    Temperature, Humidity and Heat Index Data

23.    According to the NWS, the average maximum temperature in July 2013 in Baton Rouge, Louisiana was 90.5.[70]  In August 2013, the average maximum temperature in Baton Rouge was 90.9 degrees.[71]

24.    However, as summarized above, the uncontroverted USRM data established that, during July and August 2013, inmates housed in each of the death row tiers were frequently subjected to temperatures above 90.5 degrees.  The uncontroverted USRM data also established that inmates housed in each of the death row tiers were frequently subjected to heat indices above 100 degrees.  The data collected by USRM established that the temperature, humidity, and heat index recorded *inside* the death row tiers was, more often than not, the same or *higher* than the temperature, humidity, and heat index recorded *outside* of the death row facility.[72]

25.    For example, as noted above, inmates housed in tiers C and G were frequently subjected to heat indices that were up to twenty degrees higher than the heat indices recorded outside.  Indeed, the uncontroverted USRM data established that inmates housed in these two tiers were subjected to heat indices as high as 110.3 degrees.

---

[70]    National Weather Service Forecast Office, New Orleans/Baton Rouge, LA, http://www.nws.noaa.gov/climate/index.php?wfo=lix (last visited Dec. 17, 2013).

[71] *Id.*

[72] For example, as summarized above, inmates in tier C were subjected to heat indices up to twenty degrees higher than outside of the death row facility for multiple hours on August 3, 2013.  Inmates housed at the rear of tier G were also were subjected to heat indices up to twenty degrees higher than outside of the death row facility for multiple hours on that day.

26.     As it relates to Plaintiffs, the data shows that inmates housed in tier A, including Plaintiff Magee, were subjected to heat indices at 100 degrees or higher on five days during the data collection period.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.  Indeed, the data established that on each day of the collection period, the heat index rose to 92 degrees or higher in tier A.

27.     The data also shows that inmates housed in tier H, including Plaintiffs Ball and Code, were subjected to heat indices at 100 degrees or higher on seven consecutive days during the data collection period.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.  The data established that on each day of the collection period, the heat index rose to 90 degrees or higher in tier H.

28.     According to the NWS, "higher risk" individuals are at risk of sunstroke, heat cramps, or heat exhaustion with prolonged exposure to heat indices in the "extreme caution" or "danger" zones[73]:

---

[73] *Heat: A Major Killer, supra* note 37.

48

| Heat Index | Possible Heat Disorders for Individuals in Higher Risk Groups |
|---|---|
| 130° or higher | Heat Stroke/Sun Stroke Highly Likely with Continued Exposure |
| 105° - 130° | Sunstroke, Heat Cramps, or Heat Exhaustion Likely, and Heatstroke Possible with Prolonged Exposure and/or Physical Activities |
| 90° - 105° | Sunstroke, Heat Cramps, or Heat Exhaustion Possible with Prolonged Exposure and/or Physical Activities |
| 80° - 90° | Fatigue Possible with Prolonged Exposure and/or Physical Activities |

In other words, sunstroke, heat cramps, or heat exhaustion are "possible" among high risk individuals who are subjected to prolonged exposure to heat indices in the "extreme caution" zone, and "likely" among high risk individuals who are subjected to prolonged exposure to heat indices in the "danger" zone. *See also* Exhibit 1.

### 2.) The Risk of Harm to Plaintiffs Given Their Medical Conditions and Medications

29.    The substantial risk of serious harm to Plaintiffs was further underscored by the sworn testimony of Plaintiffs' expert, Dr. Susan Vassallo, M.D. ("Vassallo").

30.    Vassallo, who has been on the faculty of the New York University School of Medicine since 1993, is an attending physician in emergency medicine at Bellevue Hospital Center in New York, New York.  Vassallo is a certified correctional heath

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 49 of 102

professional and an expert on the effects of drugs and illness on an individual's ability to thermoregulate (or regulate one's own body temperature).[74]

31. After observing the conditions in the death row facility, reviewing the USRM data, and reviewing Plaintiffs' medical records and Administrative Remedy Program ("ARP") requests[75], Vassallo concluded that the heat conditions in the death row facility: (1) put all three Plaintiffs at risk of heat-related illnesses, including heat stroke; and (2) worsened Plaintiffs' underlying medical conditions:

> BY MR. KAMIN: . . . And based upon your review of the information that you looked at, have you reached an opinion on that matter?
>
> BY DR. VASSALLO: Yes. My opinion is that the temperatures on death row are excessively hot, and put the prisoners there at risk of heat stroke, as well as worsening of their underlying medical conditions. In addition [ ], maybe death from those conditions, that is, cardiovascular disease, particularly.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

---

[74] During the trial, the parties stipulated that Vassallo qualified as an expert "on the effect of drugs and [ ] illness on thermoregulation, including [the] effect of temperature on prisoners." According to Vassallo, ". . . it's not until your body loses [the] ability to regulate that the [body] temperature starts to rise and [it] becomes an emergency." Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

[75] According to the Louisiana Department of Public Safety and Corrections' website, "[t]he Department and all local jails housing state offenders have established Administrative Remedy Procedures (ARP) through which an offender may, in writing, request a formal review of a complaint related to any aspect of his incarceration. Such complaints include actions pertaining to conditions of confinement, personal injuries, medical malpractice, time computations, or challenges to rules, regulations, policies, or statutes. Through this procedure, offenders shall receive reasonable responses and where appropriate, meaningful remedies." *Frequently Asked Questions*, Louisiana Department of Public Safety and Corrections, Corrections Services, http://www.doc.la.gov/quicklinks/offender-info/faq/ (last visited Dec. 17, 2013).

32.     Vassallo testified that each of Plaintiffs' underlying medical conditions (i.e. diabetes, hypertension, uncontrolled blood pressure) inhibit their ability to thermoregulate.

33.     Vassallo further testified that the Plaintiffs' medications (i.e. beta blockers, diuretics, antidepressants) also inhibit their ability to thermoregulate.

> BY DR. VASSALLO:     Well, the reason that [there is] increased risk is because they have underlying health problems, including cardiovascular disease, diabetes, hypertension.     Those are the problems that cause [increased risk]. Secondly, the medications that are required to treat them, which prevent their ability to respond to heat, which [are] well accepted to be risks.     So those are some of the problems that the Plaintiffs have that make th[ese] conditions dangerous for them.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

34.     Vassallo also testified about the increased risk to Plaintiffs Ball and Code, who are over the age of fifty-five:

> BY MR. KAMIN:     . . . Mr. Ball is actually sixty years old.  Is that a factor in your assessment of his risk?

> BY DR. VASSALLO:     Well, it is.  Because, when you look at the CDC, which publishes something called an MMWR, which is the morbidity and mortality weekly report - it's probably one of the most respected journals and publications in America today - [ ] you see very clearly that the people who are above the age of fifty-five to sixty are the ones who most commonly die during heat - during heat episodes.  They're much more at risk.  And so, the risk with age is shown in experimental studies.     It's shown in

51

> epidemiological studies of heat waves. We
> have a plethora of knowledge about that.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

35.    When asked about the symptoms that Plaintiffs testified they experience during

the summer months, Vassallo testified as follows:

| | |
|---|---|
| BY MR. KAMIN: | During his testimony yesterday at trial, Mr. Ball testified about symptoms including dizziness, sweating, light-headedness and weakness, all when it's hot. Do those symptoms have any significance to you? |
| BY DR. VASSALLO: | Well, those are common temperatures - symptoms that people will describe when they're entering a phase of heat exhaustion. |

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

36.    Vassallo further emphasized that even heathy individuals, and individuals

whose blood pressure is being controlled by medication are at risk of serious harm in

heat conditions like those in the death row tiers:

| | |
|---|---|
| BY MR. KAMIN: | Okay. Does blood pressure control, due to medication, alleviate the risk of heat-related illness? |
| BY DR. VASSALLO: | No. I mean, the problem with these temperatures is that everybody is at risk in these temperatures. So, although the young, healthy individual who is not exercising is at less risk than an older individual with medical problems, like these three Plaintiffs. But every - this is - these temperatures are dangerous when you're confined in this setting. |
| BY MR. KAMIN: | I just want to be clear for the Court's benefit. That - does someone with hypertension - let's |

52

take Mr. Magee as an example. Even though his hypertension is in the best state of the three Plaintiffs due to medication, does the hypertension itself still put him at risk for heat-related illness that he would not face if he did not have hypertension?

BY DR. VASSALLO:        The - my answer is yes. . . .

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

37.    Vassallo's expert opinion was further informed by her review of the USRM data:

BY MR. KAMIN:        And, so, Dr. Vassallo, based upon the data received from the neutral third party, USRM, has your opinion changed in any way from the report that you previously submitted?

BY DR. VASSALLO:        No.

BY MR. KAMIN:        What is your opinion, based upon the data submitted by USRM?

BY DR. VASSALLO:        My opinion is that the temperatures on death row are a health hazard to everybody, particularly to those individuals with health problems, such as cardiovascular disease, diabetes, hypertension. And that . . . it's just a matter of time until there is a health emergency, such as heat stroke or myocardial infarction or stroke arises because of the temperatures on death row.

BY MR. KAMIN:        It is your opinion that the Plaintiffs, Nathaniel Code, Elzie Ball, and James Magee, are at imminent risk of severe physical harm due to the heat conditions on death row?

BY DR. VASSALLO:        Yes, it is.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

38.     During cross-examination, Vassallo testified as to how quickly one can have a

heat stroke:

> BY MR. JONES:          Wouldn't you expect in the medical records of
> Mr. Ball, for instance, who's been on death row
> for fifteen years, to see some medical evidence
> of the effects of heat on him over that period of
> time?
>
> BY DR. VASSALLO:       Well, no sir.  The heat strokes that happened
> in Dallas, the heat strokes I've had in my
> entire career, I've had hundreds where I've
> been at the bedside of 110 degrees.  Those
> people don't have warning.  The - they don't
> have - there's no warning with heat stroke.
> You don't feel hot for five days or before or
> even one day.  So, heat stroke is a failure of
> thermoregulation which is dramatic and
> catastrophic.  It occurs suddenly. . . .

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

39.     When further questioned by counsel for Defendants about the risk of heat

stroke, Dr. Vassallo testified as follows:

> BY DR. VASSALLO:       . . . There are two pieces to the stress of the
> heat and the temperatures on death row.  One
> is the worsening of their underlying medical
> conditions.       And their risk of stroke,
> myocardial infarction, which is a heart attack,
> and et cetera.  So, that is well supported in the
> literature.  But you don't have to have heat
> stroke for heat to do its - to be bad for you.
> And a sustained temperature such as they're
> undergoing.  The second piece is this issue of
> heat stroke.  And that's the piece that I don't
> want to be misunderstood.  That people can
> suffer suddenly from heat strike without ever
> having complained about the weather. . . .

54

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

40.     The Court notes that Defendants failed to rebut Dr. Vassallo's testimony regarding the risk of harm to Plaintiffs.  Indeed, as noted above, Dr. Vassallo was subject to cross-examination.  Yet, her testimony was largely uncontroverted.

41.     Defendants point to evidence in the record that, prior to the instant litigation, Plaintiffs did not submit any formal written complaints, ARPs, or "sick call" requests as a result of the heat conditions.  Defendants further contend that Plaintiffs' medical records do not contain evidence of prior heat-related illnesses.

42.     The record, however, is replete with evidence that Plaintiffs filed multiple ARPs complaining of the excessive heat conditions, prior to filing the instant litigation.  *See*, *e.g.*, Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

43.     Further, prior complaints of heat-related illness are not a predicate for a finding that the conditions in Angola's death row facility present a substantial risk of serious harm to Plaintiffs.  "That the Eighth Amendment protects against future harm to inmates is not a novel proposition."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  *Id.*  Accordingly, Plaintiffs need not establish that death or serious illness has occurred in order to establish a substantial risk of serious harm.[76]

_____

[76] Further, assuming, *arguendo*, that prior requests for medical assistance or complaints of heat-related illness are required, there is sufficient evidence in the record to support the conclusion that Plaintiffs were discouraged from submitting "sick call" requests because of the monetary and potential disciplinary consequences of doing so.  Indeed, it is uncontested that Defendants' "Health Care Request Form" includes the following acknowledgment above the signature and date lines:

44.     Additionally, the Court is not persuaded by Defendants' argument that Plaintiffs' lifestyle or diet choices - and not the heat conditions - are what increase Plaintiffs' risk of harm.  *See* Trial Transcript, Dr. Hal David Macmurdo, Aug. 7, 2013. It is uncontested that Plaintiffs' conditions of confinement, including Plaintiffs' food, beverage, and exercise options, are in the exclusive control of Defendants.  While it is unclear from the record how often Plaintiffs are permitted to purchase beverages and snacks from the penitentiary canteen, even assuming, *arguendo*, that Plaintiffs are permitted to do so regularly, it belies logic to conclude that such beverages and snacks compose the *majority* of Plaintiffs' diet.  Rather, the majority of Plaintiffs' diet is composed of beverages and food that are in the exclusive control of *and provided by* Defendants. *See* Trial Transcript, Testimony of Dr. Raman Singh, M.D., Aug. 7, 2013.[77] Thus, Defendants' argument is unavailing.

### 3.)     Multiple Federal and State Agencies Have Recognized the Risk of Harm to Individuals Subjected to Extreme Heat

45.     According to the Federal Emergency Management Agency ("FEMA"), "[m]ost heat disorders occur because the victim has been overexposed to heat or has over-

---

I understand that in accordance with Dept. Reg. No. B-06-001, I will be charged $3.00 for routine request [*sic*] for health care services, $6.00 for emergency request [*sic*] and $2.00 for each new prescription written and dispensed to me, with the exceptions noted in the referenced regulation.  I am aware that if I declare myself a medical emergency and the health care staff finds that and [*sic*] emergency does not exist, I may be given a disciplinary report for malingering.

[77] During the trial, Dr. Singh testified that his the Chief Medical and Mental Health Director for the all ninety of the Louisiana Department of Public Safety and Corrections' correctional facilities, including Angola.

56

exercised for his or her age and physical condition.  Older adults, young children and those who are sick or overweight are more likely to succumb to extreme heat."[78]

46.     Multiple federal agencies and the Louisiana Office of Public Health recognize that the following human factors inhibit an individual's ability to regulate temperature: age, certain medical conditions, and use of certain medications.[79]

47.     According to the Centers for Disease Control and Prevention ("CDC"), individuals sixty-five years old or older, individuals who are physically ill, especially those with heart disease or high blood pressure, and individuals with mental illness are at greater risk to develop heat-related illnesses.[80]  Additional risk factors include: "obesity, fever, dehydration, . . . poor circulation, . . . and prescription drug . . . use."[81]

---

[78] *Extreme Heat*, FEMA, http://www.ready.gov/heat (last visited Dec. 17, 2013) [hereinafter *Extreme Heat*]; *see also Heat Wave - A Major Summer Killer*, Louisiana Office of Emergency Preparedness, http://www.gohsep.la.gov/factsheets/heatwave.aspx (last visited Dec. 17, 2013) [hereinafter *Heat Wave*] ("Ranging in severity, heat disorders share one common feature: the individual has overexposed or over exercised for his age and physical condition in the existing thermal environment.").

[79] *Heat*, NWS, http://www.weather.gov/bgm/heat (last visited Dec. 17, 2013) [hereinafter *Heat*]; *Frequently Asked Questions About Extreme Heat*, Centers for Disease Control and Prevention, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/faq.asp (last visited Dec. 17, 2013) [hereinafter *Frequently Asked Questions About Extreme Heat*] ("Those at greatest risk for heat-related illness include infants and children up to four years of age, people 65 years of age and older, people who are overweight, and people who are ill or on certain medications."); *Excessive Heat Events Guidebook*, June 2006, United States Environmental Protection Agency, http://www.epa.gov/hiri/about/pdf/EHEguide_final.pdf (last visited Dec. 17, 2013) [hereinafter *Excessive Heat Events Guidebook*]; *DHH and DCFS Remind Residents to Stay Safe in Summer Heat: High Temperatures Put Louisianans at Risk*, State of Louisiana Department of Health & Hospitals, Office of Public Health, http://dhh.louisiana.gov/index.cfm/newsroom/detail/2844 (last visited Dec. 17, 2013) [hereinafter *High Temperatures Put Louisianans at Risk*].

[80] *Tips for Preventing Heat-Related Illness*, CDC, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/heattips.asp (last visited Dec. 17, 2013) [hereinafter *Tips for Preventing Heat-Related Illness*].

[81] *Extreme Heat: A Prevention Guide to Promote Your Personal Health and Safety*, CDC, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/heat_guide.asp (last visited Dec. 17, 2013) [hereinafter *Extreme Heat: A Prevention Guide*].

48.   The CDC further advises, "[t]he risk for heat-related illness and death may increase among people using the following drugs: (1) psychotropics, which affect psychic function, behavior, or experience (e.g. haloperidol or chlorpromazine); (2) medications for Parkinson's disease, because they can inhibit perspiration; (3) tranquilizers such as phenothiazines, butyrophenones, and thiozanthenes; and (4) diuretic medications or "water pills" that affect fluid balance in the body."[82]

49.   In addition to human risk factors, several environmental factors also increase the risk of heat-related illnesses and deaths.  For example, according to FEMA, "[c]onditions that can induce heat-related illnesses include stagnant atmospheric conditions and poor air quality . . . [a]lso, asphalt and concrete store heat longer and gradually release heat at night, which can produce higher nighttime temperatures . . ."[83]

50.   According to the NWS, successive days of heat with high nighttime temperatures also increases the likelihood that heat-related illnesses and deaths may occur.[84]  The NWS further advises that a building's "overnight minimum heat index" is a factor that increases the impact of heat: "houses and buildings that do not have air conditioning will not cool down if the overnight minimum heat index remains above 75-80° and the area goes into a second hot day."[85]

---

[82] *Frequently Asked Questions About Extreme Heat*, *supra* note 79.

[83] *Extreme Heat*, *supra* note 78.

[84] *Heat*, *supra* note 79 ("Successive days of heat with high nighttime temperatures is *really* bad - fatalities *will* occur.") (emphasis added).

[85] *Heat*, *supra* note 79.

58

51.    The CDC further cautions that electric fans will not prevent heat-related illnesses when the temperature is in the high 90s.[86]  Specifically, the CDC warns that "[e]lectric fans may provide comfort, but when the temperature is in the high 90's, fans will not prevent heat-related illness."[87]

52.    Instead, the CDC contends that "[a]ir conditioning is the strongest protective factor against heat-related illness."[88]  Indeed, according to the CDC, "[e]xposure to air conditioning for a few hours a day will reduce the risk of heat-related illness."[89]

53.    Given the substantial risk of serious harm due to extreme heat, which has been recognized by multiple federal and state agencies, and the CDC's recommendations, the Court is also not persuaded by Defendants' argument that the conditions of confinement in the death row tiers are no different than the conditions in a "free" person's home in which there no mechanical cooling or air conditioning is installed. While the Court recognizes that there are residents of this State who do not have air conditioning in their homes, it cannot be said that such conditions are analogous to the conditions of confinement at issue here.  Indeed, when the temperature rises, "free" people are urged to take the precautions recommended by multiple federal and state agencies, and if need be, seek refuge in air conditioned buildings *at will*.  In contrast, Plaintiffs are not permitted to take many of the precautions recommended by federal

---

[86] *Frequently Asked Questions About Extreme Heat*, *supra* note 79.

[87] *Id.*

[88] *Id.*

[89] *Id.*

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 59 of 102

and state agencies, nor are they permitted to seek refuge in air conditioned buildings *at will*.

54.    In sum, the information published by multiple federal and state agencies supports the conclusion that, considering Plaintiffs' ages[90], underlying medical conditions and/or medications, the conditions of confinement in Angola's death row tiers create a substantial risk of serious harm to Plaintiffs.

### 4.) Multiple Federal and State Agencies Have Recognized the Importance of the Heat Index

55.    During the trial, Defendants' witness John "Jay" Grymes[91] attempted to minimize the importance of the heat index by characterizing it as merely a derived number.

> BY MR. HILBURN:    . . . What about the heat index?  Can you explain what heat index means?
>
> BY MR. GRYMES:    The heat index is a derived guideline estimate of the impact of the combination of temperature and atmospheric moisture on, 'an average person.'
>
> . . .
>
> BY MR. HILBURN:    Okay.  Are there any issues with respect to using particular heat index values without taking into account various environmental and physical factors?

---

[90] The Court acknowledges that Plaintiff Magee is only thirty-five years old.  However, the evidence supports the conclusion that his underlying medical conditions and medications place him in a higher risk category.

[91] By stipulation of the parties, Grymes was accepted an as expert in the field of meteorology.  He has worked as a meteorologist and climatologist for approximately thirty years.

60

BY MR. GRYMES:          Well, the first thing you have to remember - and this sometimes gets lost in this concept of heat index - it is a derived number.  It's not a real number.  It, in fact, is sometimes called the apparent temperature.  It's what the air and humidity combination would feel like to the average person. . . . But it's simply a guideline number.

Trial Transcript, Testimony of Jay Grymes, Aug. 6, 2013.

56.     However, when further questioned by counsel for Plaintiffs, Grymes admitted that when the heat index is high, he advises his television viewers so that they can take the proper precautions.

BY MR. VORA:           Mr. Grymes, when you provide, and when your colleagues, who are weather persons, provide information about temperatures in South Louisiana during the summertime, you provide the heat index as well as the temperatures, generally, correct?

BY MR. GRYMES:          Often.  Correct.

BY MR. VORA:           And when you say often, you mean more often than not?  Is that a fair statement?

BY MR. GRYMES:          I can't speak for the others on my team, but I would say I probably mention the heat index probably every other weathercast.

BY MR. VORA:           And the reason you provide the heat index every other weathercast is because you believe that it is important [to] your job [of] informing the public as to what they can expect the ambient conditions [to] which they are about to be exposed - in the event they go outside - to be, so that they can go on with their lives in a predictable fashion, correct?

61

| BY MR. GRYMES: | I provide heat index as a guideline to our viewers for them to make better decisions. |
| BY MR. VORA: | And it is a guideline that you would expect your viewers to make decisions pursuant to, correct? |
| BY MR. GRYMES: | I would hope so. |

Trial Transcript, Testimony of Jay Grymes, Aug. 6, 2013.

57.    The Court notes that reputable meteorology organizations agree that the heat index is critical to human safety. For example, the NOAA's heat alert procedures "are based mainly on Heat Index Values." *See, e.g.*, *Heat: A Major Killer*, *supra* note 37; *Heat*, *supra* note 79.

58.    Finally, the Fifth Circuit itself has recognized heat index as a valid measure for determining the constitutionality of prison conditions. *See Gates*, 376 F.3d at 334, 336.

59.    Thus, the Court is unpersuaded that the heat index - which is calculated based on the temperature *and* humidity - is not of critical importance when evaluating the risk of serious harm to Plaintiffs.

60.    In sum, based on the USRM data summarized above, the testimony presented at trial, and the advisories issued by numerous federal and state agencies, the Court concludes that Plaintiffs have met their burden of establishing that the conditions of confinement at Angola's death row constitute a substantial risk of serious harm to plaintiffs. The Court's conclusion is consistent with previous rulings by the Fifth Circuit. *See, e.g.*, *Valigura*, 265 F. Appx. at 236 (unpublished) ("requiring an inmate to remain on his bunk almost twenty-four hours a day for several days in a row in

temperatures into the nineties and hundreds are allegations that are sufficiently serious to implicate the minimal civilized measure of life's necessities."). Accordingly, the Court shall evaluate the second element of Plaintiffs' Eighth Amendment claim.

### b.     The Evidence Establishes that Defendants Acted with Deliberate Indifference to the Substantial Risk of Serious Harm to Plaintiffs

61.     Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105-106.

62.     To establish that a prison official was deliberately indifferent to an inhumane condition of confinement, the plaintiff bears the burden of showing that the official knew of and disregarded an excessive risk to inmate health or safety.

63.     "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 332. *See also Farmer*, 511 U.S. at 837 (the evidence must show that "the official [was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that] he . . . also [drew] the inference.")*; Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir. 1994) ("[u]nder exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk.").

64.     As established by the Supreme Court in *Farmer*, it is not necessary for an Eighth Amendment claimant to show that a prison official acted or failed to act due to

a belief that an inmate would actually be harmed.  It is enough that the official acted

or failed to act despite his knowledge of a substantial risk of serious harm.  511 U.S.

at 842.

### 1.) The Evidence Establishes that Defendants Had Knowledge of the Substantial Risk of Serious Harm to Plaintiffs

65.    Considering the uncontroverted USRM data summarized above, Plaintiffs' ages,

Plaintiffs' underlying medical conditions, and Plaintiffs' medications, the Court

concludes that Defendants' knowledge of the substantial risk of harm may be inferred

by the obviousness of the risk to Plaintiffs.[92]

66.    In the alternative, the Court concludes that Defendants' knowledge of the

substantial risk of harm to Plaintiffs may be inferred from circumstantial evidence

presented at trial.

67.    In cases asserting deliberate indifference by prison officials where there is

excessive heat, the Fifth Circuit has found deliberate indifference where prison officials

ignored complaints "of heat stroke or some other heat-related illness." *Gates*, 376 F.3d

at 339; *Blackmon*, 484 F. Appx. at 872-73 (evidence was sufficient to allow a jury to

conclude that prison officials were deliberately indifferent to significant risks to

prisoner's health where prisoner "filed numerous grievances complaining about the

heat, its effect on his health, and prison officials' failure to address his concerns").

---

[92] Indeed, there is nothing in the record to suggest that the temperature, humidity, and heat index data collected, analyzed, and disseminated by USRM from July 15 - August 5, 2013 was higher than the average temperature, humidity, and heat index normally experienced during the summer months in south Louisiana.  Further, the record establishes that Defendants have been in possession of Plaintiff's medical records throughout the duration of their incarceration at death row.

68.    Here, it is uncontroverted that Plaintiffs submitted multiple ARPs to Defendants complaining of the excessive heat conditions, prior to filing the instant litigation.

69.    During the trial, the Court admitted into evidence multiple ARPs submitted by Plaintiffs to Defendants between July 24 and October 17, 2012. The Court also admitted into evidence Defendants' responses to Plaintiffs' ARPs, in which Defendants acknowledged Plaintiffs' claims that it is "extremely hot on Death Row" and that they are "more susceptible to heat" because of their underlying medical conditions and medications, and denied Plaintiffs' requests for relief.[93]

---

[93] Defendants' receipt of and response to Plaintiffs' ARPs was also summarized in the parties' Statement of Undisputed Facts (Doc. 53-1), which states:

Plaintiff Ball submitted a Request for Administrative Remedy ("ARP") on July 28, 2012 to Warden Cain, describing among other things the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Plaintiff Elzie Ball requested that the prison accommodate his illness by providing a safer environment. Angola, through Warden Norwood, issued a Response denying the ARP on October 12, 2012. Plaintiff Ball appealed Warden Norwood's response on October 17, 2012. The DOC denied the appeal December 14, 2012. Plaintiff Ball's grievance process was thereby exhausted.

Plaintiff Code submitted Request for Administrative Remedy ("ARP") on July 24, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Plaintiff Nathaniel Code requested that the prison accommodate his illness by providing a safer environment. Angola, through Warden Norwood, issued a Response denying the ARP on September 5, 2012. Plaintiff Code appealed Warden Norwood's response on September 13, 2012, reasserting his grievances and outlining why LSP's First Step Response was inadequate. The DOC denied the appeal on November 21, 2012. Plaintiff Code's grievance process was thereby exhausted.

Plaintiff Magee submitted a Request for Administrative Remedy ("ARP") on August 28, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Plaintiff James Magee requested that the prison accommodate his illness by providing a safer environment. Angola, through Warden Norwood, issued a Response denying the ARP on November 6, 2012. Plaintiff Magee appealed Warden Norwood's response on November 7, 2012. The DOC denied the appeal

65

70.     During the trial, Defendant Norwood, who has been the Assistant Warden responsible for the death row tiers since February 2011, testified that she received thirteen ARPs related to the heat conditions in the death row tiers:

BY MR. VORA:          You received the ARP request that was filed by Mr. Elzie Ball, correct?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          And you received the ARP request that was filed by Mr. Code?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          You received the ARP request that was filed by Mr. Magee?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          You received all of those ARP requests?

BY MS. NORWOOD:     I did, among others.

BY MR. VORA:          And you received - the ARP requests that I'm referring to, Mr. Code, Mr. Ball, Mr. Magee, were related to what they described as extreme heat or hot conditions.  Is that accurate?

BY MS. NORWOOD:     Yes.

                     . . .

BY MR. VORA:          You received many, many ARPs being filed since February, end of February, 2011, correct?

---

on January 3, 2013. Plaintiff Magee's grievance process was thereby exhausted.

(Doc. 53-1, pp. 2-3.)  Despite these undisputed facts, Norwood later attempted to characterize Plaintiffs' ARPs as nothing more than Plaintiffs' complaints that "they were hot and [that] they wanted air conditioning."  Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

66

| | |
|---|---|
| BY MS. NORWOOD: | Actually, no. I have received the most on this subject. |
| BY MR. VORA: | And when you say this subject, you mean - |
| BY MS. NORWOOD: | The heat. |
| BY MR. VORA: | - with respect to the heat, correct? |
| BY MS. NORWOOD: | Right. |
| BY MR. VORA: | And with respect to those, how many would you approximate there would be, how many requests? |
| BY MS. NORWOOD: | Thirteen. |

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

71.   Norwood also testified that she talked with Plaintiffs Ball and Code regarding

the heat conditions on multiple occasions:

| | |
|---|---|
| BY MR. VORA: | And did you speak to Mr. Ball and Mr. Code prior to the filing of the ARP? |
| BY MS. NORWOOD: | I did. |
| BY MR. VORA: | Did you speak to them after they filed the ARP? |
| BY MS. NORWOOD: | I did. |
| BY MR. VORA: | Did you speak to them after they filed this lawsuit? |
| BY MS. NORWOOD: | Yes, sir. |

72.   During the trial, Defendant Cain, who oversees the entire penitentiary,

including the death row facility[94], testified regarding Defendants' knowledge of a

---

[94] Cain testified as follows:

| | |
|---|---|
| BY MR. VORA: | How long have you been the Warden at Angola? |

67

substantial risk of serious harm to Plaintiffs.

73.    For example, according to Cain, correctional officers assigned to the death row

facility "closely monitor" the temperature in the death row tiers and record such

temperatures in tier log books.

| | |
|---|---|
| BY MR. VORA: | You state here in this letter that we do understand their concern and would like to assure you that the temperature, and all the main areas, is closely monitored. Do you see that, sir? |
| BY MR. CAIN: | Yes. |
| BY MR. VORA: | And when you say 'closely monitored' you mean in the logs that are required by the correctional officers to be filled out with the air temperatures at various times throughout the day. Is that correct? |

| | |
|---|---|
| BY MR. CAIN: | Eighteen and a half years. |
| BY MR. VORA: | And during the eighteen and a half years that you have been Warden at Angola, you have been the top official at Angola? |
| BY MR. CAIN: | Yes. |
| BY MR. VORA: | You would also, therefore, exercise control and responsibility over what happens at death row, correct? |
| BY MR. CAIN: | Yes. |

According to Cain, he also is responsible for enforcing policies and/or regulations related to inmates who have been prescribed medications that increase their risk of developing heat-related illnesses:

| | |
|---|---|
| BY MR. VORA: | Sir, my question is, you are responsible for enforcing any policies that would have to deal with medications that could create the risk of an adverse effect to somebody's health, an inmate's health, as a result of rising temperatures - is that a fair statement? |
| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

68

BY MR. CAIN:          Yes.

BY MR. VORA:          Those logs are monitored by individuals who are to monitor them to ensure that the temperatures do not reach unacceptable levels, correct?

BY MR. CAIN:          Yes, correctional officers.

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

74.    Defendant Norwood also testified as to Defendants' constant monitoring of the

internal temperature[95]:

BY MR. VORA:          . . . Correctional officers then, pursuant to policies that are in place on the death row tiers, are required to record temperatures in log books. Is that accurate?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          And that temperature is supposed to be recorded indoors as well as outdoors, correct?

BY MS. NORWOOD:     Indoors daily.

BY MR. VORA:          It is recorded indoors daily, correct?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          It is recorded multiple times per day, correct?

BY MS. NORWOOD:     Yes.

BY MR. VORA:          It is recorded more or less every two hours indoors, correct?

---

[95] Norwood further testified that the mercury in-glass thermometers in each of the death row tiers are "hard to read." However, both she and Cain testified that Defendants have not attempted to replace the thermometers nor taken any action to make the current in-mercury thermometers easier to read. Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013; Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

69

| | |
|---|---|
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | Its your responsibility to ensure that the correctional officers properly record that temperature? |
| BY MS. NORWOOD: | Ultimately, yes. |
| BY MR. VORA: | And it's your responsibility not just that they record it, but that they record it accurately, correct? |
| BY MS. NORWOOD: | Ultimately, yes. |

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

75.    Defendant Cain further testified that he visits the death row facility regularly

and is aware of the heat conditions in the tiers:

| | |
|---|---|
| BY MR. CAIN: | . . . I go to death row regularly.  So I walk in there.  So I know what it feels and how hot it is and inmates talk to me.  So, evidently I didn't have anyone talk to me about being too hot. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

76.    Despite Cain's contention that Plaintiffs did not verbally complain about the

heat conditions, the Court concludes that Defendants had knowledge of the heat

conditions in the death row tiers, and thus, the substantial risk of serious harm to

Plaintiffs.  Considering the uncontroverted USRM data, Plaintiffs' ages, Plaintiffs'

underlying medical conditions, and Plaintiffs' medications, the Court concludes that

Defendants' knowledge of the substantial risk of harm may be inferred by the

obviousness of the risk to Plaintiffs.  In the alternative, based on the evidence that: (1)

Plaintiffs submitted multiple APRs complaining of the excessive heat conditions to

Defendants, prior to filing the instant litigation; (2) Defendants "closely monitor" the temperature in each of the death row tiers and record such temperatures in tier log books; and (3) Defendants Cain and Norwood walk the death row tiers "regularly," the Court concludes that Defendants' knowledge of the substantial risk of harm to Plaintiffs may be inferred.

### 2.) The Evidence Establishes that Defendants Disregarded the Substantial Risk of Serious Harm to Plaintiffs

77. Despite "know[ing] what it feels and how hot it is," Cain testified that he did not take any actions to reduce the heat conditions in the death row tiers, prior to the data collection period.[96]

78. Indeed, according to Cain, he often "thought" of ways to reduce the heat in the death row tiers, yet failed to take any action, even after the instant litigation was filed:

| BY MR. VORA: | Warden Cain, between the June date on which this complaint was filed to July 2nd, did you ever consider taking any remedial measures to address the issue of heat on the death row tiers? |
| --- | --- |
| BY MR. CAIN: | I don't recall the specific dates and times, but we always have thought and tried to figure any way to have the ice on the tiers, any way - and to add extra fans. We've got a building with no fans. Inmates know that. Anything we can come up with and make that building cooler or any other building at Angola, we would do it. And we will - it was always on our mind how to overcome the heat. Because their comfort means less problems for me. I'm sure |

---

[96] Defendants' attempts to "lower the temperatures" in the death row tiers during the data collection period will be addressed in a separate order by this Court.

71

during that period of time, as all of the time almost, we're thinking about how to get this place cooler.

BY MR. VORA:     Did you actually do anything to try to make the death row tiers cooler between the June time frame that the complaint was filed and July 2nd?

BY MR. CAIN:     I don't know that I did or didn't. I know that we made a mistake after the Judge gave the [July 2nd] order. Is that what you're talking about?

BY MR. VORA:     No, sir. I'm trying to refer to the time before the order was issued but after the complaint, in which the lawsuit against you was filed. During that time frame, did you take any actions in order to remedy the heat that the inmates were complaining about in this case?

BY MR. CAIN:     I don't think so. I think we were already giving the ice. We thought about doing buckets at some point in there. So, I don't know exactly when. So, I can't answer accurately, because I don't remember in your dates. But we were thinking about ice and thinking about other things all through that period of time. Specifically, I don't want to say I did when I don't know for sure that I did exactly during those dates.

BY MR. VORA:     Warden Cain, you never provided a[n] [ice] bucket that you referred to in your previous answer to any of the inmates on the death row tiers at any point in time since this lawsuit was filed against you, correct?

BY MR. CAIN:     No, we haven't done that yet. I thought about it.

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

72

79.    Cain conceded, however, that once the Court-ordered data collection period

began, he took action to attempt to reduce the temperature in tiers C and G, the tiers

with the highest recorded temperatures and heat indices:

> BY MR. VORA:          But you ordered the awnings to be procured, correct?
>
> BY MR. CAIN:          Well, this is a homemade thing.  Where we had wood in the warehouse and the 2 x 4's, and we used, I think, mattress material that we would normally make mattresses with. And this was just a really thrown together thing, just to see if it would shade.  We were trying to shade the windows to see what would happen.  To see if the temperature would fall.
>
>                       . . .
>
> BY MR. VORA:          You had tried other measures in order to try to lower the temperature and address the issue of heat that had been raised by Mr. Ball, Mr. Magee, and Mr. Code, right?
>
> BY MR. CAIN:          I haven't tried other measures.  I've only given them ice.
>
> BY MR. VORA:          You never tried to do - you never tried to do something with soaker hoses?
>
> BY MR. CAIN:          I had never before, but I did during this [data collection period], but it didn't work.
>
> BY MR. VORA:          And during this time, when did you try to use soaker hoses?
>
> BY MR. CAIN:          At the same time that we were putting the awnings up.  I would think the next day or two.  And there was, I mean, that didn't work at all.  It was not, it was never up, really.  It was up, but the water all ran out as soon as you put it on.  We didn't have enough power.

73

|  | It was a half inch of line going into a three-quarter inch hose. |
|---|---|
| BY MR. VORA: | Who gave the order to install the soaker hoses and try to use them? |
| BY MR. CAIN: | Me. |
|  | . . . |
| BY MR. VORA: | Outside of misting, using soaker hoses and awnings, have you ever attempted to do anything else in order to address the issues that Mr. Ball, Mr. Code, and Mr. Magee have raised with respect to what they consider to be prolonged exposure to heat, sir? |
| BY MR. CAIN: | I've just ensured - the only thing I would do is ensure that the system put in the building was working, that the belts were there, that they kept it operating, and it didn't, it didn't falter. Because it did a time or two. And so we had to keep the belt on there because the belts would break off. And they turned the fans that worked in the duct work that make air moves through the, through the little vents that go into the cells. So yes, keep it, keep it up. Maintain it well. What we do have, make it work the best we can. And add the additional fans. |
| BY MR. VORA: | Did you ever consider doing anything that would not have manipulated the USRM data, that would have provided some relief for Mr. Ball, Mr. Code, or Mr. Magee? |
| BY MR. CAIN: | I just told you what I did. That's all I've ever done. |
| BY MR. VORA: | You had considered previously, though, providing them with larger buckets in which they could store ice, correct? |

74

| | |
|---|---|
| BY MR. CAIN: | We've never given them buckets. We thought about that, about using the soft-type ice chests. |
| BY MR. VORA: | But you never provided the soft-type ice chest that you had considered to Mr. Ball, Mr. Code, or Mr. Magee. Is that correct? |
| BY MR. CAIN: | Correct. |
| BY MR. VORA: | To this day, you do not have a soft-type ice chest, correct? |
| BY MR. CAIN: | No. We don't have one. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

80.     While the Court questions Cain's motivation for taking such actions *for the first time* during the Court ordered data collection period, it defies logic to conclude that Cain would have taken such actions if he *did not* have knowledge of the heat conditions in the death row tiers. Indeed, prior to the filing of the instant litigation, Cain acknowledged the heat conditions in the death row tiers and the need for remedial action. *See* Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013 ("Anything we can come up with and make that building cooler or any other building at Angola, we would do it. And we will - it was always on our mind how to overcome the heat."). Nevertheless, Cain failed to take any remedial action *until* USRM began collecting, analyzing, and disseminating the *alarming* temperature, humidity, and heat index data.

81.     Further, during the trial, Cain testified about the importance of even one-half of a degree decrease in the death row tiers:

BY MR. CAIN:          And if it were a half degree, we would know it. And the half a degree is a half a degree. And we would put the awnings up, if we could save a half a degree.

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

82.    Additionally, the evidence establishes that Defendants failed to abide by their own policies and regulations when they failed to add Plaintiff Magee, who is on psychotropic medication, to Angola's "Heat Precautions List."[97]

BY MR. VORA:          . . . Do you recognize this document as being an email that you sent to the death row supervisors on July 24, 2013 at 9:19 a.m.? Do you recognize that?

BY MS. NORWOOD:    Yes.

BY MR. VORA:          And that is an email that relates to the heat precaution list for the week of July 22nd, correct?

BY MS. NORWOOD:    Yes.

BY MR. VORA:          This goes out to all of the death row supervisors because there are [inmates who] belong on the heat precautions list that [the supervisors are] supposed to monitor, correct?

BY MS. NORWOOD:    Yes.

BY MR. VORA:          And that is pursuant to a prison policy and applies to the death row tiers in which [inmates] are to be monitored because of their risk of heat-related illness. Is that correct?

BY MS. NORWOOD:    Yes.

---

[97] During the trial, the Court admitted into evidence Louisiana Department of Public Safety and Corrections Health Care Policy No. HC-45 and Louisiana State Penitentiary Department Regulation No. B-06-001. It is undisputed that both the policy and regulation require Defendants to, *inter alia*, identify, and monitor "offenders prescribed psychotropic medication."

76

. . .

BY MR. VORA:              You were the recipient of this email, correct?

BY MS. NORWOOD:           Yes.

BY MR. VORA:              This was July 23, 2013, correct?

BY MS. NORWOOD:           Yes.

BY MR. VORA:              You did not ask for Mr. Ball, Mr. Magee, or Mr. Code to be put on a list, or this list, correct?

BY MS. NORWOOD:           No.

BY MR. VORA:              Meaning that you did not ask at any time? That is your statement?

BY MS. NORWOOD:           That's true.

. . .

BY MR. VORA:              Warden Norwood, there is, in fact, a list of offenders who are placed on a list because they are perceived to be at risk of heat-related illness, correct?

BY MS. NORWOOD:           If they are on any type of psychotropic medication, yes.

. . .

BY MR. VORA:              This list was distributed then weekly to you, who then in turn provide[d] it to the relevant death row supervisors to ensure [that] the policies of the prison [ ], with respect to the death row tiers [and] with respect to monitoring, [were] properly followed and enforced, is that correct?

BY MS. NORWOOD:           Yes.

77

| BY MR. VORA: | And this is an example of the list that you did not put Mr. Ball, Mr. Magee, or Mr. Code on, despite the fact that they had complained of their concern about being affected by the heat that they had been exposed to, correct? |
| --- | --- |
| BY MS. NORWOOD: | They are not on any psychotropic, except for Mr. Magee.[98] |
| | . . . |
| BY MR. VORA: | Warden Norwood, the lists that get sent out every week of the [inmates] who are at risk for heat-related illness, with respect to that list that goes out every week, at no time did you ask that Mr. Code, Mr. Magee, or Mr. Ball be placed on that list, is that a true statement? |
| BY MS. NORWOOD: | Yes. |

Indeed, Defendants failed to introduce any evidence that Magee is on, or was ever placed on, the "Heat Precautions List."

83.     In sum, the Court concludes that Defendants disregarded the substantial risk of serious harm to Plaintiffs' health and safety.  Accordingly, the Court concludes that Plaintiffs have met their burden of proving that Defendants  acted with deliberate indifference.  Thus, the Court concludes that the conditions of confinement at Angola's death row do not meet constitutional standards, and Defendants have violated the

---

[98] Defendants' staff physician, Dr. Macmurdo, also acknowledged this fact:

| BY MS. MONTAGNES: | Do you consider Remeron® to be a psychotropic drug? |
| --- | --- |
| BY DR. MACMURDO: | Yes. |
| BY MS. MONTAGNES: | And Mr. Magee is on Remeron®, isn't he? |
| BY DR. MACMURDO: | Yes. |

Trial Transcript, Testimony of Dr. Hal David Macmurdo, Aug. 7, 2013.

Eighth Amendment.[99]

84.    This conclusion is consistent with determinations made by other District Courts

addressing similar prison conditions, and affirmed by various Courts of Appeals.

85.    For example, in *Russell v. Johnson*, No. 02-261, 2003 WL 22208029 (N.D. Miss.

May 21, 2003) a magistrate judge in the Northern District of Mississippi determined

that prison officials at the Mississippi State Penitentiary ("Parchman") violated death

row inmates' Eighth Amendment rights by, among other things, forcing them to endure

summer cell temperatures exceeding a heat index of 90 degrees without access to

"extra showers, ice water, or fans" where the ventilation in death row was otherwise

"inadequate to afford prisoners a minimal level of comfort during the summer months."

*Id.* at *2, *5, *aff'd in part, vacated in part sub nom. by Gates*, 376 F.3d 323.  After a

bench trial, the magistrate judge found:

> The probability of heat-related illness is extreme [on death row], and is
> dramatically more so for mentally ill inmates who often do not take
> appropriate behavioral steps to deal with the heat.  Also, the medications
> commonly given to treat various medical problems interfere with the
> body's ability to maintain a normal temperature.

*Id.* at *2.  Based on these findings of fact, the court determined that the inmates' cell

conditions were unconstitutional, and ordered the defendants to "insure that each cell

is equipped with a fan, that ice water is available to each inmate, and that each inmate

may take one shower during each day when the heat index is 90 degrees or above."  *Id.*

at *5.  As an alternative, the magistrate judge ordered that "the defendants may

---

[99] The Court notes that the fact that Angola has attained accreditation from the American Correctional
Association (ACA) does not moot the issues in this matter, nor does it automatically ensure that the
conditions of confinement at death row meet constitutional standards.  *See Friends of the Earth, Inc. v.
Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2002).

79

provide fans, ice water, and daily showers during the months of May through September."[100]  *Id.*

86.    On appeal, the Fifth Circuit agreed that the magistrate judge's findings were sufficient to support the injunction, to the extent that it applied to Parchman's death row unit.[101]  *Gates*, 376 F.3d at 340.  In particular, the Fifth Circuit noted that the magistrate judge's findings supported a determination that "the probability of heat-related illness [was] extreme" on Parchman's death row and, therefore, the heat index "present[ed] a substantial risk of serious harm to the inmates."  *See id.*  Thus, "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness," the Fifth Circuit affirmed "the trial court's finding regarding MDOC's deliberate indifference" and held that the injunction was "justified by an Eighth Amendment violation."  *Id.  See also Valigura*, 265 F. Appx. at 235-36 (affirming the district court's denial of summary judgment to prison officials at Texas's Beeville State Prison on an inmate's prison conditions claim where poor ventilation in the bunk area resulted in "temperatures above the eighties and into the

---

[100] In contrast, here, Plaintiffs' cells are not equipped with fans.  Rather, each housing tier includes non-oscillating fans, which are mounted approximately nine feet away from the inmate cells.  Each fan is shared by two cells.  However, during the Court's site visit, the undersigned observed that the fans did not provide equal amounts of air flow to each cell, nor did the fans provide a detectable cooling effect or relief from the heat conditions in the tier.  Further, it is uncontroverted that Plaintiffs do not have direct access to ice during the twenty-three hours per day that they are confined to their cells.  Rather, Plaintiffs are largely dependant on other death row inmates to distribute ice to them during that inmate's tier time.  Further, while the Court did not attempt to measure the temperature of the water from the in-cell faucets, the undersigned noted that the cold water was lukewarm to the touch.  Additionally, it is uncontroverted that Plaintiffs are permitted only one shower per day, and that the shower water temperature is maintained between 100 and 120 degrees.

[101] The Fifth Circuit invalidated the injunction to the extent that it purported to apply to cell blocks beyond Parchman's death row because "the class represented by [the plaintiff] consists entirely of Parchman's Death Row prisoners."  *Gates*, 376 F.3d at 339.

hundreds," because temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment) (citing *Gates*, 376 F.3d at 339-40).

87.    The district court for the Western District of Wisconsin addressed a similar situation in *Jones'El v. Berge*, No. 00-421, 2003 WL 23109724 (W.D. Wis. Nov. 26, 2003), *aff'd Jones'El*, 374 F.3d at 545.    After prisoners confined at the Supermax Correctional Institution in Boscobel, Wisconsin ("Supermax") sued prison officials alleging unconstitutional conditions of confinement based, in part, on having to endure "extreme" summer temperatures in their cells, *Jones'El*, 374 F.3d at 542-43, the defendants entered into a settlement agreement requiring them to "investigate and implement as practical a means of cooling the cells during summer heat waves." *Jones'El*, 2003 WL 23109724, at *1.    Later, when the defendants failed "to cool the cells to temperatures between 80 degrees and 84 during the hot months," the prisoners sought an enforcement order from the district court.    *See id.*    Noting the defendants' admission that "air conditioning [was] the only viable way to cool the cells to the required temperatures," *id.*, the district court ordered the defendants "to take steps immediately to air condition the cells."    *Id.* at *2.

88.    On appeal, the Seventh Circuit affirmed the district court's enforcement order, and rejected the prison officials' arguments that the order failed under the Prison Litigation Reform Act because it was not narrowly drawn, and that installing air conditioning at Supermax was otherwise impractical and/or would cause undue strife

between prisoners and guards. *Jones'El*, 374 F.3d at 545.

89.    Likewise, in *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010), the Ninth Circuit affirmed a district court order requiring the Sheriff of Maricopa County, Arizona to "provide pretrial detainees taking psychotropic medications with housing in which the temperature does not exceed 85° F." *Id.* at 1045. The district court's order came in the wake of ongoing litigation in which pretrial detainees argued that "harsh conditions of confinement at [county] jails," which included "dangerously high [cell] temperatures," violated their constitutional rights. *Id.* at 1046. After a hearing on the defendants' Motion to Terminate a previous order requiring remedial relief, *see id.* at 1046, "[t]he district court found that air temperatures above 85° F greatly increase the risk of heat-related illnesses for individuals who take psychotropic medications and found further that pretrial detainees taking psychotropic medications [were] held in areas [of the jails] where the temperature . . . exceeded 85° F." *Id.* at 1048-49. Based on these findings, "[t]he district court ordered Sheriff Arpaio to house all detainees taking psychotropic medications in temperatures that do not exceed 85° F." *Id.* at 1049.

90.    On appeal, the Ninth Circuit determined that "the district court reasonably concluded that temperatures in excess of 85° F are dangerous for pretrial detainees taking psychotropic medications," and agreed with its legal conclusion that the "Eighth Amendment requires that the temperature of the areas in which pre-trial detainees are held or housed does not threaten their health or safety." *Id.* Thus, "the Eighth Amendment prohibits housing such pretrial detainees in areas where the temperature

exceeds 85° F."

91.     Finally, this Court's conclusion that the conditions in Angola's death row tiers are unconstitutional is *not* inconsistent with the Eleventh Circuit's reasoning in *Chandler v. Crosby*.  In that case, death row inmates at Florida's Union Correctional Institution ("UCI") also alleged unconstitutional conditions of confinement based on "the high temperatures in their cells during the summer months." *Chandler*, 379 F.3d at 1282.  After a bench trial, the district court rejected the inmates' claims, determining that they failed to establish the objective prong for proving an Eighth Amendment violation.[102]  *See id.* at 1297 n.27.  This determination was based on evidence showing that during the period in question: (1) the typical temperature in the inmates' cells was "between approximately eighty degrees at night to approximately eighty-five or eighty-six degrees during the day," *id.* at 1285 (quotation marks omitted); (2) the inmates' experienced temperatures over ninety degrees only nine percent of the time and never experienced temperatures exceeding 100 degrees, *id.* (quotation marks omitted); and (3) the ventilation system on UCI's death row exceeded industry standards for air circulation and was working properly, *see id.* at 1285-86 n.14.

92.     On appeal, the Eleventh Circuit affirmed the district court's ruling.  Before discussing the evidence, the Court clarified three points of law: "[f]irst, the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation.  Cooling and ventilation are distinct prison conditions, and a prisoner may state an Eighth

---

[102] The district court also determined that the inmates failed to satisfy the subjective prong. *Chandler*, 379 F.3d at 1297 n.27.

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 83 of 102

Amendment claim by alleging a deficiency as to either condition in isolation or both in combination," *id.* at 1294; "[s]econd, the Eighth Amendment is concerned with both the 'severity' and the 'duration' of the prisoner's exposure to inadequate cooling and ventilation," *id.* at 1295; and "[t]hird, a prisoner's mere discomfort, without more, does not offend the Eighth Amendment," *id.* However, despite acknowledging that under the right circumstances an excessive heat claim could make out an Eighth Amendment violation, the Eleventh Circuit agreed with the district court that the inmates "failed to meet their burden under the objective component" of the test. *Id.* at 1297. First, the summertime heat, averaging "between approximately eighty degrees at night to approximately eighty-five or eighty-six degrees during the day," was simply "not unconstitutionally excessive." *Id.* "Second, [UCI was] equipped with a ventilation system that effectively manage[d] air circulation and humidity." *Id.* at 1298. Finally, "apart from the ventilation system, numerous conditions at [UCI] alleviate[d] rather than exacerbate[d] the heat," including that "[t]he cells [were] not exposed to any direct sunlight"; the inmates were allowed to wear "only shorts in the summer months"; every cell had a sink with "cold running water, and every inmate possesse[d] a drinking cup"; the inmates were not compelled to engage in strenuous activity; and, finally, the inmates had "limited opportunities to gain relief in air-conditioned areas, e.g., during visitation time."

93.    As discussed, the facts in the instant matter are materially different than the facts addressed by the district court and the Eleventh Circuit in *Chandler*. First, and most obvious, the temperatures, humidity, and heat index endured by Plaintiffs here

are substantially higher than those at issue in *Chandler*. Second, it is uncontroverted that Plaintiff Code is subjected to direct sunlight through the window across from his cell. Third, whereas the prison officials in *Chandler* produced extensive evidence regarding the ventilation system at UCI and its functional capacity, *see id.* at 1283-85, the record here is void of any evidence regarding the instant ventilation system's ability to lower the temperature, humidity, and heat index in the tiers. Rather, Plaintiffs produced testimonial evidence from David Garon[103], which was uncontroverted, that the ventilation system at Angola is incapable of cooling or dehumidifying the death row tiers:

| | |
|---|---|
| BY MS. COMPA: | . . . Can you describe the system that's in place in the death row tiers? |
| BY MR. GARON: | It's a - there's a heating only system for winter conditions. And there's an exhaust system for ventilation. That's basically all there is. |
| BY MS. COMPA: | And were there - |
| BY MR. GARON: | There's some prop fans mounted on the walls also. |
| BY MS. COMPA: | And with respect to the exhaust system that you just mentioned, what is that designed to do? |
| BY MR. GARON: | Its designed to exhaust air from the facility and its toilets and each cell. And there's - so there's an exhaust system for the cell block, each individual cell. There's exhaust fans to take care of that. And there is a separate exhaust system for the showers, basically just |

---

[103] The parties stipulated that Garon is an expert in the field of testing and balancing, who tests, adjusts, and analyzes mechanical heating, ventilation, and air conditioning systems.

|  |  |
|---|---|
|  | to remove odors and provide some ventilation. |
| BY MS. COMPA: | And what - what is it designed to do, if I can ask it that way?  What are the limitations of the serta system? |
| BY MR. GARON: | Its just to remove odors and ventilate the cell. |
| BY MS. COMPA: | And is [the ventilation system] designed to cool or dehumidify the air in any way? |
| BY MR. GARON: | No.  You can't dehumidify with exhaust. |

Trial Transcript, Testimony of David Garon, Aug. 5, 2013.  Garon further testified that

Angola's "natural" ventilation system, which is not recommended in hot, humid

climates, does not include features that are essential to a sound natural ventilation

system:

|  |  |
|---|---|
| BY MS. COMPA: | Is building a building in south Louisiana with natural ventilation typical for this region? |
| BY MR. GARON: | I have never seen a naturally ventilated building that didn't have mechanical cooling. |
| BY MS. COMPA: | Have you seen a naturally ventilated building that did have mechanical cooling? |
| BY MR. GARON: | Yes. |
|  | . . . |
|  | The exhaust system would qualify under naturally ventilated.  As long as it doesn't have the mechanical cooling, it will qualify as naturally ventilated. |
|  | . . . |
| BY MS. COMPA: | Does the death row building, based on your inspection of the premises, include features |

86

|  | that are considered part of a sound natural ventilation system? |
|---|---|
| BY MR. GARON: | No. |
| BY MS. COMPA: | And what - what are some features that might describe such a system that are lacking in death row? |
| BY MR. GARON: | As I described before, usually you would want to have cross - some sort of cross ventilation. Windows on both sides. Orientation of the building geographically, and the geometry of the building. . . . |

Trial Transcript, Testimony of David Garon, Aug. 5, 2013. Thus, according to the uncontroverted testimony of Plaintiffs' expert, a building designed and built to house human beings for twenty-four hours per day should have included a mechanical cooling system *or* a cross-ventilation system *at the very least*. The death row tiers have *neither*. Fourth, whereas the UCI inmates each had sinks with cold running water in their cells, the uncontroverted evidence here is that Plaintiffs do not have unfettered access to ice. Further, as noted above, during the Court's site visit, the undersigned noted that the "cold" water was lukewarm to the touch. Fifth, it is uncontroverted that Plaintiffs' opportunities to gain relief in air-conditioned areas is limited to once every few months.

94. Additionally, the medical records and uncontroverted testimonial evidence establish that, due to their underlying medical conditions and medications, which interfere with their ability to maintain a normal temperature, the probability of Plaintiffs developing heat-related illness in such extreme heat conditions is high.

87

95.    As noted above, "the Supreme Court has made clear that the standard against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society,' and not the standards in effect during the time of the drafting of the Eighth Amendment."  *Gates*, 376 F.3d at 332-33 (quoting *Estelle*, 429 U.S. at 102) ("The [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency'. . . against which we must evaluate penal measures.") (citations omitted).  Given the overwhelming evidence in the record and our nations' current standards of decency, it cannot be said that the conditions of confinement in Angola's death row facility pass constitutional muster.

96.    In sum, the Court concludes that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment.

### B.    Title II of the Americans with Disabilities Act, the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973

97.    Plaintiffs also allege that Defendants have violated their rights under the ADA, as modified by the ADAAA, and the Rehabilitation Act, by "fail[ing] and refus[ing] to reasonably accommodate their disabilities while in custody," and that this "failure and refusal put them at substantial risk of serious harm"  (Doc. 1, ¶ 73.)

98.    The ADA and related statutes afford certain rights to incarcerated individuals in state facilities.[104]

---

[104] Here, Defendants do not contest that they are subject to Title II of the ADA, the ADAA, and Section 504 of the Rehabilitation Act of 1973:

> BY MR. VORA:                    And you understand that the Louisiana State Penitentiary is subject to the requirements of Title II of the Americans with Disabilities Act.  Correct, sir?

99.    Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

100.    A "public entity" includes "any State or local government" and "any department, agency, . . . or other instrumentality of a State."  42 U.S.C. § 12131(1)(A)-(B).

101.    State agencies, including Defendant Louisiana Department of Public Safety and Corrections, can be sued under Title II.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006) (holding that Title II "validly abrogates state sovereign immunity" and

---

| BY MR. CAIN: | Yes. |

| BY MR. VORA: | . . . You also understand as a recipient of public federal funds, the Louisiana Department of Public Safety and Corrections is subject to Section 504 of the Rehabilitation Act, correct? |

| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.  Defendants also do not contest that they had an obligation, under the ADA, to provide eligible inmates with an accommodation:

| BY MR. VORA: | And your officers, after receiving this training, then would understand that depression is one of the types of mental illnesses, correct? |

| BY MR. CAIN: | I would hope. |

| BY MR. VORA: | And you would also hope that the correctional officers working under you at Angola would understand that these types of mental illnesses would be the types of things for which accommodations should be provided pursuant to Title II of the Americans with Disabilities Act, correct? |

| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 89 of 102

authorizes suits against States, including complaints concerning conditions of confinement in state prisons).

102.    Title II of the ADA followed in the footsteps of Section 504 of the Rehabilitation Act, which provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).  The Fifth Circuit has observed:

> The language of Title II generally tracks the language of Section 504 of the Rehabilitation Act of 1973, and Congress' intent was that Title II extend the protections of the Rehabilitation Act "to cover all programs of state or local governments, regardless of the receipt of federal financial assistance" and that it "work in the same manner as Section 504."

*Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting H.R. Rep. No. 101-485, pt. III at 49-50 (1990)) (footnotes omitted).

103.    Indeed, Title II of the ADA specifically provides that "[t]he remedies, procedures and rights" available under Section 504 shall be the same as those available under Title II.  42 U.S.C. § 12133.  Thus, cases interpreting either Title II of the ADA or Section 504 of the Rehabilitation Act are applicable to both.  *Hainze*, 207 F.3d at 799.

104.    The tests for determining success under the Rehabilitation Act and Title II of the ADA are substantially similar.  To prove a claim under Section 504 of the Rehabilitation Act, a plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in, denied benefits of, or subjected to discrimination under the defendant's program solely because of his

90

disability; and (3) that the program in question receives federal financial assistance. 29 U.S.C. § 794(a). Similarly, to prove discrimination under Title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he has been excluded from participation in, or denied the benefits of the services, programs, or activities of a public entity, or that he was otherwise discriminated against by such entity; and (3) that such exclusion or discrimination was by reason of his disability. 42 U.S.C. § 12132; *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).

> ### 1.    Plaintiffs Failed to Introduce Evidence into the Record to Establish that They are Qualified Individuals with Disabilities

105.    The ADA and the Rehabilitation Act each define disability to mean "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(B) ("The term 'disability' means . . . the meaning given it in section 12102 of Title 42.").[105]

106.    "Major life activities" are "those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).

107.    The Equal Employment Opportunity Commission's regulations implementing the ADA provide a non-exhaustive list of "major life activities." Such activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing,

---

[105] In 2008, the ADA was modified by the ADAAA, Pub. L. No. 110-325, 122 Stat. 3553, which, among other things, clarified that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," 42 U.S.C. § 12102(4)(A), and that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication, [or] medical supplies." 42 U.S.C. § 12102(4)(E)(i)(I).

eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i). *See also* 42 U.S.C. § 12102(2)(A)(1).

108.    "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009) (citing 29 C.F.R. § 1630.2(j)).

109.    In making that determination, the EEOC has advised that courts consider: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* at 614-15 (citing 29 C.F.R. § 1630.2(j)).

110.    The evidence in the record establishes that Plaintiffs suffer from several chronic diseases. As previously noted, it is uncontroverted that Plaintiff Ball suffers from uncontrolled blood pressure, hypertension, diabetes, and obesity; Plaintiff Code suffers from hypertension, obesity, and hepatitis; and Plaintiff Magee suffers from hypertension, high cholesterol, and depression.

111.    While the Court has no doubt that such diseases may limit one or more of Plaintiffs' major life activities, the record is void of any *evidence* to support such a conclusion.

112.    Indeed, Plaintiffs failed to introduce evidence into the record to establish that Plaintiffs chronic diseases substantially limit their ability to care for themselves,

92

perform manual tasks, walk, see, hear, speak, breath, learn, working, eat, sleep, stand, lift, bend, read, concentrate, think, or communicate.  Rather, the evidence introduced by Plaintiffs was limited to how the *heat conditions* in the death row tiers limit Plaintiffs' major life activities, and how Plaintiffs' underlying medical conditions put them at increased risk of developing heat-related illnesses.

113.    During the trial and in their submissions to the Court, Plaintiffs described the chronic diseases that each Plaintiff suffers, and the medications that each Plaintiff is required to take.  *See, e.g.*, Doc. 53-9, pp. 11-15.  However, "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA." *Chevron Phillips Chem. Co.*, 570 F.3d at 614.  Here, Plaintiffs simply failed to introduce evidence that their chronic diseases and/or medications impede their ability to perform major life activities.

114.    In their submissions to the Court, Plaintiffs describe themselves as "disabled" and allege that they are "qualified individuals regarded as having physiological impairments that substantially limit one or more of their major life activities." (Docs. 1, ¶73; 53-9, p. 11.)  However, such conclusory statements and/or allegations are insufficient to establish that Plaintiffs have physical or mental impairments that substantially limit one or more major life activities.  Nor are such conclusory statements and/or allegations sufficient to establish that Plaintiffs are regarded as having a physical or mental impairment that substantially limits one or more of their life activities.

115.    In sum, the Court concludes that Plaintiffs have failed to establish that they are

qualified individuals with a disability. *See Chevron Phillips Chem. Co.*, 570 F.3d at 614.

116.    Absent evidence in the record that Plaintiffs' underlying medical conditions substantially limit one or more of their life activities, Plaintiffs have failed to establish a prima facie case for discrimination under Title II of the ADA, as modified by the ADAAA, and the Rehabilitation Act. *Blanks v. SW Bell Communs., Inc.*, 310 F.3d 398, 400 (5th Cir. 2002) ("To establish a prima facie case for discrimination under the ADA, a plaintiff must be a qualified individual with a disability."). Accordingly, Plaintiffs' claims under the ADA and the Rehabilitation Act must be denied.

## VII.    CONCLUSION

### A.    Declaratory and Injunctive Relief

1.    "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing cases).

2.    Here, as discussed at length above, Plaintiffs have met their burden of proving that Defendants have violated, and continue to violate, their Eighth Amendment rights. Undoubtedly, remedies available at law, such as monetary damages, are

94

inadequate to compensate Plaintiffs for such injury.  To support their argument that the "harm" to Defendants outweighs the injury to Plaintiffs, Defendants introduced testimonial evidence regarding the Louisiana Department of Public Safety and Corrections' "reduced budget."  *See* Trial Transcript, Testimony of James M. LeBlanc, Aug. 7, 2013.  However, Defendants' purported financial hardships "can never be an adequate justification for depriving any person of his constitutional rights."  *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986).  Finally, it is beyond dispute that a permanent injunction against Defendants serves the public interest in that it will enforce the fundamental rights enshrined in the United States Constitution.  In sum, the Court concludes that Plaintiffs have met the test and shown "a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner."  *Posada v. Lamb County*, 716 F.2d 1066, 1070 (5th Cir. 1983).  Accordingly, the Court concludes that it has a "duty and obligation to fashion effective relief."  *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974); *see also Swann v. Board of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

3.     Because this case concerns conditions of confinement, the Court must abide by the standards set out in the Prison Litigation Reform Act ("PLRA").  The PLRA narrowly limits the relief that a federal court may impose in prisoner suits.  *See* 18 U.S.C. § 3626.

4.     According to the PLRA, injunctive relief "must be narrowly drawn, extend no

further than necessary to correct the harm the court finds requires preliminary relief,

and be the least instrusive means necessary to correct that harm."  18 U.S.C.

§ 3626(a)(2).

5.     The PLRA further prohibits a federal court from ordering any prospective relief

"unless the court finds that such relief is narrowly drawn, extends no further than

necessary to correct the violation of the Federal right, and is the least intrusive means

necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

6.     According to the parties' Statement of Undisputed Facts: "Plaintiffs have each

exhausted their administrative remedy proceedings as required under the Prison

Litigation Reform Act[,] 42 U.S.C. § 1997(e) . . ."  (Doc. 53-1, p. 3.)  *See also supra* note

93.

7.     The Fifth Circuit has held that "[i]ntrusion of federal courts into state agencies

should extend no further than necessary to protect federal rights of the parties. An

injunction, however, is not necessarily made overbroad by extending benefit[s] or

protection to persons other than prevailing parties in the lawsuit - even if it is not a

class action - if such breadth is necessary to give prevailing parties the relief to which

they are entitled."  *Prof'l Assoc. of College Educators v. El Paso County Cmty. College

Dist.*, 730 F.2d 258, 273-274 (5th Cir. Tex. 1984) (citing *Meyer v. Brown & Root Const.

Co.*, 661 F.2d 369, 374 (5th Cir.1981)); *accord Gregory v. Litton Systems, Inc.*, 472 F.2d

631, 633-34 (9th Cir.1972).

8.     Here, it is uncontested that Defendants may move any death row inmate to a different tier and/or cell at any time.  Accordingly, the Court finds that a remedy aimed at ameliorating the heat conditions throughout the death row facility is necessary to adequately vindicate Plaintiffs' rights, and is not overbroad.

9.     Having found that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment, the Court grants Plaintiffs request for declaratory and injunctive relief, and directs the following immediate remedial actions:

10.     Defendants are hereby ordered to immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit.

11.     Defendants shall submit their plan to the Court **no later than February 17, 2014 at 5:00 p.m.**

12.     Defendants' plan shall include a step-by-step description as to how Defendants will: (1) immediately lower and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit **from April 1 through October 31**; (3) monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis **from April 1 through October 31**; (4) provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with (a) at least one cold shower per day; (b) direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" *and* the twenty-

97

three hours in which the inmates are confined to their cell; and (c) any and all relief that it is necessary to comply with this Court's order and the prevailing constitutional standards.

13.     Defendants are advised that financial considerations will **not** be considered a legitimate reason for Defendants' failure to comply with this Court's order.  As noted above, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights."  *Udey*, 805 F.2d at 1220; *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977) (rejecting the defendants' argument that "lack of funds to implement the trial court's order" justified the defendants' failure to remedy ongoing constitutional violations); *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1972) ("Where state institutions have been operating under unconstitutional conditions and practices, the defense[ ] of fund shortage . . . ha[s] been rejected by the federal courts.").

14.     Defendants are further ordered to comply with Louisiana Department of Public Safety and Corrections Health Care Policy No. HC-45 and Louisiana State Penitentiary Department Regulation No. B-06-001 and immediately add Plaintiff James Magee to Angola's "Heat Precautions List."

15.     Plaintiffs shall file a response to Defendants' proposed plan **no later than March 10, 2014 at 5:00 p.m.**

16.     Given Defendants' deliberate indifference to the substantial risk of harm to Plaintiffs, and Defendants' actions throughout the data collection period, the Court will retain jurisdiction and monitor Defendants' implementation of the plan.  Accordingly, the Court shall also appoint a Special Master to oversee Defendants' implementation

of the plan, and report on Defendants' progress on a weekly basis. Fed.R.Civ.P. 53. Defendants shall bear all costs associated with the duties of the Special Master.

17.    Plaintiffs and Defendants shall jointly or separately recommend candidates for appointment as Special Master **no later than March 10, 2014 at 5:00 p.m.** The parties' recommendations shall be filed into the record of this matter and shall set out the qualifications of the persons so recommended.

18.    Prior to the trial on the merits, the United States Department of Justice submitted a Statement of Interest of the United States (Doc. 64), advising the Court as to the additional relief available to Plaintiffs. Accordingly, Plaintiffs and Defendants shall jointly or separately file a response to the United States Department of Justice's submission **no later than March 10, 2014 at 5:00 p.m.**.

### B.    Attorneys' Fees and Costs

19.    42 U.S.C. § 1988 states in pertinent part:

> (b) Attorney's fees

> In any action or proceeding to enforce a provision of section [ ] . . . 1983 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

42 U.S.C. § 1988(b).

20.    Accordingly, Plaintiffs are awarded reasonable attorneys' fees and costs. Counsel for Plaintiffs shall file their motion for attorneys' fees and costs **on a date to be fixed by the Court**. Plaintiffs' motion shall comply with the Federal Rules of Civil

Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

## VIII.  JUDGMENT

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Motion for a Preliminary Injunction (Doc. 12)** is **DENIED AS MOOT**.

The Court concludes that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment.

The Court further concludes that Plaintiffs have failed to establish a prima facie case for discrimination under Title II of the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.

Accordingly,

**IT IS FURTHER ORDERED** that Plaintiffs' request for declaratory and injunctive relief is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants shall immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit.

**IT IS FURTHER ORDERED** that Defendants shall submit their plan to the Court **no later than February 17, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Defendants' plan shall include a step-by-step description as to how Defendants will: (1) immediately lower and maintain the

heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit **from April 1 through October 31**; (3) monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis **from April 1 through October 31**; (4) provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with (a) at least one cold shower per day; (b) direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" *and* the twenty-three hours in which the inmates are confined to their cell; and (c) any and all relief that it is necessary to comply with this Court's order and the prevailing constitutional standards.

*Defendants are advised that financial considerations will **not** be considered a legitimate reason for Defendants' failure to comply with this Court's order.*

**IT IS FURTHER ORDERED** that Defendants shall immediately add Plaintiff James Magee to Angola's "Heat Precautions List."

**IT IS FURTHER ORDERED** that Plaintiffs shall file a response to Defendants' proposed plan **no later than March 10, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall jointly or separately recommend candidates for appointment as Special Master **no later than March 10, 2014 at 5:00 p.m.** The parties' recommendations shall be filed into the record of this matter and shall set out the qualifications of the persons so recommended.

**IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall jointly or

separately file a response to the United States Department of Justice's submission **no later than March 10, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Plaintiffs are awarded reasonable attorneys' fees and costs. Plaintiffs shall file their motion for attorneys' fees and costs **on a date to be fixed by the Court**. Plaintiffs' motion shall comply with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

**IT IS FURTHER ORDERED** that the Clerk of Court shall serve a copy of this Ruling and Order on the United States Attorney for the Middle District of Louisiana and the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice.

Baton Rouge, Louisiana, this 19th day of December, 2013.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

102

Exhibit 3

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ELZIE BALL, ET AL                              CIVIL ACTION NO. 13-CV-368

VERSUS                                         JUDGE BRIAN A. JACKSON

JAMES M. LEBLANC, ET AL                        MAGISTRATE JUDGE REIDLINGER

## DEFENDANTS' SUBMISSION OF HEAT REMEDIATION PLAN

**NOW INTO COURT,** through undersigned counsel, come BURL CAIN, Warden, Louisiana State Penitentiary ("LSP"); JAMES LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections; ANGELIA NORWOOD, Assistant Warden, Louisiana State Penitentiary and LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; (referred to jointly as "Defendants"), who make the following submission as Defendants' heat remediation plan ("Plan") as ordered by this Court. [Doc. 87, pages 97 and 98.]

## A.    PROCEDURAL HISTORY

On December 19, 2013, this Court ordered, among other things, that the Defendants prepare and submit a Plan, which will immediately lower and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit from April 1 through October 31, monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis from April 1 through October 31, provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with at least one "cold" shower per day, and direct access to clean, uncontaminated ice and/or cold drinking water during their tier time and the remainder of their time in which they are confined to their cells. The last section of that portion of the Order was an omnibus provision to cover "any and all relief that is necessary to comply with the Court's order and the prevailing constitutional

1

standards." The order dictated that the Plan shall be submitted to the Court no later than 5:00 p.m. on February 17, 2014.

## B.    HEAT AND HUMIDITY REDUCTION AND MONITORING

Defendants have retained Mr. Frank Thompson, P.E., Thompson Luke & Associates, LLC, to promulgate a plan to maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit from April 1 through October 31, and monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis from April 1 through October 31. Mr. Thompson's CV is attached hereto as Exhibit "A" and his heat remediation and monitoring plan, with exhibits B1-B4, is attached hereto as Exhibit "B" *in globo*.

In short, Mr. Thompson's calculations show that the death row building would require approximately nine tons of air conditioning system capacity for each of the eight tiers. Mr. Thompson proposes use of a ten ton capacity system for each tier. A ninth ten ton capacity AC unit would be purchased and stored onsite should a unit fail. The AC units would utilize the existing heating, ventilation, and air conditioning ("HVAC") system in the building. As shown by Mr. Thompson's calculations, the proposed HVAC system would be capable of maintaining the heat index below 88 degrees Fahrenheit for each tier.

In addition, the temperature and humidity would be automatically monitored and recorded by a hard wired climate monitoring system for each tier. The data would be transmitted and stored as part of the LSP computer network system. The heat and humidity sensors will transmit their readings to the building's existing Johnson Control energy management system every 15 minutes. The system is capable of producing graphs showing temperature/humidity

2

conditions over any time period. The reports can be generated on an as-requested basis, such as daily, for example. The data can be accessed and provided to any parties with an interest in same.

The HVAC temperature and humidity monitoring system does not calculate the heat index using the formula established by the National Weather Service ("NWS"). To determine the heat index used by the NWS simply requires taking the recorded temperature and humidity data and utilizing the NWS heat index calculator found on the NWS website at http://www.hpc.ncep.noaa.gov/html/heatindex.shtml. Inputting those numbers into the formula would provide the NWS heat indices at the relevant time periods. LSP can provide the heat index calculations to the Court and other interested parties.

### C.    ONE "COLD" SHOWER PER DAY

From April 1 through October 31 the Defendants submit that each inmate will receive one "cold" shower per day. The Court did not set a benchmark for what temperature a "cold" shower should be. The water temperature is (and has been) regulated by LSP staff by way of a mixing valve. The mixing valve can adjust the water temperature at the shower head. LSP follows facility standards as established by the American Correctional Association ("ACA"). The relevant ACA standard requires that shower head water temperature range from 100 to 120 degrees Fahrenheit. See Exhibit "C," ACA Standard 4-4139, *Showers*, attached hereto.  LSP staff would just need to know what temperature or temperature range the Court requires.

### D.    ICE AND/OR COLD DRINKING WATER

From April 1 through October 31 the Defendants submit that each inmate will receive an ice chest which will be filled and replenished with clean ice as needed by LSP staff during their regular security rounds through each tier.

3

**WHEREFORE,** defendants, BURL CAIN, Warden, Louisiana State Penitentiary; JAMES

LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections; ANGELIA

NORWOOD, Warden, Death Row and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY

AND CORRECTIONS, respectfully pray that this Plan as required by this Court in its December

19, 2013 order be deemed good and sufficient.

Respectfully Submitted:

s/ James L. Hilburn
E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
**SHOWS, CALI & WALSH, LLP**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile:  (225) 346-1467

**ROEDEL, PARSONS, KOCH, BLACHE,**
**BALHOFF & MCCOLLISTER**
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar Roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile:  (225) 928-4925

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **February 17, 2014** a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and notice will be sent to all counsel for Plaintiffs by operation of the court's electronic filing system.

/s/ James L. Hilburn
JAMES L. HILBURN

5



**EXHIBIT 4**



# FRANK THOMPSON / Thompson Luke and Associates, LLC
Principal / Professional Engineer

Frank Thompson is the Principal Engineer and Founder of Thompson Luke and Associates (TLA). Mr. Thompson has provided cost estimates, design services and has performed construction administration on many sizeable projects for commercial buildings including general office space, hospitals, laboratories, educational facilities, municipal buildings, commercial kitchens, churches, etc. While in design, Mr. Thompson and his firm are responsible for cost estimates, engineering, design and preparation of contract documents for the mechanical, plumbing, and fire suppression systems. During the construction phase of the project TLA is responsible for construction observation and works with the design team to insure that the project is completed per construction documents. His experience with LEED certification includes the design of Beaux Box office building, Baton Rouge La., Brown Stone mixed use building, downtown Baton Rouge La. Both have been designed to meet the U.S. Green Building Council LEED Silver Standard. He is familiar with all of the current applicable codes associated with the HVAC, plumbing and fire protection systems for commercial buildings and all continuing education classes are up to date. Frank Thompson has eighteen years of professional experience with the design of nearly 2,000 projects.

TLA has provided Services for the Following Organizations:

Commercial Properties, Baton Rouge, Louisiana
Louisiana Department of Health and Hospital
Louisiana Department of Environmental Quality
Louisiana Department of Corrections
Louisiana Department of Justice
Louisiana Department of Public Works
Louisiana Department of Public Safety
Southern University and A&M College, Baton Rouge, Louisiana
East Baton Rouge Parish School Board
State of Louisiana Facility Planning and Control
Louisiana State University
City of Baton Rouge - East Baton Rouge Parish

Reference:
Tony Polatta, State of Louisiana, FP&C, 225-342-0827
Earl Kern, CSRS | Garrard Program Management, 225-226-3708
Eli G. Guillory II, Southern University, 225-771-4740

---

Frank Thompson holds the Following Licenses and Certifications:

**Education Background:**

| Institution | Degree | Year | Specialization |
|---|---|---|---|
| Louisiana State University | B.S. | 1995 | Mechanical Engineering |

**Active Registration:**

| Year First Registered, | Discipline, | Registration No. |
|---|---|---|
| 2000, | PE, Mechanical Engineering, | LA - 28854 |
| 2008, | PE, Mechanical Engineering, | OK - 22899 |
| 2012, | PE, Mechanical Engineering, | MS - 20890 |

**Continuing Education, Seminars/Institution:**

Ventilation System Design and Operation for Healthcare Facilities
Airflow Measurement for Acceptable IAQ
VSDs and their Effect on System Components
LEED Design
ADA Standard for Accessible Design 28 CFR part 36
Ethics and Standards of Professional Conducts

Representative Projects include:

- Department of Justice Building – New Building – Mechanical Engineer
- Department of Health and Hospitals OPH – New Laboratory – Mechanical Engineer
- Department of Environmental Quality – New Laboratory – Mechanical Engineer
- Department of Corrections - Angola Death Row Complex – Mechanical Engineer
- West Baton Rouge Parish Courthouse – New HVAC System – Mechanical Engineer
- DPS Trustee Compound Support Facility – New Dormitory Building – Mechanical Engineer
- Department of Public Safety – Cafeteria Renovations – Mechanical Engineer

Lead Consultant to State Awarded Projects

- Hurricane Katrina Damages Repairs, Temporary Dehumidification, Nine Campus Buildings, Southern University-New Orleans Campus, New Orleans, LA, State Project: 01-107-05B-13, Part 23
- Hurricane Katrina Damages Repairs, Air Handling Replacement for Cafeteria Building, Southern University-New Orleans Campus, New Orleans, LA, State Project: 01-107-05B-13, Part X2
- HVAC Replacements for Allen Correctional Center, Kinder, LA, State Project: 08-408-06B-01, Part 01
- HVAC Replacements for Eastine Smith Mental Health Center, Mandeville, LA, State Project: 19-603-99B04, Part 01
- Library HVAC System Modifications, UNO, New Orleans, LA, State Project: 19-601-93-01, Part 07
- A.R. Chaplin Hall HVAC Repairs, Louisiana State University, Baton Rouge, LA, State Project: 19-601-07B-03, Part 01
- Hurricane Gustav Related Damages, Replacement of Stadium Lighting, Guidry Football Stadium, Nicholls State University, Thibodaux, LA, State Project: G19-6Q1-09-ORM, Part 01
- Mechanical Modifications Wetland Resource Bldg, (CCEER) LSU, Baton Rouge, LA, State Project: 19-601-07B-11, Part 07
- Replacement of AHU, Ag Administration Building, LSU, Baton Rouge, LA, State Project: 01-107-06B-11, Part LX
- Remove and Replace Mold Infested Chilled Water Pipe Insulation Basement Level, Claiborne State Office Building, Baton Rouge, LA, State Project: G19-621-09-ORM, Part 01
- Replacement of Fume Hoods, James W. Lee Hall, SU Baton Rouge, LA, State Project: 01-107-06B-11, Part PY



# Thompson Luke & Associates, L.L.C.

3071 Teddy Dr. Baton Rouge, LA 70809
Phone   225-293-9474
Fax      225-293-4171

## MECHANICAL

### PROPOSED MECHANICAL SYSTEMS FOR THE BUILDING

Goal of the Addition:
The existing HVAC system for the four wings will be modified to maintain indoor conditions below an 88 degree heat index in these areas. Attached are the calculations that support the sizing of the new equipment. The calculations call for 17.43 tons for each wing. This will require two 10 ton cooling system to be added to each wing. This solution will exceed the requirement of the mandated maximum heat index. The ability of monitoring and trending of the conditions in these spaces will be in place after the modifications are complete.

Existing HVAC Air Distribution System for Cellblock Wings:
The wings are currently heated and ventilated only. The heating for each wing is currently accomplished by two air handling units with heat only. These systems utilize the onsite heating hot water that is delivered to each of the eight air handling units. Two air handling units are located in the mechanical room at the end of each of the four wings. Each of these air handling units supplies one half of a wing. Air is distributed to each cell and tier via security type supply air grilles that are fed by externally insulated ductwork in the ceiling space. The existing air distribution ductwork system will be utilized to provide the cooling to the wings. The general exhaust ventilation is provided by two variable speed exhaust fans located above the chase for each wing. Each cell has an exhaust grille at the rear of each cell.

HVAC Modifications to Accomplish for Cooling of the Wings:
The cooling for each wing will be provided by two 10 ton constant volume packaged units with DX coils. One of these units will supply each side of the wing as it is currently divided. Two packaged air conditioning units will be installed on an elevated steel platform located outside of each of the four wing's mechanical room. The condensate from these units will be drained to new exterior wet wells at each location. The air conditioning units will be ducted and tied into each of the existing supply and return air ductwork of each heating unit. The holes in the security wall will be cut by a third party contractor. The existing heating ductwork will be utilized for the cooling system. New isolation dampers will be installed at the existing heating units and the new cooling units to switch from heating to cooling mode. The supply and return air will be fully ducted from the packaged air conditioning units to the occupied space below via low pressure ductwork with internal fiberglass insulation. The air distribution in the cells and tiers will be accomplished by the existing ductwork system that is in place. The new packaged units will be cooling only. The heating will be provided by the existing heating system. The air conditioning units will be controlled by temperature sensors located in the return air ductwork. The sensors will be set by thermostats located in the guard station. The air conditioning units will have dedicated outside air intakes that will provide the required outside air. The fresh air will be at a rate to meet all International Building Code (IBC) requirements. A filter rack with pleated filters will be inside each unit. Refer to the attached schematic sketch of the modification. The owner will purchase and store onsite a ninth spare 10 ton packaged air conditioning unit as backup if one of these units fails.



EXHIBIT
B
in globo



# Thompson Luke & Associates, L.L.C.

3071 Teddy Dr. Baton Rouge, LA 70809
Phone   225-293-9474
Fax     .225-293-4171

Building Exhaust System:
The existing building exhaust system will be turned down to meet the exhaust requirements of the International Mechanical Code. The exhaust fans will no longer be necessary for comfort. The exhaust fans can serve as odor and toxin control. The existing exhaust fans are controlled by individual variable frequency drives and can be adjusted to the new exhaust rates.

Testing and Balancing of the New System:
An independent third party Test and Balance contractor will provide a report that verifies the cooling capacity and the performance of the system once all modifications are complete.

Monitoring of Space Temperature and Humidity:
The monitoring of the space temperature and humidity of the cellblock area will be accomplished with three monitors in each space. The building has a Johnson Controls energy management system. This system can be expanded to add temperature and humidity sensors in the wings. Three sensors will be added to each tier. One will be installed at each end on the wall and one will be installed in the center on the ceiling. A new controller will be installed in each mechanical room. This controller will integrate the sensors into the existing energy management system. The cut sheet for the sensors and the controller are attached. These sensors will take temperature and humidity readings in the space every 15 minutes. The Johnson Control energy management system is capable of producing graphs charting the temperature/humidity conditions over any time period. The reports can be generated on an as-requested basis, such as daily, for example. The data can be accessed and provided to any parties with proper security access.

Electrical System:
The power in the existing mechanical rooms will be modified to accommodate these new units. According to the Maintenance staff on site, there is plenty of spare power to feed the new equipment. The department of Corrections will use onsite skilled labor or a third party to perform all of the electrical work.

If you have any questions, do not hesitate to call.

Sincerely,

Frank Thompson, P.E.
Thompson Luke & Associates, LLC
February 17, 2014

*Angola Death Row Tier AC*
*HVAC Load Analysis*

for

Department Of Corrections





Prepared By:

Frank Thompson, PE
Thompson Luke And Associates, LLC
3071 Teddy Drive
Baton Rouge, LA



EXHIBIT

*B1*

| Chvac - Full Commercial HVAC Loads Calculation Program | | Elite Software Development, Inc. |
|---|---|---|
| Thompson Luke & Associates |  | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | | Page 2 |

## General Project Data Input

### General Project Information

| | |
|---|---|
| Project file name: | P:\Active Projects\14-024 STATE_Air Conditioning Angola Death Row\14-024 LOAD\14-024 Tier Angola Death Row HVAC Load.CHV |
| Project title: | Angola Death Row Tier AC |
| Project address: | Louisiana State Penitentiary |
| Project city, state, ZIP: | Angola, Louisiana |
| Designed by: | FST |
| Project date: | Sunday, February 16, 2014 |
| Weather reference city: | BATON ROUGE, LOUISIANA, USA |
| Client name: | Department Of Corrections |
| Company name: | Thompson Luke And Associates, LLC |
| Company representative: | Frank Thompson, PE |
| Company address: | 3071 Teddy Drive |
| Company city: | Baton Rouge, LA |

| | | |
|---|---|---|
| Barometric pressure: | 29.852 | in.Hg. |
| Altitude: | 64 | feet |
| Latitude: | 31 | Degrees |
| Mean daily temperature range: | 20 | Degrees |
| Starting & ending time for HVAC load calculations: | 1am - 12am | |
| Number of unique zones in this project: | 4 | |

### Building Default Values

| | | |
|---|---|---|
| Calculations performed: | Both heating and cooling loads | |
| Lighting requirements: | 2.00 | Watts per square foot |
| Equipment requirements: | 0.00 | Watts per square foot |
| People sensible load multiplier: | 230 | Btuh per person |
| People latent load multiplier: | 190 | Btuh per person |
| Zone sensible safety factor: | 10 | % |
| Zone latent safety factor: | 10 | % |
| Zone heating safety factor: | 10 | % |
| People diversity factor: | 100 | % |
| Lighting profile number: | 1 | |
| Equipment profile number: | 1 | |
| People profile number: | 1 | |
| Building default ceiling height: | 9.50 | feet |
| Building default wall height: | 9.50 | feet |

### Internal Operating Load Profiles (C = 100)

| | hr 1 | hr 2 | hr 3 | hr 4 | hr 5 | hr 6 | hr 7 | hr 8 | hr 9 | hr 10 | hr 11 | hr 12 | hr 13 | hr 14 | hr 15 | hr 16 | hr 17 | hr 18 | hr 19 | hr 20 | hr 21 | hr 22 | hr 23 | hr 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 2 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 3 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 4 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 5 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 6 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 7 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 8 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 9 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |
| 10 | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C | C |

| Chvac - Full Commercial HVAC Loads Calculation Program | | Elite Software Development, Inc. |
| Thompson Luke & Associates | | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | | Page 3 |

## General Project Data Input (cont'd)

### Building-Level Design Conditions

| Design Month | Outdoor Dry Bulb | Outdoor Wet Bulb | Indoor Rel.Hum | Indoor Dry Bulb | Grains Diff | In/Outdoor Correction |
|---|---|---|---|---|---|---|
| August | 95 | 80 | 50% | 80 | 54.61 | -2 |
| Winter | 25 | | | 75 | | |

### Master Roofs

| Roof No. | ASHRAE Roof# | Roof U-Fac | Dark Color | Susp. Ceil |
|---|---|---|---|---|
| 1 | 1 | 0.100 | No | No |

### Master Walls

| Wall No. | ASHRAE Group | Wall U-Fac | Wall Color |
|---|---|---|---|
| 1 | C | 0.450 | M |

### Master Partitions

| Partition No. | Partition U-Factor | Cool T-D | Heat T-D |
|---|---|---|---|
| 1 | 0.400 | 18 | 25 |

### Master Glass

| Glass No. | Summer U-Factor | Winter U-Factor | Glass Shd.Coef. | Interior Shading | Interior Shd.Coef |
|---|---|---|---|---|---|
| 1 | 1.040 | 1.100 | 0.880 | 2 | 0.000 |

| Chvac - Full Commercial HVAC Loads Calculation Program<br>Thompson Luke & Associates<br>Baton Rouge, LA 70809 | | Elite Software Development, Inc.<br>Angola Death Row Tier AC<br>Page 4 |
| --- | --- | --- |

## Air Handler Input

### Air Handler Number 1 Input Data

| | |
| --- | --- |
| Name: | AHU-1 |
| Terminal type: | Constant Volume |
| Method for CV | Sum of Peaks |
| Supply fan type: | Draw-thru fan |
| Calculations performed: | Both heating and cooling loads |
| Excess supply air: | Reheat |
| Occurrences: | 1 |
| People profile number: | 0 |
| Lighting profile number: | 0 |
| Equipment profile number: | 0 |
| Exhaust may not exceed supply air: | Yes |
| Leaving heating coil temp (deg.F): | 95.0 |
| Leaving cooling coil RH (%): | 95 |
| Cooling coil CFM | 0 |
| Misc. Btuh gain - supply side: | 0 |
| Misc. Btuh gain - return side: | 0 |
| Combined fan & motor efficiency: | 70 |
| Static pressure across fan (in.wg.): | 1.50 |
| Summer supply duct temp rise (deg.F): | 1.000 |
| Summer return duct temp rise (deg.F): | 0.250 |
| Winter supply duct temp drop (deg.F): | 2.000 |
| Winter return duct temp drop (deg.F): | 1.000 |
| Chilled water temp difference (deg.F): | 10.000 |
| Hot water temp difference (deg.F): | 20.000 |
| Cooling ventilation: | 800 Direct |
| Cooling infiltration: | 0 Direct |
| Heating ventilation: | 800 Direct |
| Heating infiltration: | 0 Direct |
| Pretreated outside air: | none |
| Pretreated air Summer DB (deg.F): | 0 |
| Pretreated air Summer WB (deg.F): | 0 |
| Pretreated air Winter DB (deg.F): | 0 |

| Design<br>Month | Outdoor<br>Dry Bulb | Outdoor<br>Wet Bulb | Indoor<br>Rel.Hum | Indoor<br>Dry Bulb | Grains<br>Diff | In/Outdoor<br>Correction |
| --- | --- | --- | --- | --- | --- | --- |
| August | 95 | 80 | 50% | 80 | 54.61 | -2 |
| Winter | 25 | | | 75 | | |

| Chvac - Full Commercial HVAC Loads Calculation Program | | Elite Software Development, Inc. |
|---|---|---|
| Thompson Luke & Associates | | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | | Page 5 |

## Building Envelope Report

### Envelope Report Using Summer U-Factors

| Material Types | | Gross Area | Glass Area | Net Area | -U- Factor | Area x U-Factor | Average U-Factor |
|---|---|---|---|---|---|---|---|
| Roof | 1 | 5,068.1 | 0.0 | 5,068.1 | 0.100 | 506.814 | 0.100 |
| Tot.Roof | | 5,068.1 | 0.0 | 5,068.1 | N/A | 506.814 | 0.100 |
| | | | | | | | |
| Wall | 1 | 2,375.0 | 380.7 | 1,994.3 | 0.450 | 897.435 | 0.450 |
| Tot.Wall | | 2,375.0 | 380.7 | 1,994.3 | N/A | 897.435 | 0.450 |
| | | | | | | | |
| Glass | 1 | 380.7 | N/A | 380.7 | 1.040 | 395.928 | 1.040 |
| Tot.Glass | | 380.7 | N/A | 380.7 | N/A | 395.928 | 1.040 |
| | | | | | | | |
| Totals | | | | 7,443.1 | | 1,800.177 | 0.242 |

| Wall Direction | Wall Area | Glass Area | Wall Net Area | Wall Avg U-Factor | Glass Avg U-Factor | Glass Avg Shd.Coef |
|---|---|---|---|---|---|---|
| N | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| NE | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| E | 1,187.5 | 190.4 | 997.2 | 0.450 | 1.040 | 0.880 |
| SE | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| S | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| SW | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| W | 1,187.5 | 190.4 | 997.2 | 0.450 | 1.040 | 0.880 |
| NW | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 |
| | | | | | | |
| Totals | 2,375.0 | 380.7 | 1,994.3 | 0.450 | 1.040 | 0.880 |

| Chvac - Full Commercial HVAC Loads Calculation Program | Elite Software Development, Inc. |
|---|---|
| Thompson Luke & Associates | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | Page 6 |

## Building Summary Loads

Building peaks in August at 5pm.

| Bldg Load Descriptions | Area Quan | Sen Loss | %Tot Loss | Lat Gain | Sen Gain | Net Gain | %Net Gain |
|---|---|---|---|---|---|---|---|
| Roof | 5,068 | 27,875 | 15.91 | 0 | 15,087 | 15,087 | 7.21 |
| Wall | 1,994 | 49,359 | 28.17 | 0 | 18,407 | 18,407 | 8.80 |
| Glass | 381 | 23,032 | 13.15 | 0 | 39,494 | 39,494 | 18.88 |
| Floor Slab | 250 | 11,138 | 6.36 | 0 | 0 | 0 | 0.00 |
| Skin Loads | | 111,404 | 63.59 | 0 | 72,988 | 72,988 | 34.89 |
| Lighting | 10,136 | 0 | 0.00 | 0 | 38,045 | 38,045 | 18.19 |
| Equipment | 4,000 | 0 | 0.00 | 0 | 15,013 | 15,013 | 7.18 |
| People | 30 | 0 | 0.00 | 6,270 | 7,590 | 13,860 | 6.63 |
| Partition | 165 | 1,818 | 1.04 | 0 | 1,309 | 1,309 | 0.63 |
| Cool. Pret. | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Heat. Pret. | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Cool. Vent. | 800 | 0 | 0.00 | 31,432 | 11,414 | 42,845 | 20.48 |
| Heat. Vent. | 800 | 43,100 | 24.60 | 0 | 0 | 0 | 0.00 |
| Cool. Infil. | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Heat. Infil. | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Draw-Thru Fan | 0 | 0 | 0.00 | 0 | 6,377 | 6,377 | 3.05 |
| Blow-Thru Fan | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Reserve Cap. | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Reheat Cap. | 0 | 0 | 0.00 | 0 | 8,738 | 8,738 | 4.18 |
| Supply Duct | 0 | 12,580 | 7.18 | 0 | 8,199 | 8,199 | 3.92 |
| Return Duct | 0 | 6,290 | 3.59 | 0 | 1,830 | 1,830 | 0.87 |
| Misc. Supply | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Misc. Return | 0 | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Building Totals | | 175,192 | 100.00 | 37,702 | 171,504 | 209,206 | 100.00 |

| Building Summary | Sen Loss | %Tot Loss | Lat Gain | Sen Gain | Net Gain | %Net Gain |
|---|---|---|---|---|---|---|
| Ventilation | 43,100 | 24.60 | 31,432 | 11,414 | 42,845 | 20.48 |
| Infiltration | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Pretreated Air | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Zone Loads | 113,222 | 64.63 | 6,270 | 143,684 | 149,954 | 71.68 |
| Plenum Loads | 0 | 0.00 | 0 | 0 | 0 | 0.00 |
| Fan & Duct Loads | 18,870 | 10.77 | 0 | 16,406 | 16,406 | 7.84 |
| Building Totals | 175,192 | 100.00 | 37,702 | 171,504 | 209,206 | 100.00 |

### Check Figures

| | | |
|---|---|---|
| Total Building Supply Air (based on a 19° TD): | 7,471 | CFM |
| Total Building Vent. Air (10.71% of Supply): | 800 | CFM |
| Total Conditioned Air Space: | 5,068 | Sq.ft |
| Supply Air Per Unit Area: | 1.4741 | CFM/Sq.ft |
| Area Per Cooling Capacity: | 290.7 | Sq.ft/Ton |
| Cooling Capacity Per Area: | 0.0034 | Tons/Sq.ft |
| Heating Capacity Per Area: | 34.57 | Btuh/Sq.ft |
| Total Heating Required With Outside Air: | 175,192 | Btuh |
| Total Cooling Required With Outside Air: | 17.43 | Tons |

| Chvac - Full Commercial HVAC Loads Calculation Program | Elite Software Development, Inc. |
|---|---|
| Thompson Luke & Associates | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | Page 7 |

## Air Handler #1 - AHU-1 - Summary Loads

| Zn No | Description Zone Peak Time | Area People Volume | Htg.Loss Htg.CFM CFM/Sqft | Sen.Gain Clg.CFM CFM/Sqft | Lat.Gain S.Exh W.Exh | Htg.O.A. Req.CFM Act.CFM | Clg.O.A. Req.CFM Act.CFM |
|---|---|---|---|---|---|---|---|
| 1 | 239 (Tier) 5pm August | 1,184 0 11,249 | 49,186 2,536 2.14 | 55,951 2,909 2.46 | 0 0 0 | Direct 187 348 | Direct 187 312 |
| 2 | West Cells 2pm August | 1,350 15 12,825 | 7,425 383 0.28 | 19,433 1,010 0.75 | 3,135 0 0 | Direct 213 52 | Direct 213 108 |
| 3 | East Cells 2pm August | 1,350 15 12,825 | 7,425 383 0.28 | 19,433 1,010 0.75 | 3,135 0 0 | Direct 213 52 | Direct 213 108 |
| 4 | 219 (Tier) 10am August | 1,184 0 11,249 | 49,186 2,536 2.14 | 48,876 2,541 2.15 | 0 0 0 | Direct 187 348 | Direct 187 272 |
| | Zone Peak Totals: Total Zones: 4 Unique Zones: 4 | 5,068 30 48,147 | 113,222 5,838 1.15 | 143,693 7,471 1.47 | 6,270 0 0 | 800 800 | 800 800 |

| Chvac - Full Commercial HVAC Loads Calculation Program | Elite Software Development, Inc. |
|---|---|
| Thompson Luke & Associates | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | Page 8 |

## Air Handler #1 - AHU-1 - Total Load Summary

Air Handler Description:     AHU-1 Constant Volume - Sum of Peaks
Supply Air Fan:              Draw-Thru with program estimated horsepower of 2.52 HP
Fan Input:                   70% motor and fan efficiency with 1.5 in. water across the fan
Sensible Heat Ratio:         0.96                           --- This system occurs 1 time(s) in the building. ---

Air System Peak Time:        5pm in August.
Outdoor Conditions:          Clg: 93° DB, 80° WB, 134.55 grains, Htg: 25° DB
Indoor Conditions:           Clg: 80° DB, 50% RH, Htg: 75° DB

Summer: Ventilation controls outside air, ----- Winter: Ventilation controls outside air.

| | | | | |
|---|---|---|---|---|
| Zone Space sensible loss: | 113,222 | Btuh | | |
| Infiltration sensible loss: | 0 | Btuh | 0 | CFM |
| Outside Air sensible loss: | 43,100 | Btuh | 800 | CFM |
| Supply Duct sensible loss: | 12,580 | Btuh | | |
| Return Duct sensible loss: | 6,290 | Btuh | | |
| Return Plenum sensible loss: | 0 | Btuh | | |
| Total System sensible loss: | | | 175,192 | Btuh |
| | | | | |
| Heating Supply Air: 125,802 / (.998 X 1.08 X 20) = | | | 5,838 | CFM |
| Winter Vent Outside Air (13.7% of supply) = | | | 800 | CFM |
| | | | | |
| Zone space sensible gain: | 134,946 | Btuh | | |
| Infiltration sensible gain: | 0 | Btuh | | |
| Draw-thru fan sensible gain: | 6,377 | Btuh | | |
| Supply duct sensible gain: | 8,199 | Btuh | | |
| Reheat sensible gain: | 8,738 | Btuh | | |
| Total sensible gain on supply side of coil: | | | 158,261 | Btuh |
| | | | | |
| Cooling Supply Air: 158,261 / (.998 X 1.1 X 19) = | | | 7,471 | CFM |
| Summer Vent Outside Air (10.7% of supply) = | | | 800 | CFM |
| | | | | |
| Return duct sensible gain: | 1,830 | Btuh | | |
| Return plenum sensible gain: | 0 | Btuh | | |
| Outside air sensible gain: | 11,414 | Btuh | 800 | CFM |
| Blow-thru fan sensible gain: | 0 | Btuh | | |
| Total sensible gain on return side of coil: | | | 13,244 | Btuh |
| Total sensible gain on air handling system: | | | 171,504 | Btuh |
| | | | | |
| Zone space latent gain: | 6,270 | Btuh | | |
| Infiltration latent gain: | 0 | Btuh | | |
| Outside air latent gain: | 31,432 | Btuh | | |
| Total latent gain on air handling system: | | | 37,702 | Btuh |
| Total system sensible and latent gain: | | | 209,206 | Btuh |

## Check Figures

| | | |
|---|---|---|
| Total Air Handler Supply Air (based on a 19° TD): | 7,471 | CFM |
| Total Air Handler Vent. Air (10.71% of Supply): | 800 | CFM |
| | | |
| Total Conditioned Air Space: | 5,068 | Sq.ft |
| Supply Air Per Unit Area: | 1.4741 | CFM/Sq.ft |
| Area Per Cooling Capacity: | 290.7 | Sq.ft/Ton |
| Cooling Capacity Per Area: | 0.0034 | Tons/Sq.ft |
| Heating Capacity Per Area: | 34.57 | Btuh/Sq.ft |
| | | |
| Total Heating Required With Outside Air: | 175,192 | Btuh |
| Total Cooling Required With Outside Air: | 17.43 | Tons |

| Chvac - Full Commercial HVAC Loads Calculation Program | | | | | | Elite Software Development, Inc. |
|---|---|---|---|---|---|---|
| Thompson Luke & Associates | | | | | | Angola Death Row Tier AC |
| Baton Rouge, LA  70809 | | | | | | Page 9 |

## Zone Detailed Loads (At Zone Peak Times)

| Load Description | Unit Quan | -SC- CFAC | CLTD SHGF | U.Fac -CLF- | Sen. Gain | Lat. Gain | Htg. Mult. | Htg. Loss |
|---|---|---|---|---|---|---|---|---|
| **Zone 1-239 (Tier) peaks (sensible) in August at 5pm, Air Handler 1 (AHU-1), Group 1, 8.7 x 136.1, Construction Type: 1 (Light)** | | | | | | | | |
| Roof-1-1-No.Clg-L | 1,184 | 0.50 | 27.1 | 0.100 | 3,204 | | 5.000 | 5,920 |
| Wall-1-W-C-M | 997 | 0.83 | 14.5 | 0.450 | 6,505 | | 22.500 | 22,436 |
| Partition-2-1 | 82.65 | | 18/25 | 0.400 | 595 | | 10.000 | 827 |
| Gls-W-1-90-Tran | 190.4 | 1.000 | 11 | 1.040 | 2,178 | | 55.000 | 10,469 |
| 0%S-0-NS-Solar | 190.4 | 0.880 | 219 | 0.640 | 23,478 | | | |
| Lights-Prof=1 | 2,368 | 1.000 | | | 8,080 | | | |
| Equipment-Prof=1 | 2,000 | 1.000 | | | 6,824 | 0 | | |
| Floor slab | 125 | | | | | | 40.500 | 5,063 |
| | | | | | | | | |
| Sub-total | | | | | 50,864 | 0 | | 44,714 |
| Safety factors: | | | | | +10% | +10% | | +10% |
| | | | | | --------- | --------- | | --------- |
| Total w/ safety factors: | | | | | 55,951 | 0 | | 49,186 |
| | | | | | | | | |
| **Zone 2-West Cells peaks (sensible) in August at 2pm, Air Handler 1 (AHU-1), Group 1, 135.0 x 10.0, Construction Type: 1 (Light)** | | | | | | | | |
| Roof-1-1-No.Clg-L | 1,350 | 0.50 | 37.1 | 0.100 | 5,003 | | 5.000 | 6,750 |
| Lights-Prof=1 | 2,700 | 1.000 | | | 9,213 | | | |
| People-Prof=1 | 15.0 | 1.000 | | | 3,450 | 2,850 | | |
| | | | | | | | | |
| Sub-total | | | | | 17,666 | 2,850 | | 6,750 |
| Safety factors: | | | | | +10% | ÷10% | | +10% |
| | | | | | --------- | --------- | | --------- |
| Total w/ safety factors: | | | | | 19,433 | 3,135 | | 7,425 |
| | | | | | | | | |
| **Zone 3-East Cells peaks (sensible) in August at 2pm, Air Handler 1 (AHU-1), Group 1, 135.0 x 10.0, Construction Type: 1 (Light)** | | | | | | | | |
| Roof-1-1-No.Clg-L | 1,350 | 0.50 | 37.1 | 0.100 | 5,003 | | 5.000 | 6,750 |
| Lights-Prof=1 | 2,700 | 1.000 | | | 9,213 | | | |
| People-Prof=1 | 15.0 | 1.000 | | | 3,450 | 2,850 | | |
| | | | | | | | | |
| Sub-total | | | | | 17,666 | 2,850 | | 6,750 |
| Safety factors: | | | | | +10% | +10% | | +10% |
| | | | | | --------- | --------- | | --------- |
| Total w/ safety factors: | | | | | 19,433 | 3,135 | | 7,425 |
| | | | | | | | | |
| **Zone 4-219 (Tier) peaks (sensible) in August at 10am, Air Handler 1 (AHU-1), Group 1, 8.7 x 136.1, Construction Type: 1 (Light)** | | | | | | | | |
| Roof-1-1-No.Clg-L | 1,184 | 0.50 | 22.1 | 0.100 | 2,612 | | 5.000 | 5,920 |
| Wall-1-E-C-M | 997 | 0.83 | 11.2 | 0.450 | 5,015 | | 22.500 | 22,436 |
| Partition-2-1 | 82.65 | | 18/25 | 0.400 | 595 | | 10.000 | 827 |
| Gls-E-1-90-Tran | 190.4 | 1.000 | 2 | 1.040 | 396 | | 55.000 | 10,469 |
| 0%S-0-NS-Solar | 190.4 | 0.880 | 219 | 0.570 | 20,910 | | | |
| Lights-Prof=1 | 2,368 | 1.000 | | | 8,080 | | | |
| Equipment-Prof=1 | 2,000 | 1.000 | | | 6,824 | 0 | | |
| Floor slab | 125 | | | | | | 40.500 | 5,063 |
| | | | | | | | | |
| Sub-total | | | | | 44,433 | 0 | | 44,714 |

| Chvac - Full Commercial HVAC Loads Calculation Program | | | | | | Elite Software Development, Inc. |
| Thompson Luke & Associates | | | | | | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | | | | | | Page 10 |

## Zone Detailed Loads (At Zone Peak Times) (cont'd)

| Load Description | Unit Quan | -SC- CFAC | CLTD SHGF | U.Fac -CLF- | Sen. Gain | Lat. Gain | Htg. Mult. | Htg. Loss |
|---|---|---|---|---|---|---|---|---|
| Safety factors: | | | | | +10% | +10% | | +10% |
| | | | | | --------- | --------- | | --------- |
| Total w/ safety factors: | | | | | 48,876 | 0 | | 49,186 |

| Chvac - Full Commercial HVAC Loads Calculation Program | Elite Software Development, Inc. |
|---|---|
| Thompson Luke & Associates | Angola Death Row Tier AC |
| Baton Rouge, LA 70809 | Page 11 |

## Air System #1 (AHU-1) Psychrometric Analysis

| System Load Analysis | Latent | Grains | Sensible | Temp | CFM |
|---|---|---|---|---|---|
| Leaving Coil Condition | | 75.403 | | 60.697 | |
| Draw-Thru Fan | | | 6,377 | 0.778 | 301 |
| Misc Load on Supply Side | | | 0 | 0.000 | 0 |
| Supply Air Duct | | | 8,199 | 1.000 | 387 |
| Zone Loads | 6,270 | 1.237 | 134,946 | 16.459 | 6,370 |
| Reheat | | | 8,738 | 1.066 | 412 |
| | | | | | |
| Zone Condition | 6,270 | 76.640 | 158,261 | 80.000 | 7,471 |
| Return Air Duct | | | 1,830 | 0.250 | |
| Return Air Plenum | | | 0 | 0.000 | |
| Misc Load on Return Side | | | 0 | 0.000 | |
| Vent Air 800 CFM | 31,432 | 6.201 | 11,414 | 1.365 | |
| Blow-Thru Fan | | | 0 | 0.000 | |
| | | | | | |
| Entering Coil Condition | 37,702 | 82.841 | 171,504 | 81.615 | 7,471 |

### General Psychrometric Equations Used In Analysis:

| PR | = | (Barometric pressure of site / Standard ASHRAE pressure of 29.921) |
|---|---|---|
| TSH | = | PR x    1.10   x CFM x (DB entering - DB leaving) |
| TLH | = | PR x    0.68   x CFM x (Grains entering - Grains leaving) |
| GTH | = | PR x    4.50   x CFM x (Enthalpy entering - Enthalpy leaving) |

| TSH | = | 0.998 | x | 1.10 | x | 7,471 | x ( | 81.615 | - | 60.697 | ) = | 171,504 | Btuh |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TLH | = | 0.998 | x | 0.68 | x | 7,471 | x ( | 82.841 | - | 75.403 | ) = | 37,700 | Btuh |
| | | | | | | | | | | | ---------- | |
| SUM | = | | | | | | | | | | 209,204 | Btuh |
| GTH | = | 0.998 | x | 4.50 | x | 7,471 | x ( | 32.575 | - | 26.289 | ) = | 210,855 | Btuh |
| Total System Load | | | | | | | | | | = | 209,206 | Btuh |

### Chilled and Hot Water Flow Rates and Steam Requirement

| Cooling GPM | = | 210,855 / ( | 10.00 | x | 500 | ) | = | 42.2 | GPM |
|---|---|---|---|---|---|---|---|---|---|
| Heating GPM | = | 175,192 / ( | 20.00 | x | 500 | ) | = | 17.5 | GPM |
| Steam Req. | = | 175,192 / | 970 | | | | = | 180.6 | lb./hr |

### Entering Cooling Coil Conditions
### Entering Heating Coil Conditions

| Dry bulb temperature: | 81.62 | | Dry bulb temperature: | 67.28 |
|---|---|---|---|---|
| Wet bulb temperature: | 68.35 | | | |
| Relative humidity: | 51.20 | | | |
| Enthalpy: | 32.58 | Btu/lbm | | |

### Leaving Cooling Coil Conditions
### Leaving Heating Coil Conditions

| Dry bulb temperature: | 60.70 | | Dry bulb temperature: | 95.00 |
|---|---|---|---|---|
| Wet bulb temperature: | 59.79 | | | |
| Relative humidity: | 95.00 | | | |
| Enthalpy: | 26.29 | Btu/lbm | | |

Chvac - Full Commercial HVAC Loads Calculation Program
Thompson Luke & Associates
Baton Rouge, LA  70809

Elite Software Development, Inc.
Angola Death Row Tier AC
Page 12

## Air System #1 (AHU-1) Psychrometric Chart

| ZC | Zone Condition | OC | Outdoor Condition |
|----|----------------|----|-------------------|
| LC | Leaving Coil Condition | EC | Entering Coil Condition |
| SD | Supply Duct Temperature Rise | RD | Return Duct Temperature Rise |
| DTF | Draw Through Fan Sensible Gain | BTF | Blow Through Fan Sensible Gain |
| RE | Reserve or Reheat Sensible Gain | PL | Return Air Plenum Sensible Gain |
| SM | Supply Side Miscellaneous Sensible Gain | RM | Return Side Miscellaneous Gain |
| PRE | Pretreated Air Condition | HRV | Heat Recovery Ventilator Condition |



# Input/Output Module (IOM) Series Controllers Catalog Page

Code No. LIT-1900349
Issued November 1, 2013
*Supersedes January 30, 2013*

Refer to the QuickLIT website for the most up-to-date version of this document.

The Input/Output Module (IOM) Series Controllers are BACnet® Application Specific Controllers (B-ASCs) with integral RS-485 Master-Slave/Token-Passing (MS/TP) communications. IOM controllers integrate into the web-based Metasys® system.

IOMs can serve in one of two capacities, depending on where they are installed in the Metasys system. When installed on the Sensor/Actuator (SA) Bus of an Field Equipment Controller (FEC), Advanced Application Field Equipment Controller (FAC), or VMA controller, the IOMs expand the point count of these controllers. When installed on the Field Controller (FC) Bus, IOMs can be used as I/O point multiplexors to support monitoring and control from an Network Automation Engine (NAE) or Network Control Engine (NCE). The point multiplexor can also be useful for sharing points between other field controllers on the FC Bus using peer-to-peer connectivity.

A full range of FEC models combined with the IOM models can be applied to a wide variety of building applications ranging from simple fan coil or heat pump control to advanced central plant management.

| Important: | You cannot purchase a similar third-party device and install it in a UL/ULC Listed smoke control system. Doing so voids the UL/ULC Smoke Control Listing. Third-party devices must be provided and labeled by the factory as described in the UL/ULC Smoke Control Listing. |
|---|---|

| Important: | Only those Johnson Controls products identified for use in smoke control applications have been tested and listed by UL for use in a Metasys System UL 864 9th Edition UUKL/ORD-C100-13 UULKC Smoke Control System. Installation of a product that is not UL/ULC Listed and labeled for this application prevents the entire system from being UL/ULC Listed for smoke control. |
|---|---|

Refer to the *Metasys® System Field Equipment Controllers and Related Products Product Bulletin (LIT-12011042)* for product application details.

## Features

- Standard BACnet® Protocol - Provides interoperability with other Building Automation System (BAS) products that use the widely accepted BACnet standard.
- Standard Hardware and Software Platform - Uses a common hardware design throughout the family line to support standardized wiring practices and installation workflows. Also uses a common software design to support use of a single tool for control applications, commissioning, and troubleshooting to minimize technical training.
- ZigBee™ Wireless FC/SA Bus Interface - Provides a wireless alternative to hard-wired Metasys system counterparts, providing application flexibility and mobility with minimal disruption to building occupants.
- Bluetooth® Wireless Commissioning Interface - Provides an easy-to-use connection to the configuration and commissioning tool.

- Auto Tuned Control Loops - Reduce commissioning time, eliminate change-of-season re-commissioning, and reduce wear and tear on mechanical devices.
- Universal Inputs, Configurable Outputs, and Point Expansion Modules - Allow multiple signal options to provide input/output flexibility.
- Optional Local User Interface Display - Allows convenient monitoring and adjusting capabilities at the local device.
- BACnet Testing Laboratories™ (BTL) Listing - Ensures interoperability with other BTL-listed devices. BTL is a third-party agency which validates that BAS vendor products meet the BACnet industry-standard protocol.
- 32-bit microprocessor ensures optimum performance and meets industry specifications.
- BACnet Automatic Discovery support enables easy controller integration into Metasys BAS.
- Integral end-of-line (EOL) switch enables field controller as a terminating device on the communications bus.
- Pluggable communications bus and supply power terminal blocks expedite installation and troubleshooting.
- Wireless capabilities via a ZFR1800 Series Wireless Field Bus System enable wireless mesh connectivity between Metasys field controllers to WRZ Series Wireless Room Temperature Sensors and to supervisory controllers, facilitating easy initial location and relocation.
- Ability to reside on the FC Bus or SA Bus provides application flexibility.

If the product fails to operate within its specifications, replace the product. For a replacement product, contact the nearest Johnson Controls® representative.

**Figure 1: IOM4711**







Table 1: IOM Series Point Type Counts Per Model

| Point Types | Signals Accepted | IOM 1711 | IOM 2711 | IOM 2721 | IOM 3711 | IOM 3721 | IOM 3731 | IOM 4711 |
|---|---|---|---|---|---|---|---|---|
| Universal Input (UI) | Analog Input, Voltage Mode, 0–10 VDC | | 2 | 8 | 4 | | | 6 |
| | Analog Input, Current Mode, 4–20 mA | | | | | | | |
| | Analog Input, Resistive Mode, 0–2k ohm, RTD (1k NI [Johnson Controls], 1k PT, A99B SI), NTC (10k Type L, 2.252k Type 2) | | | | | | | |
| | Binary Input, Dry Contact Maintained Mode | | | | | | | |
| Binary Input (BI) | Dry Contact Maintained Mode | 4 | | | | 16 | 8 | 2 |
| | Pulse Counter/Accumulator Mode (High Speed), 100 Hz | | | | | | | |
| Analog Output (AO) | Analog Output, Voltage Mode, 0–10 VDC | | | 2 | | | | 2 |
| | Analog Output, Current Mode, 4–20 mA | | | | | | | |
| Binary Output (BO)[1] | 24 VAC Triac | | | | | | 8 | 3 |
| Universal Output (UO) | Analog Output, Voltage Mode, 0–10 VDC | | 2 | | 4 | | | |
| | Binary Output Mode, 24 VAC/DC FET | | | | | | | |
| | Analog Output, Current Mode, 4–20 mA | | | | | | | |
| Configurable Output (CO) | Analog Output, Voltage Mode, 0–10 VDC | | | | | | | 4 |
| | Binary Output Mode, 24 VAC Triac | | | | | | | |
| Relay Output (RO) | 120/240 VAC | | 2 | | 4 | | | |

1  The BOs on the IOM3731-0A model require an external low-voltage power source.

Table 2: IOM Series Ordering Information

| Product Code Number | Description |
|---|---|
| MS-IOM1711-0 | 4-Point IOM with 4 BI, FC Bus and SA Bus Support |
| MS-IOM2711-0 | 6-Point IOM with 2 UI, 2 UO, 2 BO, FC Bus, and SA Bus Support |
| MS-IOM2721-0 | 10-Point IOM with 8 UI, 2 AO, FC Bus, and SA Bus Support |
| MS-IOM3711-0 | 12-Point IOM with 4 UI, 4 UO, 4 BO, FC Bus, and SA Bus Support |
| MS-IOM3721-0 | 16-Point IOM with 16 BI, FC Bus, and SA Bus Support |
| MS-IOM3731-0 | 16-Point IOM with 8 BI, 8 BO, FC Bus, and SA Bus Support |
| MS-IOM3731-0A[1] | 16-Point IOM with 8 BI, 8 BO, FC Bus, and SA Bus Support |
| | Note:    Binary Outputs (BOs) on MS-IOM3731-0A controllers do not supply power for the outputs; the BOs require external low-voltage (<30 VAC) power sources. |
| MS-IOM4711-0 | 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO, FC and SA Bus Support |

1  This model is currently available only in Asia; contact your local Johnson Controls representative for more information.

Table 3: IOM Series for Smoke Control Ordering Information

| Product Code Number[1], [2] | Description |
|---|---|
| MS-IOM1710-0U | 4-Point IOM with 4 BI; 24 VAC; FC Bus and SA Bus Support |
| MS-IOM1711-0U | 4-Point IOM with 4 BI; 24 VAC; FC Bus and SA Bus Support |
| MS-IOM2710-0U | 6-Point IOM with 2 UI, 2 UO, 2 BO; 24 VAC; FC Bus and SA Bus Support |
| MS-IOM2711-0U | 6-Point IOM with 2 UI, 2 UO, 2 BO; 24 VAC; FC Bus and SA Bus Support |
| MS-IOM3710-0U | 12-Point IOM with 4 UI, 4 UO, 4 BO; 24 VAC; FC Bus and SA Bus Support |
| MS-IOM3711-0U | 12-Point IOM with 4 UI, 4 UO, 4 BO; 24 VAC; FC Bus and SA Bus Support |
| MS-IOU4710-0U | 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO; 24 VAC; FC Bus and SA Bus Support with Mounting Base |
| MS-IOM4711-0U | 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO; 24 VAC; FC Bus and SA Bus Support with Mounting Base |

1  These devices are UL/ULc 864 Listed, File S4977, 9th Edition UUKL/ORD-C100-13 UUKLC Smoke Control System.
2  All field controllers in a smoke control system must be mounted in Johnson Controls custom or standard UL 864 panels or in panels that are ordered from Johnson Controls. If these field controllers are used with panels that are not supplied by Johnson Controls, they are not compliant with the UL 864 9th Edition UUKL/ORD-C100-13 UUKLC Smoke Control System listing.

---

Input/Output Module (IOM) Series Controllers Catalog Page                    2

## Accessories

**Table 4: IOM Accessories**

| Product Code Number | Description |
|---|---|
| MS-BTCVT-1 | Wireless Commissioning Converter with Bluetooth® Technology |
| TL-BRTRP-0 | Portable BACnet IP to MS/TP Router |
| MS-ZFR1811-0 | Wireless Field Bus Router, 10 mW Transmission Power. Functions with Metasys BACnet FECs, VMA16s, and WRZ-TTx Series Wireless Mesh Room Temperature Sensors |
| MS-BTCVTCBL-700 | Cable Replacement Set for the MS-BTCVT-1 or the NS-ATV7003-0; Includes One 5 ft (1.5 m) Retractable Cable |
| Y64T15-0 | Transformer, 120/208/240 VAC Primary to 24 VAC Secondary, 92 VA, Foot Mount, 30 in. Primary Leads and 30 in. Secondary Leads, Class 2 |
| Y65A13-0 | Transformer, 120 VAC Primary to 24 VAC Secondary, 40 VA, Foot Mount (Y65AS), 8 in. Primary Leads and 30 in. Secondary Leads, Class 2 |
| Y65T42-0 | Transformer, 120/208/240 VAC Primary to 24 VAC Secondary, 40 VA, Hub Mount (Y65SP+), 8 in. Primary Leads and Secondary Screw Terminals, Class 2 |
| Y65T31-0 | Transformer, 120/208/240 VAC Primary to 24 VAC Secondary, 40 VA, Foot Mount (Y65AR+), 8 in. Primary Leads and Secondary Screw Terminals, Class 2 |
| AP-TBK4SA-0 | Replacement MS/TP SA Bus Terminal, 4-Position Connector, Brown, Bulk Pack |
| AP-TBK4FC-0 | Replacement MS/TP FC Bus Terminal, 4-Position Connector, Blue, Bulk Pack |
| AP-TBK3PW-0 | Replacement Power Terminal, 3-Position Connector, Gray, Bulk Pack |
| ZFR-USBHA-0 | USB Dongle with ZigBee™ Driver provides a wireless connection through CCT to allow wireless commissioning of the wirelessly enabled FEC, Advanced Application Field Equipment Controller (FAC), IOM, and VMA16 controllers. Also allows use of the ZFR Checkout Tool (ZCT) in CCT. <br><br> Note: The ZFR-USBHA-0 replaces the IA OEM DAUBI_2400 ZigBee USB dongle. For additional information on the ZFR-USBHA-0 ZigBee dongle, refer to the *ZFR1800 Series Wireless Field Bus System Technical Bulletin (LIT-12011295)* or *ZFR1800 Series Wireless Field Bus System Quick Reference Guide (LIT-12011630)*. |

## IOM Series Technical Specifications

**Table 5: IOM Series**

| Product Code Numbers | MS-IOM1711-0: 4-Point IOM with 4 BI, FC Bus and SA Bus Support |
|---|---|
| | MS-IOM2711-0: 6-Point IOM with 2 UI, 2 UO, 2 BO, FC Bus, and SA Bus Support |
| | MS-IOM2721-0: 10-Point IOM with 8 UI, 2 AO, FC Bus, and SA Bus Support |
| | MS-IOM3711-0: 12-Point IOM with 4 UI, 4 UO, 4 BO, FC Bus, and SA Bus Support |
| | MS-IOM3721-0: 16-Point IOM with 16 BI, FC Bus, and SA Bus Support |
| | MS-IOM3731-0: 16-Point IOM with 8 BI, 8 BO, FC Bus, and SA Bus Support |
| | MS-IOM3731-0A[1]: 16-Point IOM with 8 BI, 8 BO, FC Bus, and SA Bus Support |
| | MS-IOM4711-0: 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO, FC and SA Bus Support |
| | **Smoke Control Models:** |
| | MS-IOM1710-0U: 4-Point IOM with 4 BI, FC Bus and SA Bus Support |
| | MS-IOM1711-0U: 4-Point IOM with 4 BI, FC Bus and SA Bus Support |
| | MS-IOM2710-0U: 6-Point IOM with 2 UI, 2 UO, 2 BO, FC Bus, and SA Bus Support |
| | MS-IOM2711-0U: 6-Point IOM with 2 UI, 2 UO, 2 BO, FC Bus, and SA Bus Support |
| | MS-IOM3710-0U: 12-Point IOM with 4 UI, 4 UO, 4 BO, FC Bus, and SA Bus Support |
| | MS-IOM3711-0U: 12-Point IOM with 4 UI, 4 UO, 4 BO, FC Bus, and SA Bus Support |
| | MS-IOU4710-0U: 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO, FC Bus and SA Bus Support with Mounting |
| | MS-IOM4711-0U: 17-Point IOM with 6 UI, 2 BI, 3 BO, 2 AO, 4 CO, FC Bus and SA Bus Support with Mounting |
| Supply Voltage | 24 VAC (nominal, 20 VAC minimum/30 VAC maximum), 50/60 Hz, Power Supply Class 2 (North America), Safety Extra-Low Voltage (SELV) Europe |
| Power Consumption | 14 VA maximum <br><br> Note: VA ratings do not include any power supplied to the peripheral devices connected to Binary Outputs (BOs) or Configurable Outputs (COs), which can consume up to 12 VA for each BO or CO, for a possible total consumption of an additional 84 VA (maximum), depending on the IOM model. |
| Ambient Conditions | Operating: 0 to 50°C (32 to 122°F); 10 to 90% RH noncondensing |
| | Storage: -40 to 80°C (-40 to 176°F); 5 to 95% RH noncondensing |

---

Input/Output Module (IOM) Series Controllers Catalog Page                                          3

**Table 5: IOM Series**

| | |
|---|---|
| Addressing | DIP switch set; valid field controller device addresses 4–127 |
| | (Device addresses 0–3 and 128–255 are reserved and not valid IOM addresses). |
| Communications Bus[2] | BACnet MS/TP, RS-485 |
| | 3-wire FC Bus between the supervisory controller and field devices |
| | 4-wire SA Bus between field controller, network sensors, and other sensor/actuator devices. includes a lead source 15 VDC supply power (from field controller) to bus devices. |
| Processor | H8SX/166xR Renesas® 32-bit microcontroller |
| Memory | 512 KB Flash Memory and 128 KB Random Access Memory (RAM) |
| Input and Output Capabilities | **IOM1711:** |
| | 4 - Binary Inputs: Defined as Dry Contact Maintained or Pulse Counter/ Accumulator Mode |
| | **IOM2711:** |
| | 2 - Universal Inputs: Defined as 0–10 VDC, 4–20 mA, 0–600k ohm, or Binary Dry Contact |
| | 2 - Universal Outputs: Analog Output: Voltage Mode, 0-10 VDC; Binary Output Mode: 24 VAC/DC FET; Analog Output: Current Mode, 4-20 mA |
| | 2 - Relay Outputs: (Single-Pole, Double-Throw); UL 916: 1/4 hp 120 VAC, 1/2 hp 240 VAC; 360 VA Pilot Duty at 120/240 VAC (B300); 3 A Non-inductive 24-240 VAC; EN 60730: 6 (4) A N.O. or N.C. only |
| | **IOM2721:** |
| | 8 - Universal Inputs: Defined as 0–10 VDC, 4–20 mA, 0–600k ohm, or Binary Dry Contact |
| | 2 - Analog Outputs: Defined as 0–10 VDC or 4–20 mA |
| | **IOM3711** |
| | 4 - Universal Inputs: Defined as 0–10 VDC, 4–20 mA, 0–600k ohm, or Binary Dry Contact |
| | 4 - Universal Outputs: Analog Output: Voltage Mode, 0-10 VDC; Binary Output Mode: 24 VAC/DC FET; Analog Output: Current Mode, 4-20 mA |
| | 4 - Relay Outputs: (Single-Pole, Double-Throw); UL 916:1/4 hp 120 VAC, 1/2 hp 240 VAC; 360 VA Pilot Duty at 120/240 VAC (B300); 3 A Non-inductive 24-240 VAC; EN 60730: 6 (4) A N.O. or N.C. only |
| | **IOM3721:** |
| | 16 - Binary Inputs: Defined as Dry Contact Maintained or Pulse Counter/Accumulator Mode |
| | **IOM3731** |
| | 8 - Binary Inputs: Defined as Dry Contact Maintained or Pulse Counter/Accumulator Mode |
| | 8 - Binary Outputs: Defined as 24 VAC Triac (Require external low-voltage power source.) |
| | **Note:** Binary Outputs (BOs) on MS-IOM3731-0A controllers do not supply power for the outputs; the BOs require external low-voltage (< 30 VAC) power sources. |
| Input and Output Capabilities (Cont.) | **IOM4711:** |
| | 6 - Universal Inputs: Defined as 0–10 VDC, 4–20 mA, 0–600k ohm, or Binary Dry Contact |
| | 2 - Binary Inputs: Defined as Dry Contact Maintained or Pulse/Counter Accumulator Mode |
| | 3 - Binary Outputs: Defined as 24 VAC Triac (selectable internal or external source power) |
| | 4 - Configurable Outputs: Defined as 0–10 VDC or 24 VAC Triac BO |
| | 2 - Analog Outputs: Defined as 0–10 VDC or 4–20 mA |
| Analog Input/Analog Output Resolution and Accuracy | **Analog Input:** 16-bit resolution |
| | **Analog Output:** 16-bit resolution and ±200 mV in 0–10 VDC applications |
| Terminations | Input/Output: Fixed Screw Terminal Blocks |
| | SA/FC Bus and Supply Power: 4-wire and 3-wire Pluggable Screw Terminal Blocks |
| | SA/FC Bus Port: RJ-12 6-Pin Modular Jacks |
| Mounting | Horizontal on single 35 mm DIN rail mount (preferred), or screw mount on flat surface with three integral mounting clips on controller |
| Housing | Enclosure material: ABS and polycarbonate UL94 5VB; self-extinguishing, Plenum-rated protection class: IP20 (IEC529) |

**Table 5: IOM Series**

| Dimensions (Height x Width x Depth) | **IOM171x-x and IOM271x-x Models:** |
|---|---|
| | 150 x 120 x 53 mm (5-7/8 x 4-3/4 x 2-1/8 in.) including terminals and mounting clips |
| | **IOM2721, IOM3721, and IOM3731 Models:** |
| | 150 x 164 x 53 mm (5-7/8 x 6-7/16 x 2-1/8 in.) including terminals and mounting clips |
| | **IOM371x-x and IOM471x-x Models:** |
| | 150 x 190 x 53 mm (5-7/8 x 7-1/2 x 2-1/8 in.) including terminals and mounting clips |
| | **Note:** Mounting space for all field controllers requires an additional 50 mm (2 in.) space on top, bottom, and front face of controller for easy cover removal, ventilation, and wire terminations. |
| Weight | 0.5 kg (1.1 lb) maximum |
| Compliance | **United States:** UL Listed, File E107041, CCN PAZX, UL 916, Energy Management Equipment; UL/ULc 864 Listed, File S4977, 9th Edition UUKL/ORD-C100-13 UUKLC Smoke Control System (models with **U** product code suffix only); FCC Compliant to CFR47, Part 15, Subpart B, Class A |
| | **Canada:** UL Listed, File E107041, CCN PAZX7, CAN/CSA C22.2 No. 205, Signal Equipment; Industry Canada Compliant, ICES-003 |
| | **Europe:** CE Mark – Johnson Controls, Inc., declares that this product is in compliance with the essential requirements and other relevant provisions of the EMC Directive 2004/108/EC. |
| | **Note:** For **IOM27 and IOM37**, Low Voltage Directive 2006/95/EC. For **IOM47xx Models**, Conducted RF Immunity within EN 61000-6-2 meets performance criteria B. |
| | **Australia and New Zealand:** C-Tick Mark, Australia/NZ Emissions Compliant |
| | **BACnet International:** BACnet Testing Laboratories (BTL) Protocol Revision 4 Listed BACnet Application Specific Controller (B-ASC) |

1 This model is currently available only in Asia; contact your local Johnson Controls representative for more information.
2 For more information, refer to the *MS/TP Communications Bus Technical Bulletin (LIT-12011034)*.

*The performance specifications are nominal and conform to acceptable industry standards. For application at conditions beyond these specifications, consult the local Johnson Controls office. Johnson Controls, Inc. shall not be liable for damages resulting from misapplication or misuse of its products.*



**Johnson Controls**

**Building Efficiency**
507 E. Michigan Street, Milwaukee, WI 53202

*Metasys® and Johnson Controls® are registered trademarks of Johnson Controls, Inc.*
*All other marks herein are the marks of their respective owners. © 2013 Johnson Controls, Inc.*

Published in U.S.A.                                                                    www.johnsoncontrols.com

Input/Output Module (IOM) Series Controllers Catalog Page                                               5


**Johnson Controls**

Code No. LIT-1900655
Issued April 12, 2011

HE-6800 Series

# Humidity Transmitters with Temperature Sensor

## Description

The HE-6800 Series Humidity Transmitters with Temperature Sensor provide both humidity and temperature sensing in room wall-mount applications. The transmitter offers local warmer/cooler temperature setpoint adjustment and temporary occupancy override. The humidity sensor provides Relative Humidity (RH) accuracy of ±2% or ±3% RH and measures RH over the entire range of 0 to 100%.

A warmer/cooler dial is included on certain models for minor temperature adjustments from the setpoint. All models feature an occupancy override button that allows the user to override time-of-day scheduling when the space is occupied outside of the normal occupied hours schedule. The transmitter also includes DIP switches to enable or disable override and Light-Emitting Diode (LED) functions. In addition, all models feature a user-selectable 0 to 5 VDC or 0 to 10 VDC humidity output switch, and a power supply selection switch.

The HE-6800 Series Humidity Transmitters include screw terminal block terminations that provide flexibility for field wiring. All models include a 6-pin modular jack access port for connecting accessories to the Zone Bus. This feature allows a technician to commission or service the controller via the transmitter.

## Features

- controller configuration DIP switch — allows users to adjust the room comfort and choose occupancy features that match the application and transmitter
- power supply selection switch — enables transmitter use in high input voltage applications
- user-selectable humidity output — provides either a 0 to 5 VDC or 0 to 10 VDC output for compatibility with various controllers



**HE-6800 Series Humidity Transmitters with Temperature Sensor**

- occupancy Light-Emitting Diode (LED) indicator — displays the current operating mode of the controller (VMA12 and VMA14 Series only)
- manual override pushbutton (PB) — overrides time-of-day scheduling when the space is occupied outside of the normal occupied hours schedule
- warmer/cooler setpoint dial (select models) — allows for minor temperature adjustments from the setpoint

## Repair Information

If the HE-6800 Series Humidity Transmitter fails to operate within its specifications, replace the unit. For a replacement transmitter, contact the nearest Johnson Controls® representative.

## Selection Charts

**HE-6800 Series Humidity Transmitter with Temperature Sensor Product Code Numbers**

| Product Code Number | Temperature Sensing Element | Humidity Accuracy (% RH) | Warmer/Cooler Temperature Setpoint Adjustment Override | Enclosure Dimensions (mm) |
|---|---|---|---|---|
| HE-68N2-0N00WS | Nickel | ±2% | No | 80 x 80 |
| HE-68N3-0N00WS | Nickel | ±3% | No | 80 x 80 |
| HE-68N2-1N00WS | Nickel | ±2% | Yes | 80 x 80 |
| HE-68N3-1N00WS | Nickel | ±3% | Yes | 80 x 80 |
| HE-68P2-0N00WS | Platinum | ±2% | No | 80 x 80 |
| HE-68P3-0N00WS | Platinum | ±3% | No | 80 x 80 |
| HE-68P2-1N00WS | Platinum | ±2% | Yes | 80 x 80 |
| HE-68P3-1N00WS | Platinum | ±3% | Yes | 80 x 80 |

**Optional Accessories**

| Product Code Number | Description |
|---|---|
| ACC-INSL-0[1] | Wallbox Mounting Pad (10 per Bag) |
| ACC-INSL-1[1] | Surface Mounting Pad (10 per Bag) |
| NS-WALLPLATE-0 | Adapts an HE-6800 Series Humidity Transmitter (3-3/16 x 3-3/16 in. [80 x 80 mm]) to a Standard 3-3/16 x 3-3/16 in. (80 x 120 mm) Wallbox |
| T-4000-119 | Allen-Head Adjustment Tool (30 per Bag) |

1. These foam pads help prevent drafts from entering the unit through the wall, and make installation easier when mounting on an uneven surface.



**EXHIBIT B4**

The performance specifications are nominal and conform to acceptable industry standards. For applications at conditions beyond these specifications, consult the local Johnson Controls office. Johnson Controls, Inc. shall not be liable for damages resulting from misapplication or misuse of its products. © 2012 Johnson Controls, Inc.          www.johnsoncontrols.com

**1 of 2**


Johnson
Controls

## HE-6800 Series Humidity Transmitters with Temperature Sensor (Continued)

### Technical Specifications

| HE-6800 Series Humidity Transmitters with Temperature Sensor | | | |
|---|---|---|---|
| Power Requirements | | 4.5 to 7.5 mA at 14 to 30 VDC and 5K ohm Load, or 18 to 25 mA at 20 to 30 VAC and 5K ohm Load | |
| Terminations | | 9-Position Screw Clamp Terminal Block | |
| Wire Size | | 16 to 24 AWG (1.3 to 0.6 mm Diameter); 18 AWG (1.0 mm Diameter) Recommended | |
| Temperature Measurement Range | | 32 to 131°F (0 to 55°C) | |
| Humidity Measurement Range | Full Range | 0 to 100% RH | |
| | Calibrated Range | 10 to 90% RH | |
| Temperature Sensor | Nickel (HE-68Nx Models) | Sensor Type | 1,000 ohm Thin Film Nickel |
| | | Coefficient | Approximately 3 ohm per F° (5.4 ohm per C°) |
| | | Reference Resistance | 1,000 ohm at 70°F (0°C) |
| | | Accuracy | ±0.34F° at 70°F (±0.18C° at 21°C) |
| | Platinum (HE-68Px Models) | Sensor Type | 1,000 ohm Thin Film Platinum |
| | | Coefficient | Approximately 2 ohm per F° (3.9 ohm per C°) |
| | | Reference Resistance | 1,000 ohm at 32°F (0°C) |
| | | Accuracy | ±0.35F° at 70°F (±0.19C° at 21°C) |
| Humidity Sensor Type | | Capacitive Polymer Sensor | |
| Humidity Element Accuracy | HE-68x2 Models | ±2% RH for 20 to 80% RH at 50 to 95°F (10 to 35°C); ±4% RH for 10 to 20% RH and 80 to 90% RH at 50 to 95°F (10 to 35°C) | |
| | HE-68x3 Models | ±3% RH for 20 to 80% RH at 77°F (25°C); ±6% RH for 10 to 20% RH and 80 to 90% at 77°F (25°C) | |
| Setpoint Range | | Warmer/Cooler | |
| Temperature Sensor Time Constant | | 10 Minutes at 10 ft per Minute | |
| Manual Override | | Integral Momentary Pushbutton (DIP Switch Selectable) | |
| LED | | Green LED Indicates Three Modes of Operation (VMA12 and VMA14 Series Controllers Only) | |
| Ambient Operating Conditions | | 32 to 131°F (0 to 55°C), 10 to 95% RH Noncondensing; 86°F (30°C) Maximum Dew Point | |
| Ambient Storage Conditions | | -40 to 140°F (-40 to 60°C), 5 to 95% RH Noncondensing; 86°F (30°C) Maximum Dew Point | |
| Materials | | White Thermoplastic Protection: IP30 (EN 60529) | |
| Dimensions (H x W x D) | HE-68xx-0 Models | 3-3/16 x 3-3/16 x 1-5/16 in. (80 x 80 x 32 mm) | |
| | HE-68xx-1 Models | 3-3/16 x 3-3/16 x 1-7/16 in. (80 x 80 x 35 mm) | |
| Shipping Weight | | 0.44 lb (0,20 kg) | |
| Compliance | United States | UL Listed, File E107041, CCN PAZX, Under UL 916, Energy Management Equipment | |
| | Canada | UL Listed, File E107041, CCN PAZX7, Under CAN/CSA C22.2 No. 205, Signal Equipment | |
| | Europe | CE Mark – Johnson Controls, Inc., declares that this product is in compliance with the essential requirements and other relevant provisions of the EMC Directive 2004/108/EC. WEEE Directive 2002/96/EC RoHS Directive 2002/95/EC | |
| | Australia and New Zealand | C-Tick Mark, Australia/NZ Emissions Compliant | |

CE

The performance specifications are nominal and conform to acceptable industry standards. For applications at conditions beyond these specifications, consult the local Johnson Controls office. Johnson Controls, Inc. shall not be liable for damages resulting from misapplication or misuse of its products. © 2012 JohnsonControls, Inc.    www.johnsoncontrols.com

**2 of 2**



*Comment*: Provision must be made for inmate access in cells or sleeping areas, dayrooms, and other parts of the facility. The requirement of an approved ratio is designed to assure that inmates have adequate access to meet their basic personal hygiene needs.

## Showers

**4-4139**
**(Ref. 3-4134)**

Inmates have access to operable showers with temperature-controlled hot and cold running water, at a minimum ratio of one shower for every eight inmates, unless national or state building or health codes specify a different ratio. Water for showers is thermostatically controlled to temperatures ranging from 100 degrees Fahrenheit to 120 degrees Fahrenheit to ensure the safety of inmates and to promote hygienic practices.

*Comment*: Offenders can use scalding showers as a weapon against, or punishment for, other inmates. Also, accidental injury could occur when cold water is drawn in other areas, thereby unexpectedly elevating the hot water in showers to scalding temperatures. Water temperatures below 100 degrees Fahrenheit are uncomfortable and may deter an individual from pursuing good hygienic practices. The temperature controls should not preclude the use of water at higher temperatures, if needed, in other areas of the institution, such as kitchens.

## Special Management Housing

**4-4140**
**(Ref. 3-4135)**

Segregation housing units provide living conditions that approximate those of the general inmate population; all exceptions are clearly documented. Segregation cells/rooms permit the inmates assigned to them to converse with and be observed by staff members.

*Comment*: None.

**4-4141**
**(Ref. 3-4136)**

4-4141
Interpretation August 2004

All cells/rooms in segregation provide a minimum of 80 square feet, of which 35 square feet is unencumbered space.

*Comment*: Segregated inmates are confined in cells/rooms for more extended periods during the day. Therefore the cell/room must provide additional space for in-cell activity.

## Housing for the Disabled

**4-4142**
**(Ref. 3-4137)**

Inmates with disabilities are housed in a manner that provides for their safety and security. Housing used by inmates with disabilities is designed for their use and provides for integration with other inmates. Programs and services are accessible to inmates with disabilities who reside in the facility.

*Comment*: If the facility accepts individuals with disabilities, it must provide for their housing and use of facility resources. Housing includes, but is not limited to, rooms, sleeping areas, furnishings, dayrooms, toilets, washbasins,

# Exhibit 4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE, | * | CIVIL ACTION NO. 13-368 |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY, ANGELA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, | * | JUDGE: BAJ |
| | * | |
| | * | |
| | * | MAGISTRATE: SCR |
| | * | |
| DEFENDANTS | * | |
| | * | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSION OF HEAT REMEDIATION PLAN

NOW INTO COURT come Plaintiffs Elzie Ball, Nathaniel Code, and James Magee, through undersigned counsel, and make the following Response to Defendants' *Submission of Heat Remediation Plan*, Rec. Doc. 118, as ordered by this Court, Rec. Doc. 87 at 101.

### I.    Procedural History

This Court's Ruling and Order of December 19, 2013, ordered Defendants to immediately develop and submit to the Court by Feb. 17, 2014, a plan to reduce and maintain the heat index at the Death Row facility.  Rec. Doc. 87 at 100.  The Court further instructed that Defendants' plan was to include:

a step-by-step description as to how Defendants will: (1) immediately lower and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index in the Angola death row tiers at or below

1

88 degrees Fahrenheit from April 1 through October 31; (3) monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis from April 1 through October 31; (4) provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with (a) at least one cold shower per day; (b) direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" and the twenty-three hours in which the inmates are confined to their cell; and (c) any and all relief that it is necessary to comply with this Court's order and the prevailing constitutional standards.

*Id.* at 100-01. The Court ordered Plaintiffs to respond to Defendants' plan by March 10, 2014. *Id.* at 101.

Defendants submitted their heat remediation plan to the Court on February 17, 2014. Rec. Doc. 118. Defendants' plan, developed in consultation with Frank Thompson, P.E., Thompson Luke & Associates, consists of (1) adding nine tons of air conditioning capacity to the existing HVAC system on each Death Row tier, (2) automatic monitoring and recording of temperature and humidity data through the Death Row facility's existing Johnson Controls energy management system, (3) the capability of adjusting shower temperatures as required, and (4) the provision of ice chests and clean ice by LSP staff. *Id.* at 2-3.

## II.     Plaintiffs' Response to Defendants' Heat Remediation Plan

Plaintiffs find that Defendants' plan proposes an adequate remedy for the violation of their Eighth Amendment rights. Defendants' engineer Mr. Thompson's explanation of the plan describes the several respects in which it retrofits the existing HVAC system of the Death Row facility to add prefabricated cooling units to the ductwork. Rec. Doc. 118-2 at 1-2. As Mr. Thompson's comments indicate, this proposal is the simplest, most practical and effective way to create safe heat conditions on the Death Row tiers.

Plaintiffs have conferred with their testing and balancing expert David Garon on this point, and Mr. Garon has confirmed that this is the most practical and effective way to maintain a

heat index below 88 degrees. Defendants' plan is cost-effective because it depends largely on utilizing existing systems within the facility, and to Plaintiffs' understanding it is the most straightforward and practical way to alleviate the unsafe heat conditions during the summer on Death Row. Indeed, Mr. Thompson, states that the proposed plan will likely exceed the 88-degree threshold, owing to equipment design and standard engineering practice. *Id.* at 1.

Defendants' plan does not discuss a specific timeline for procuring and installing the new equipment. Because this Court's order contemplated that Defendants' plan be implemented and operational by April 1, 2014, Plaintiffs understand that to be the date by which Defendants believe this plan can be implemented. Rec. Doc. 87 at 101.

Certain details remain to be clarified as to how the data recorded at the Death Row facility will be monitored and transmitted to the Court, a potential Special Master, or other interested parties. Defendants' proposal to make use of the facility's existing Johnson Control system could render this process quite simple given that the system can be set to generate reports at regular intervals. Rec. Doc. 118-2 at 2.

In light of the Court's order, Plaintiffs wish to flag one area of potential concern. Cooling showers are a limited remedial measure which provide for some immediate and short-lived relief in conditions where the heat index is not as extreme as in the instant case. Since the Court has ordered that the heat index be kept below 88 degrees, Plaintiffs do not believe that cooling showers would be required. Furthermore, Plaintiffs would be concerned that cold showers in addition to mechanical cooling could have a deleterious effect on their health and safety. Therefore, should the Court require the use of mechanical cooling, Plaintiffs take the position that cooling showers would be unnecessary.

### III.     Conclusion

WHEREFORE, Plaintiffs Elzie Ball, Nathaniel Code, and James Magee, respectfully pray that the Court order implementation of the heat remediation plan proposed by Defendants.

Date: Mar. 10, 2014

Respectfully submitted,

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490
Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

CERTIFICATE OF SERVICE

I do hereby certify that on Mar. 10, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.


/s/ Mercedes Montagnes
MERCEDES MONTAGNES, LSBA #33287
Attorney at Law
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955

Exhibit 5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**ELZIE BALL, NATHANIEL CODE AND JAMES MAGEE**

**VERSUS**

**JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF CORRECTIONS, ET AL.**

**CIVIL ACTION NO. 13-368**

**JUDGE BRIAN A. JACKSON**

**MAGISTRATE JUDGE STEPHEN C. REIDLINGER**

---

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN THAT Defendants, Burl Cain, Warden, Louisiana State Penitentiary; James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections; Angelia Norwood, Assistant Warden, Louisiana State Penitentiary, and the Louisiana Department of Public Safety and Corrections, pursuant to Rule 3 of the Federal Rules of Appellate Procedure, 28 U.S.C. § 1291 and 28 U.S.C. § 1292(a)(1), respectfully appeal to the United States Court of Appeals for the Fifth Circuit from this Court's Ruling and Order ("Ruling and Order") entered December 19, 2013 (Doc. 87).

Defendants submit that the Ruling and Order was issued after a trial on the merits and disposes of all of the plaintiffs' claims, excepting plaintiffs' claims for attorney's fees and any ancillary relief related to the relief granted by the Ruling and Order. Accordingly, Defendants respectfully submit that the Ruling and Order qualifies as a final ruling subject to entry of judgment under Rule 58. To date, no entry of judgment has been made. Therefore, out of an

1

abundance of caution, Defendants file this Notice of Appeal prior to entry of judgment pursuant to Rule 4(a)(2) of the Federal Rules of Appellate Procedure.

In the alternative, in the event that it is determined that the Ruling and Order is interlocutory or otherwise does not require entry of judgment, Defendants submit this Notice of Appeal pursuant to 28 U.S.C. § 1292(a)(1).

Respectfully Submitted:

James D. "Buddy" Caldwell Attorney General

By: **/s/ James L. Hilburn**
E. Wade Shows, La. Bar Roll No. 7637
Amy L. McInnis, La. Bar Roll No. 29337
James L. Hilburn, La. Bar Roll No. 20221
Jacqueline B. Wilson, La. Bar Roll No. 31055
**SHOWS, CALI & WALSH, LLP**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

and

Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar Roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
**ROEDEL, PARSONS, KOCH, BLACHE,**
**BALHOFF & MCCOLLISTER**
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

*Counsel for defendants*

2

## CERTIFICATE

I hereby certify that a copy of the foregoing Notice of Appeal was this date electronically filed with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to all counsel participating in the Court's CM/ECF system by operation of the Court's electronic filing system.  Notice will be mailed to any party or counsel not participating in the Court's CM/ECF system by this date depositing same in the United States Mail, first class postage prepaid and properly addressed.

Baton Rouge, Louisiana this 21st day of January, 2014.

/s/ James L. Hilburn
**JAMES L. HILBURN**

3

Exhibit 6

# In the United States Court of Appeals
# for the Fifth Circuit

---

No. 1430067

---

ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE
Plaintiff/Appellee

v.

JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS, BURL CANE, WARDEN OF THE LOUISIANA STATE
PENITENTIARY, ANGELA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
Defendants/Appellants

---

On appeal from the United States District Court
for the Middle District of Louisiana
Civil Action No. 3:13-CV-368
The Honorable Brian A. Jackson, Judge Presiding

### APPELLANTS' MOTION FOR EMERGENCY STAY OF
### JUDGMENT PENDING APPEAL

---

SHOWS, CALI AND WALSH, LLP
E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

ROEDEL, PARSONS, KOCH, BLACHE
BLACHE, BALHOFF & McCOLLISTER
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar Roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

COUNSEL FOR DEFENDANTS

1

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

1. ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE, *plaintiffs/respondents;*

2. MERCEDES MONTAGNES, ELIZABETH COMPA, AND THE PROMISE OF JUSTICE INITIATIVE, *attorneys for plaintiffs/respondents*;

3. MITCHELL A. KAMIN, JESSICA C. KORNBERG, NILAY U. VORA, AND THE LAW FIRM OF BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS & LINCENBERG, P.C., *attorneys for plaintiffs/respondents;*

4. STEVEN SCHECKMAN AND THE LAW FIRM OF SCHIFF, SCHECKMAN, & WHITE, LLP, *attorneys for plaintiffs/respondents;*

5. JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, BURL CANE, WARDEN OF THE LOUISIANA STATE PENITENTIARY, ANGELA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, *defendants/applicants.*

6. E. WADE SHOWS, JAMES L. HILBURN, AMY L. MCINNIS, JACQUELINE B. WILSON, AND THE LAW FIRM OF SHOWS, CALI & WALSH, LLP, *attorneys for defendants/applicants*; and

7. THOMAS E. BALHOFF, JUDITH R. ATKINSON, CARLTON JONES, III, ROEDEL, PARSONS, KOCH, BLACHE, BALHOFF & MCCOLLISTER, *attorneys for defendants/applicants*.

Respectfully Submitted:

/s/ *James L. Hilburn*

E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
**SHOWS, CALI &WALSH, LLP**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
wade@scwllp.com
jamesh@scwllp.com
amym@scwllp.com
jbw@scwllp.com

**ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & MCCOLLISTER**
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

3

## REQUEST FOR EMERGENCY CONSIDERATION

The district court has ignored this court's 2004 ruling in *Gates v. Cook.*[1]

Defendants/Appellants, Burl Cain, Warden, Louisiana State Penitentiary; James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections; Angelia Norwood, Assistant Warden, Louisiana State Penitentiary and Louisiana Department of Public Safety and Corrections, respectfully ask for a stay pending appeal of the Rulings and Order issued by the district court on December 19, 2013.[2]

This matter arises out of an action alleging that Defendants violated Plaintiff-Inmates' Eighth Amendment rights by subjecting them to an environment that constitutes cruel and unusual punishment. The Plaintiffs, who reside at Death Row at Louisiana State Penitentiary ("LSP"), argued, and the district court agreed, that despite the LSP's full compliance with this Court's previously promulgated standards, as well as the lack of evidence as to any medical condition suffered by Plaintiffs resulting therefrom, the temperatures and humidity levels in Plaintiffs cells creates an environment rising to the level of cruel and unusual punishment.

After making such findings, the district court issued a Ruling and Order on December 19, 2013 directing Defendants to submit plans to decrease the heat index

---

[1] 376 F.3d 323 (5th Cir. 2004).
[2] Doc. 87 attached hereto as Exhibit B.

4

in the death row tiers by February 17, 2014.[3] But at that time (as well as now), the

district court's ruling did not comply with Federal Rule of Civil Procedure 58 and

therefore was not appealable by Defendants. After submitting a Motion for Entry

of Final Judgment[4] with a request of an expedited hearing on December 26, 2013,[5]

the district court has still not entered a final judgment, even though the deadline to

comply with its December 19, 2013 Ruling and Order is only four weeks away.

Defendants aver that the district court's ruling runs contrary to the well-

settled principles set forth by this Court, establishing the standards necessary for

prisons to comply with the Eighth Amendment. The district court's order goes

way beyond requiring Defendants to control the temperature in the death row tiers

and to provide Plaintiffs with adequate relief therefrom. Instead, it requires them

to also control the heat index and humidity in the tiers, a feat that can only be

performed by an air conditioner, chiller, or some other expensive dehumidifying

system.

A stay is warranted where there is a substantial likelihood of success on the

merits; where the absence of its imposition would cause substantial harm to

Defendants yet its implementation would cause no harm to Plaintiffs; and where

public interest lies with the requesting party. Therefore, Defendants request stay of

---

[3] *Id.*

[4] Doc. 91 attached hereto as Exhibit C.

[5] Doc. 92 attached hereto as Exhibit D.

the matter during the pendency of its appeal in front of the Fifth Circuit.
Defendants request that this Court issues a ruling on the instant motion by January
31, 2014.

## FACTUAL BACKGROUND

On June 10, 2013, Plaintiffs Elzie Ball, Nathaniel Code, and James Magee
filed a complaint the United States District Court for the Middle District of
Louisiana, asserting violations of their Eighth Amendment rights pursuant to 42
U.S.C. § 1983, violations of the Americans with Disabilities Act, and violations of
the Rehabilitation Act, seeking declaratory and injunctive relief and requesting
attorneys' fees and costs.

All three Plaintiffs are prisoners at the Louisiana State Penitentiary who
have been sentenced to death for their crimes. Accordingly, they all reside in
Death Row. Plaintiffs complained that the heat index to which they were subjected
during the summer months created a condition of cruel and unusual punishment.

Death Row is a sector of LSP that is comprised of four housing wings, each
of which contain two housing tiers (Tiers A-H) as well as administrative offices
and other rooms. Each tier is comprised of 12 and 16 open-air cells. The cells are
not exposed to direct sunlight. Windows are spaced along the outer walls, and
each window is equipped with screens and blades that may be adjusted to admit air
or light into the tier as weather and climate dictate. Located immediately above the

6

windows on the tiers are industrial size fans which are directed at the cells. These fans may be turned on or off at the request of inmates, but are generally on during the summer months. The fans move air across the skin, making it feel cooler.

The living areas on Death Row contain a cross-ventilation system which contains exhaust vents located on the back wall of each cell. Air enters the tiers through the windows and passes over the walkways into the cells, travels through the vents in the cells and into a pipe chase which runs along the walkway in the middle of the cells of each tier. The air then is exhausted through fans on the roof. The ventilation system is designed to replace the air in each cell approximately 20 times per hour. The living areas were never outfitted or designed for the use of air conditioning.

During the course of this action, it was ordered that the parties hire an independent monitoring agency to monitor temperatures and humidity within the Death Row for a period of 20 days. During the monitoring period, no temperature readings were recording in excess of 90 degrees Fahrenheit on Tiers A or H. There was only one temperature reading in excess of 90 degrees Fahrenheit (90.6 degrees), and it was on Tier C. The heat index on the Death Row tiers frequently ranged between 86 degrees to 97 degrees Fahrenheit, and very rarely exceeded 99 degrees Fahrenheit.

The common areas at the Death Row facility, which includes the control room, the visitation room, and the medical clinic, are outfitted with air conditioning. Each cell is equipped with a sink with hot and cold running water, a toilet, a bed, a desk, and a chair. Inmates are allowed unlimited use of water from their sinks, which is sourced from the same water available to LSP employees and visitors. Inmates are allowed to leave their cells one hour every day, at which time they may shower, exercise or move freely on the tiers. The inmates are also allowed to engage in outdoor recreation four times per week during their daily one hour "tier time." Showers do not contain adjustable controls for inmates, however, they are adjusted by officers at the request of inmates and done so seasonally to be warmer during colder months and cooler during warmer months.

Inmates in Death Row are sedentary and are not required to perform any prison labor. They are not required to wear many clothes while in their cells and many wear only shorts in the summer months. They are provided ice throughout the day from a large ice chest located on each tier to which every inmate has access. The chests are regularly filled with clean ice made by an ice machine located at the Death Row facility. Each inmate is provided with two containers that they may fill with ice and keep within his cell. Inmates are also allowed to and frequently do fill the sink located in their cells with ice in addition to the two containers. They may access the ice chests during their "tier time" and are allowed

to and frequently request ice from other inmates who are out of their cells exercising their "tier time" to refill ice. They also may request ice refills from officers. No inmate has been deprived of water or ice upon request. Inmates are also provided with towels in their cells and may wet the towels with water from their sinks to cool them.

No inmate has ever suffered heat-related injuries at the current Death Row facility, and a review of the medical records of each of the three Plaintiffs since 2011 does not indicate an elevated body temperature, objective data which negates the allegations that plaintiffs are pre-disposed to heat-related illness(es). Plaintiffs have not been denied access to any facility, program, or activity at LSP because of any medical conditions and none have requested a reasonable accommodation based on any alleged disability. No illness has substantially limited a major life function of any of the Plaintiffs and they have not been treated differently than any other offender on Death Row.

### PROCEDURAL BACKGROUND

After filing their initial Complaint, Plaintiffs subsequently filed a Motion for Preliminary Injunction which was deferred until an evidentiary hearing on August 5, 2013. The district court also scheduled the trial on the merits to commence on the same date - August 5, 2013.

9

After a three-day bench trial, the district court determined that conditions at Death Row violated the provisions of the Eighth Amendment of the United States Constitution. The district court found that the heat index levels in the cells of the plaintiff-inmates created an environment of cruel and unusual punishment due to the "substantial risk of serious harm to Plaintiffs." The court also found that Defendants acted with deliberate indifference to this risk, that they had knowledge of risk, and that they disregarded the risk.

The district court issued these finding by means of a Ruling and Order on December 19, 2013,[6] granting Plaintiffs' request for declaratory and injunctive relief as to Plaintiffs' Eighth Amendment claims but denying relief as to Plaintiffs' claims under the ADA and Rehabilitation Act. The court denied Plaintiffs' Motion for Preliminary Injunction as moot.

The court also issued several Orders to Defendants directing them to immediately develop a plan to reduce and maintain the heat index on the Death Row tiers at or below 88 degrees Fahrenheit. The Court further ordered that Defendants shall submit their plan to the Court no later than February 17, 2014 at 5:00 p.m. and that the plan include a step-by-step description as to how Defendants will: (1) immediately lower and maintain the heat index on the Death Row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index on the Death Row tiers

---

[6] Doc. 87 attached hereto as Exhibit B.

at or below 88 degrees Fahrenheit from April 1 to October 31; (3) monitor, record, and report the temperature, humidity, and heat index on each of the Death Row tiers every two hours on a daily basis from April 1 to October 31; (4) provide Plaintiffs with at least one cold shower per day, direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" and the 23 hours in which the inmates are confined to their cells, and any and all relief that is necessary to comply with the Court's order and the prevailing constitutional standards. The Court advised explicitly that financial considerations will not be considered a legitimate reason for Defendants/ failure to comply with the court's order. The district court also ordered that Defendants to immediately add Plaintiff James Magee to Angola's "Heat Precautions List" and awarded Plaintiffs reasonable attorneys' fees and costs.[7]

But because this order was not a valid Judgment pursuant to Federal Rule of Civil Procedure 58 and therefore not immediately appealable, Defendants filed a Motion for Entry of Final Judgment[8] and Motion for Expedited Consideration[9] thereof on December 26, 2013. The district court denied Defendants' Motion for Expedited Consideration on January 6, 2014, giving Plaintiffs until January 16,

---

[7] *Id.*

[8] Doc. 91 attached hereto as Exhibit C.

[9] Doc. 92 attached hereto as Exhibit D.

2014 to file a response to the Motion for Expedited Consideration.[10]  In light of the fast approaching deadlines, Defendants then filed a Motion for Stay Pending Appeal on January 13, 2014[11] with a Motion for Expedited Consideration.[12]  The district court denied the Motion to Stay, and in doing so, implied that his order was only interlocutory in nature and that Defendants were to proceed with an appeal in the absence of a Judgment.[13]  Accordingly, out of an abundance of caution Defendants filed a Notice of Appeal.[14]  Still believing, however, that an appeal requires a separate judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure, Defendants expects to file a Writ of Mandamus to this Court on January 24, 2014 requesting that it order the district court to enter a valid and appealable judgment.[15]

Defendants' Motion for Entry of Judgment is still pending, despite the passage of more than three weeks.  And while Defendants acknowledge the potential procedural impropriety in submitting this motion before Final Judgment (or interlocutory judgment) is entered, considering the impending deadlines of the

---

[10] Doc. 95 attached hereto as Exhibit G.

[11] Doc. 97 attached hereto as Exhibit H.

[12] Doc. 98 attached hereto as Exhibit I.

[13] Doc. 100 attached hereto as Exhibit K.

[14] Doc. 103 attached hereto as Exhibit L.

[15] *See* Petition for Mandamus which will be filed with this Court today if weather is permitting.  Due to inclement weather, the roads between Baton Rouge and New Orleans have been closed and at the time of this filing, Defendants have not been able to travel thereto to file the Petition.  If road closures are lifted, Defendants expect to file the Petition today.  If not, the Petition for Mandamus will be filed Monday, January 27, 2014.

district court's order, as well as its failure to timely enter a judgment, they simply have no choice but to do so at this time.

**ARGUMENTS AND AUTHORITY**

Whether this Court should stay the district court's judgment pending appeal turns on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[16] All four factors favor a stay.[17] A movant need not show even a "probability" of success on the merits.[18] It is enough for the movant to "present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay."[19]

## I.   DEFENDANTS WILL LIKELY PREVAIL ON THE MERITS.

The relief ordered by the district court is unlikely to survive appellate review of this Court. The Court's ruling finds that Death Row subjects Plaintiffs to cruel and unusual punishment in violation of the Eighth Amendment. The determination of whether prison conditions pose a substantial risk of harm to a prisoner so as to

---

[16] Hilton v. Braunskill, 481 U.S. 770, 776 (1987).

[17] *See* Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981).

[18] *Id.* (If a movant were required in every case to establish that the appeal would probably be successful, the Rule would not require as it does a prior presentation to the district judge whose order is being appealed.").

[19] *Id.*

13

violate the Eighth Amendment is a question of law that is contingent upon factors which vary based on the nature of the conditions.[20] This is a serious legal question based upon constitutional interpretation which has been greatly expanded by the district court despite the rulings of this Court finding that even harsher prison conditions than those present at the LSP do not violate the provisions of the Eighth Amendment.

Aside from the district court's ultimate determination, Defendants also take issue with the court's Orders, especially that which goes beyond all prevailing precedent and directs Defendants to maintain Death Row at an arbitrary minimum heat index rather than temperature, effectively ordering that air conditioning or some other expensive cooling method be implemented.

All of the above, coupled with the mistaken factual findings listed by the district court in forming its Ruling and Order, demonstrate at a minimum a substantial case on the merits, if not a probability of success thereon. And considering the importance of the serious legal question at issue which will be considered by this Court on appeal, a stay is warranted to prevent the enforcement of the district court's judgment prior to an appellate decision in this matter.

---

[20] *See* Hudson v. McMillian, 503 U.S. 1, 5 (1992); *see also* Whitley v. Albers, 475 U.S. 312 (1986).

**A. Conditions within Death Row are not sufficiently extreme to create an environment of cruel and unusual punishment as they are not as severe as conditions previously deemed constitutional by this Court.**

The Eighth Amendment of the U.S. Constitution provides that: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It "does not mandate comfortable prisons but neither does it permit inhumane ones."[21] Accordingly, "[p]rison officials must provide humane conditions of confinement; they must ensure that the inmates receive adequate food, clothing, shelter, and medical care and must take reasonable measure to ensure the safety of the inmates."[22] An inmate's discomfort, without more, does not offend the Eighth Amendment,[23] and if prison conditions are "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."[24] Under the first prong of the U.S. Supreme Court's two part analysis for challenges such as this, the Plaintiffs must first prove the existence of sufficiently extreme conditions.[25] "Extreme deprivations are required to make a conditions-of-confinement claim under the Eighth Amendment."[26]

---

[21] Farmer v. Brennan, 511 U.S. 825, 832 (1994).

[22] Id. at 832; see also Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004).

[23] Woods v. Edwards, 51 F.3d 577, 581 (2004).

[24] Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Chandler v. Crosby, 379 F.3d 1278, 1290.

[25] Hudson v. McMillan, 503 U.S. 1, 8 (1992)

[26] Id. at 9.

Plaintiffs are on death row due to the imposition of death sentences for the crimes for which they are incarcerated. And while they are confined in non-air conditioned cells, they have access to numerous accommodations to grant them relief from any high temperatures. In fact, more accommodations are made at the LSP death row than those mandated by this Court and others as sufficient remedies for subjection to heat.

Plaintiffs, for instance, are similarly situated to the death row inmate residing at Mississippi State Penitentiary who brought an Eighth Amendment action in the 2004 matter of *Gates v. Cook*.[27] In that case, plaintiff complained of several conditions, including temperature. He claimed that relief could only be obtained by opening windows and that the ventilation resulting from windows and fans in the hallway was not adequate to afford a minimal level of comfort in the summer months. The district court granted injunctive relief on the heat claim and directed the Mississippi Department of Corrections to provide fans, ice water and daily showers to death row inmates when the heat index registered 90 degrees Fahrenheit or above.[28] The plaintiffs in this action all currently enjoy all of the remedies ordered by the Court in *Gates*, including the use of fans, access to water, access to ice, and daily showers regardless of the heat index.

---

[27] 376 F.3d 323 (5th Cir. 2004).
[28] *Id.* at 340.

16

Likewise, in *Chandler*, plaintiff-inmates at death row at Union Correctional Institution in Florida also brought an Eighth Amendment claim due to heat.[29] Although the facility in that matter had a ventilation system similar to LSP, no fans were used to circulate the air, and the plaintiffs were only allowed three showers per week.[30] The death row cells remained on average, between 80 and 86 degrees, with temperatures over 90 degrees approximately nine percent of the time and sporadic readings over 95 degrees.[31] The district court held, and the Eleventh Circuit affirmed, that plaintiffs did not present a sufficient case for an Eighth Amendment violation due to the numerous conditions which alleviated the heat, including lack of direct sunlight in cells, sinks with hot and cold running water in each cell, sedentary behavior, minimal clothing requirements, and occasional ventures into air conditioned portions of the death row facility for visitation or medical care.[32] Again, the inmates in the instant matter currently enjoy all of these alleviating conditions in addition to others that make the environment more favorable than those enjoyed by the *Chandler* plaintiffs.

Plaintiffs in this case are not subjected to any conditions beyond those already deemed acceptable by courts of review in these factually similar cases. Knowing the alleviating conditions necessary to comply with the prevailing

---

[29] Chandler v. Crosby, 379 F.3d 1278 (11th Cir. 2004).

[30] *Id.* at 1284.

[31] *Id.* at 1297.

[32] *Id.* at 1298.

constitutional standards, Defendants have consciously granted Plaintiffs access to accommodations above and beyond that which is required. They cannot be deemed to be in objective violation of the Eighth Amendment by subjecting Plaintiffs to "extreme deprivations" or "sufficiently extreme conditions" when Plaintiffs' living conditions are better than those already deemed satisfactory. Therefore, Defendants' claim is likely to prevail on the merits of this issue, and stay is therefore warranted to prevent the execution of the district court's order directing that expensive measures be immediately implemented to better Plaintiffs' conditions even further.

### B. The District Court's Ruling and Order mandates performance well-beyond all prevailing Constitutional standards, potentially creating dangerous new precedent and a windfall of litigation.

In accordance with the district court's erroneous finding discussed above, the district court also entered an order that LSP implement a plan to maintain the heat index in the Death Row cells. The district court's ruling therefore effectually orders Defendants to install an extensive and expensive air conditioning unit or some other humidity-controlling device, a requirement that has never been mandated by any Court to correct an Eighth Amendment violation.[33]

As demonstrated above, courts have never ordered that prisons actually control the temperature and heat index within their facilities. They have only

---

[33] *See for example* Gates v. Cook, 376 F.3d 323 (5th Cir. 2004); Chandler v. Crosby, 379 F.3d 1278 (11th Cir. 2004).

required that prisons provide prisoners with adequate means to gain relief from such temperatures. No prison has ever been directed to provide air conditioning or any other cooling system and the LSP as well as many other prisons are not outfitted with the ability to do so.

Courts are directed not to micromanage prisons, and their authority regarding the dictation of such preventative measures is limited to providing the least burdensome remedy possible to bring the prison into compliance with the Constitution.[34] To require a prison to actually change its structure and install new machinery and equipment in order to affirmatively regulate the heat index within the cells is far from the least burdensome remedy available, especially in a situation where the prison is already in compliance with the Constitution. To uphold a ruling instituting such a requirement will be to create a whole new standard for Eighth Amendment violations, bringing with it lawsuits from prisoners across the country demanding that air conditioning be implemented in their cells. As prisoners clearly do not possess a Constitutional right to air conditioning, the district court's orders go well beyond the scope of all prevailing precedent and authority. Therefore, they cannot be sustained. And because they cannot be sustained, a stay is warranted to prevent their implementation prior to this Court's determination of the issue on appeal.

---

[34] *Gates*, 376 F.3d at 338.

### C. The District Court erred in finding that Defendants were deliberately indifferent to excessive risk to inmate health or safety, or that they knew of and disregarded such risk.

The second prong of the two-part Eighth Amendment analysis involves a "subjective" component, by which an inmate must show that prison officials knew of and disregarded an excessive risk to inmate health or safety.[35] There was no evidence presented by Plaintiffs that Defendants knew of the alleged excessive heat on the tiers and disregarded it. In fact, Warden Cain and Warden Norwood testified that they are routinely on the tiers and do not find that the temperatures are excessive.

### D. Plaintiffs did not provide a reasonable basis for the District Court to conclude that their medical conditions warranted such a drastic remedy.

The district court concluded that Plaintiffs' individual health conditions warranted the implementation of such extreme actions discussed above. But Plaintiffs did not present adequate evidence to support such a finding. The testimony established that two of the Plaintiffs were living on the tiers since the opening of the facility in 2006, for more than seven years, with no heat-related conditions. In fact, since 2006, Defendants have increased the number of instruments designed to reduce the effects of heat, thereby reducing the risk of heat-related illnesses to Plaintiffs.

---

[35] *Farmer*, 511 U.S. at 837.

Nor did any of the Plaintiffs report heat-related illnesses or symptoms during their routine medical visits. The trial testimony established that these Plaintiffs failed to properly treat their individual medical conditions and that this failure was the likely cause of their medical problems, not the conditions at the facility.

### E. The District Court's Ruling and Order is erroneous insomuch as it relies on heat index to be the determining factor as to the allegedly extreme conditions in the Death Row tiers.

The district court improperly looked at the heat index instead of the actual temperatures on the tiers. Expert testimony at trial established that the heat index is a derived number which can be affected by a number of environmental and physical factors, including the height and weight of a person, the extent to which a person is stationary or mobile, and the amount of clothes worn. None of these factors are translatable in the unique environment of a maximum security prison. In fact, Defendants' expert testified that heat index figures should not be used. The district court reliance only upon the heat index figures was in error.

### F. The District Court's Ruling and Order is erroneous insomuch as it arbitrarily determines that 88 degrees Fahrenheit is the standard heat index temperature necessary to comply with the U.S. Constitution.

The entirety of the district court's ruling is based on the premise that a heat index in excess of 88 degrees is per se unconstitutional. Its order demanding a plan to ensure that the heat index does not exceed 88 degrees during specified months is also based on this premise. However, there was no testimony or

21

evidence that persons exposed to heat indices above 88 degrees would incur unconstitutional pain and suffering. Thus, the district court's use of a heat index as a standard is arbitrary and not based on any competent evidence.

### G. The District Court's explicit Order directing Defendant's to disregard financial concerns as a factor for compliance is contrary to the controlling principles regarding the issuance of injunctions to bring prisons into compliance with the Eighth Amendment.

The district court also refused to consider the costs of mechanical cooling in clear violation of the injunction factors. Because one factor that the party seeking an injunction bears in proving is that the injury to the moving party outweighs any damage that will result to the opposing party. Thus, the trial court's refusal to consider costs is in clear violation of the well-established jurisprudence concerning the propriety of granting injunction, particularly against public bodies.

## II.   DEFENDANTS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY.

Even despite the probability of success on the merits presented above, Defendants contend that the imposition of a stay is more than warranted based upon the irreparable harm that would be caused by its absence. Failure to impose a stay in this case will cause Defendants to suffer irreparable injury in the form of substantial costs and considerable time and efforts expended in fulfilling and implementing the district court's Orders which this Court may find to be unnecessary and unwarranted. Defendants would not only have to consult with

and hire engineers and other experts to determine how to implement such plans, but they would then have to put the plans into action no matter how exorbitant the costs, as the district court has directed that financial concerns cannot be a consideration.[36] In the event that the district court's ruling should be reversed on this particular ground or any other discussed above, such efforts would be entirely wasted.

### III. DEFENDANTS' IRREPARABLE INJURIES STRONGLY OUTWEIGH ANY HARM TO THE PLAINTIFFS.

And though the failure to impose a stay will cause substantial, irreparable injury to the Defendants, its imposition will conversely cause no harm to occur to the Plaintiffs. This matter involves a claim that Plaintiffs' Eighth Amendment rights were violated due to the high temperatures reached in their cells during the warmer months of the year. At this point in time, Plaintiffs are not being subjected to the high temperatures of which they complain and will not be subjected to them for several months. Therefore, a stay will not have any effect on any alleged infringement of Plaintiffs' constitutional rights. In the event that the matter is stayed and this Court ultimately denies Defendants' appeal, Defendants will then be required to comply with the district court's Orders. Thus, the potential harm a stay would impose on Plaintiffs cannot be a deterrent of its implementation.

---

[36] Doc. 87 attached hereto as Exhibit B.

IV.   **PUBLIC INTEREST LIES IN THE IMPOSITION OF A STAY PENDING APPEAL.**

Defendants are public entities, and public interest lies in making sure that the dollars spent by these entities are spent prudently and necessarily, without undue waste or unwarranted expenditures.   Failure to impose a stay could compel Defendants to expend public funds in accordance with a Court Order that may be reversed on appeal, making such spending futile and needless.   Defendants are simply asking that the public interest be protected in prolonging the enforcement of a Judgment requiring this spending until after it is contemplated by the Court of Appeal.

## CONCLUSION

Defendants will be appealing the Court's Rulings and Order as well as any Final Judgment that is issued. Absent the imposition of a stay, Defendants' appeal is potentially fruitless, as a decision by this Court in their favor would reverse the Judgment, but it could not reverse the actions and expenditures already exhausted by Defendants while the matter was pending. Because the consequences of imposing a stay are so few yet the consequences of failing to impose it are so great, Defendants aver that a stay is warranted pending appeal to this Court.

WHEREFORE, Defendants, Burl Cain, Warden, Louisiana State Penitentiary; James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections; Angelia Norwood, Assistant Warden, Louisiana State

24

Penitentiary and Louisiana Department of Public Safety and Corrections, pray that the Court grant their Motion to Stay Pending Appeal and that it stay the enforcement of the district court's Rulings and Order issued on December 19, 2013.

Respectfully Submitted:

*s/ James L. Hilburn*
E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
SHOWS, CALI & WALSH, LLP
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
wade@scwllp.com
jamesh@scwllp.com
amym@scwllp.com
jbw@scwllp.com

ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & MCCOLLISTER
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

## CERTIFICATE OF EMERGENCY

I certify that the facts supporting emergency consideration of this motion are true and complete.

/s/ James L. Hilburn
James L. Hilburn

### CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. Rules 25.2.1 and 25.2.13, I certify that the required privacy redactions have been made; the electronic submission is an exact copy of the paper document. Pursuant to 5th Cir. Rule 32, I certify that this opposition complies with the type-volume limitations of Fed. R. App. P. 8 and 27(d)(2), because it is less than 20 pages in length.

This opposition complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E), Fed. R. App. P. 32(a)(5), and Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 software in Times New Roman 14-point font.

I understand that a material misrepresentation in completing this certificate or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7) may result in the Court striking the brief and imposing sanctions against the person signing the brief.

/s/ James L. Hilburn
James L. Hilburn

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **24th** day of **January, 2014**, a copy of the foregoing has this date been served upon all parties through their respective counsel of record by operation of the Court's electronic filing system and has been filed electronically with the Clerk of Court using the CM/ECF system. I also certify that a copy of the foregoing was served upon counsel for all parties via e-mail and/or by depositing same in the U.S. Mail, postage prepaid and properly addressed, on this 24th day of January, 2014.

/s/ James L. Hilburn
JAMES L. HILBURN


Mercedes Montagnes
THE PROMISE OF JUSTICE INITIATIVE
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
mmontagnes@thejusticecenter.org

Mitchell A. Kamin
BIRD, MARELLA, BOXER, WOLPERT, NESSIM
DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201-2100
Fax (310) 201-2110
bak@birdmarella.com

Steven Scheckman
SCHIFF, SCHECKMAN, & WHITE, LLP
829 Baronne Street
New Orleans, Louisiana, 70113
Tel. (504) 581-9322
Fax (504) 581-7651
steve@sswethicslaw.com

*Representing Plaintiffs*

Exhibit 7

# IN THE UNITED STATES FIFTH CIRCUIT COURT OF APPEALS

## No. _____

**ELZIE BALL, NATHANIEL CODE
AND JAMES MAGEE**                                        **RESPONDENTS**

**VERSUS**

**JAMES M. LEBLANC, SECRETARY
OF THE LOUISIANA DEPARTMENT
OF PUBLIC SAFETY AND
CORRECTIONS, ET AL.**                                   **PETITIONERS**

---

## PETITION FOR WRIT OF MANDAMUS

NOW COME, James M. LeBlanc, Secretary of Louisiana Department of
Public Safety and Corrections; Burl Cain, Warden, Louisiana State Penitentiary;
Angelia Norwood, Assistant Warden, Louisiana State Penitentiary and the
Louisiana Department of Public Safety and Corrections (collectively
"Petitioners"); through undersigned counsel, and file this *Petition for Writ of
Mandamus* pursuant to Rule 21 of the Federal Rules of Appellate Procedure.

## RELIEF SOUGHT

Petitioners respectfully requests that this Court issue a writ of mandamus
directing the U.S. District Court for the Middle District of Louisiana to enter a
judgment consistent with its Ruling and Order (Doc. 87) issued on December 19,

1

2013, in the matter entitled *Elzie Ball, et al. v. James M. LeBlanc, et al.*, Civil Action No. 13-368. The Ruling and Order followed a trial on the preliminary and permanent injunctions requested by the plaintiffs/respondents, and resulted in disposition of all of the claims presented, with the exception of the setting of attorney's fees and costs pending a deadline to be set by the Court.

Premised upon a finding that the "conditions of confinement at Angola's death row constitute cruel and unusual punishment in violation of the Eighth Amendment," and upon a finding of "Defendants' deliberate indifference to the substantial risk of harm to Plaintiffs" (Ruling and Order, ¶ IV(83)), the Ruling and Order of the district court provides very specific deadlines for compliance, including:

1. Defendants must "immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit" and "shall submit their plan to the Court **no later than February 17, 2014 at 5:00 p.m.**" (Ruling and Order, ¶¶ VII(10-11)).

2. Plaintiffs are directed to file a response to the plan by March 10, 2014. (Ruling and Order, ¶ VII(15)).

3. Plaintiffs and Defendants are ordered to "jointly or separately recommend candidates for appointment as Special Master **no later than March 10, 2014 at 5:00 p.m.**" (Ruling and Order, ¶ VII(17)).

4. Plaintiffs and Defendants are ordered to "jointly or separately file a response to the United States Department of Justice's submission **no later than March 10, 2014 at 5:00 p.m.**" (Ruling and Order, ¶ VII(18)).

2

Considering these rapidly approaching deadlines, entry of judgment consistent with Rule 58(a) is necessary to vest appellate or other rights the Petitioners may have in response to the Court's Ruling and Order. Petitioners, therefore, request that this Court issue a writ of mandamus compelling entry of judgment and/or suspending the deadlines contained in the Ruling and Order pending appeal.

## ISSUE PRESENTED

Whether, in light of the deadlines presented by the Ruling and Order, the failure of the district court to enter judgment consistent with Rule 58(a) warrants a writ of mandamus.

## RELEVANT FACTS

On December 26, 2013, shortly after receipt of the Ruling and Order, Petitioners filed a Motion for Entry of Final Judgment Pursuant to Rule 58(d) (Doc. 91) and Motion for Expedited Consideration (Doc. 92). Petitioners even submitted a Proposed Judgment (Doc. 91-3). In these motions, Petitioners submit that a final judgment is necessary for any exercise of appellate rights or even the request of a stay. On December 31, 2013, Plaintiffs/Respondents filed an Opposition to Motion for Expedited Consideration of Motion for Entry of Final Judgment (Doc. 93). In their opposition, Plaintiffs/Respondents seem primarily concerned about their request for attorney's fees, an issue which is simply not

3

relevant to the entry of final judgment. Plaintiffs/Respondents did not specifically address or oppose the Proposed Judgment submitted by the Petitioners. On December 31, 2013, Petitioners filed a Motion for Leave to File Reply Memorandum. (Doc. 94.)

On January 6, 2014, the district court denied the Petitioners' Request for Expedited Consideration and Petitioners' Motion for Leave. (Doc. 95.) The district court also allowed Plaintiffs/Respondents through January 16, 2014 to file an opposition to Petitioners' Motion for Expedited Consideration, despite the Plaintiffs/Respondents having already done so. The Motion for Entry of Final Judgment remains pending.

On January 13, 2014, Petitioners filed a Motion to Stay Pending Appeal (Doc. 97) and Motion for Expedited Consideration (Doc. 98). On January 17, 2014, after granting the Motion for Expedited Consideration, the district court denied the Motion to Stay Pending Appeal (Doc. 100). Defendants' Notice of Appeal was filed on January 21, 2014 (Doc. 103).

The primary reason for this Petition is discussed in a footnote of the district court's January 17, 2014 decision, where the district court indicated as follows:

> Here, the Court has not entered a final judgment, nor did the Court's Ruling and Order put an end to the action. Rather, the Court's Ruling and Order requires further action by both parties and the Court. Thus, at this stage of the litigation, Defendants are precluded from seeking

4

an appeal of a final judgment, pursuant to 28 U.S.C. § 1291. (Doc. 100, Ruling and Order, January 17, 2014, p. 2 fn. 1.)

As the district court noted, the crux of the matter is this — the district court's Ruling and Order places concrete deadlines with onerous requirements on the Petitioners, some of which are only mere weeks away. The absence of a final judgment gives Petitioners no avenue to seek any relief, including an appeal or stay of the deadlines from the district court or this Court. Absent the relief sought by this petition, Petitioners are without recourse — without due process — to challenge the significant expense and effort required by the Ruling and Order and the approaching deadlines.

## LAW AND ARGUMENT

### I.   The Elements of the Writ

A writ of mandamus is an extraordinary remedy that "is appropriate only when the trial court has exceeded its jurisdiction or has declined to exercise it[.]" In re Gulf Publishing Co., 135 Fed.Appx. 716, 718 (5th Cir. 2005); In re Dresser Industries, Inc., 972 F.2d 540-542-543 (5th Cir. 1992). Yet, despite being extraordinary, the conditions for obtaining a writ of mandamus "are not insuperable." Cheney v. U.S. District Court, 542 U.S. 367, 381 (2004).

Three requirements must be satisfied before a writ of mandamus will issue: (1) the party seeking issuance of the writ must have no other adequate means to

attain the relief desired; (2) the petitioner must satisfy the burden of showing that the right to issuance of the writ is clear and indisputable; and (3) even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." Cheney, 542 U.S. 367, 381; United States v. Unknown, 701 F.3d 749, 773 (2012). Petitioners meet these requirements and mandamus is appropriate.

## II.   Petitioners Have No Alternate Means to Procure a Final Judgment or Obtain Relief from the Pending Deadlines

In the mandamus action of In re Hood, 135 Fed.Appx. 709 (5th Cir. 2005), this Court found the petitioner had met the requirements for issuing a writ to the district court who had failed to issue an order in the seven months following a hearing. Hood, 135 Fed.Appx. at 711. While the Court did not directly issue the writ, this Court "held [the matter] in abeyance trusting the district judge's representation that he will address the matters referred to in the petition for writ of mandamus by the end of this week" and further holding open the probability of the writ's issuance if the lower court failed to issue an order by the promised time. Id.

Just as in Hood, Petitioners are without any adequate means to obtain a final judgment from which to seek relief. Petitioners have filed a motion seeking relief. But for every day that final judgment is not entered, Petitioners are brought closer to the deadlines imposed by the district court in the Ruling and Order without

6

recourse for a stay of proceedings or appeal. It is those deadlines which present a writ of mandamus as the last option available to the Petitioners at this junction.

### III.    The Petitioners' Right to the Writ is Clear and Undisputable

The second requirement for the writ's issuance is that the right of the petitioner is clear and undisputable. Under Rule 58(d), Petitioners are entitled to a final, appealable judgment. This Court in <u>Hood</u> found that the petitioner's right was clear and undisputable when the district court had promised an order and had not provided one in seven months. <u>Hood</u>, 135 Fed.Appx. at 711. This matter poses even more deserving facts because of the deadlines imposed.

The defendants deserve a writ of mandamus directing the district court to issue final judgment and/or suspend the deadlines in the Ruling and Order to afford the defendants the opportunity to appeal and request a stay.

### IV.    The Writ is Appropriate Under the Circumstances

This Court found that the writ was warranted in <u>Hood</u> and this case provides even more exigent circumstances. The defendants' appeal rights vest upon entry of final judgment but not until that time. Therefore, the writ requested herein is appropriate under the circumstances.

Even thought the district court issued its Ruling and Order on December 19, 2013, the Federal Rules of Civil Procedure and this Court require that every

7

judgment be set out in a separate document. Citing Rule 58, this Court has concluded that Rule 58 "requires a judgment separate and apart from an accompanying opinion." Sassoon v. United States, 549 F.2d 983, 984 (5th Cir. 1977). Further, "the separate-document rule must be 'mechanically applied' " and "[t]echnical application of the separate-judgment requirement is necessary." Bankers Trust Co. v. Mallis, 435 U.S. 381, 386 (1978). This Court has vacated district court orders refusing to enter a separate document judgment and remanded the case with strict instructions to enter a separate document judgment. Baker v. Mercedes Benz of North America, 114 F.3d 57, 61 (5th Cir. 1997).

In 2002, Rule 58(d) was amended to allow a party to request that judgment be set out in a separate document as required under Rule 58(a): "A party may request that judgment be set out in a separate document as required by Rule 58(a)." As the Advisory Committee Notes indicate, Rule 58(d) was revised to "protect all needs for prompt commencement of the periods for motions, appeal, and execution or other enforcement." Accordingly, entry of final judgment consistent with this Court's Ruling and Order would allow the prompt commencement of any and all appeals.

A decision on the merits is a "final decision" within the ambit of 28 U.S.C. § 1291, even if the recovery or amount of attorney's fees is left to be decided.

8

Buninick v. Becton Dickson & Co., 486 U.S. 196 (1988); Moody National Bank of Galveston v. GE Life & Annuity Assurance Co., 383 F.3d 249, 253 (5th Cir. 2004). Thus, the fact that this Court granted the plaintiffs' unspecified attorneys' fees does not affect the finality of its decision or the necessity for final judgment.

The pending sanctions motions also do not prevent final judgment on the merits. See Jackson Marine Corp. v. Harvey Barge Repair, Inc., 794 F.2d 989 (5th Cir. 1986); Turnball v. Wilcken, 893 F.2d 256, 257 (10th Cir. 1990), citing Cox v. Flood, 683 F.2d 330, 331 (10th Cir. 1982); Budinick, supra.

The defendants present the necessary requirements for this Court to issue a writ of mandamus. The defendants therefore seek this Court's assistance and respectfully request the issuance of a writ of mandamus requiring the district court to issue final judgment and/or suspend the deadlines in the Ruling and Order. Because of the approaching deadlines, the defendants are entitled to the entry of a final judgment in accordance with this Court's December 19, 2013 Ruling and Order pursuant to Rule 58(d) and/or suspension of the deadlines contained therein.

9

## CONCLUSION

The defendants do not approach this matter lightly.  However, the Ruling and Order of the district court imposes temporally onerous deadlines on Petitioners.  Without a final judgment, Petitioners are left without an avenue for relief from these deadlines.  Without a writ of mandamus or other intervention from this Court, Petitioners have no remedy at all.  Petitioners have a right to appeal and a right to request a stay from complying with the extensive requirements contained in the Ruling and Order.  None of these things can happen until the district court issues a final judgment.  Therefore, for the foregoing reasons, the defendants urge this Court to consider their Petition for Writ of Mandamus and issue a writ requiring entry of final judgment consistent with the Ruling and Order and/or suspending the deadlines contained in the Ruling and Order pending a request for a stay with this Court.

Respectfully Submitted:

James D. "Buddy" Caldwell Attorney General

By: /s/ *James L. Hilburn*

E. Wade Shows, La. Bar Roll No. 7637
Amy L. McInnis, La. Bar Roll No. 29337
James L. Hilburn, La. Bar Roll No. 20221
Jacqueline B. Wilson, La. Bar Roll No. 31055
**SHOWS, CALI & WALSH, LLP**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

and

Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar Roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
**ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & MCCOLLISTER**
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

11

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

1. Elzie Ball, Nathaniel Code, and James Magee, *plaintiffs/respondents;*

2. Mercedes Montagnes, Elizabeth Compa, and The Promise of Justice Initiative, *attorneys for plaintiffs/respondents*;

3. Mitchell A. Kamin, Jessica C. Kornberg, Nilay U. Vora, and the Law Firm of Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C., *attorneys for plaintiffs/respondents;*

4. Steven Scheckman and the Law Firm of Schiff, Scheckman, & White, LLP, *attorneys for plaintiffs/respondents;*

5. James M. Leblanc, Secretary of the Louisiana Department of Public Safety and Corrections, Burl Cane, Warden of the Louisiana State Penitentiary, Angela Norwood, Warden of Death Row, and the Louisiana Department of Public Safety and Corrections, *defendants/applicants.*

6. E. Wade Shows, James L. Hilburn, Amy L. McInnis, Jacqueline B. Wilson, and the Law Firm of Shows, Cali & Walsh, LLP, *attorneys for defendants/applicants*; and

7. Thomas E. Balhoff, Judith R. Atkinson, Carlton Jones, III, Roedel, Parsons, Koch, Blache, Balhoff & McCollister, *attorneys for defendants/applicants.*

12

Respectfully Submitted:

*/s/James L. Hilburn*

E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
SHOWS, CALI & WALSH, LLP
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
wade@scwllp.com
jamesh@scwllp.com
amym@scwllp.com
jbw@scwllp.com

ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & MCCOLLISTER
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon counsel for all parties via e-mail and/or by depositing same in the U.S. Mail, postage prepaid and properly addressed, on this 24th day of January, 2014.

/s/ James L. Hilburn
JAMES L. HILBURN

Mercedes Montagnes
THE PROMISE OF JUSTICE INITIATIVE
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
mmontagnes@thejusticecenter.org

Mitchell A. Kamin
BIRD, MARELLA, BOXER, WOLPERT, NESSIM
DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201-2100
Fax (310) 201-2110
bak@birdmarella.com

Steven Scheckman
SCHIFF, SCHECKMAN, & WHITE, LLP
829 Baronne Street
New Orleans, Louisiana, 70113
Tel. (504) 581-9322
Fax (504) 581-7651
steve@sswethicslaw.com

*Representing Plaintiffs*

14

# Exhibit 8

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 14-30067

---

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE,

      Plaintiffs - Appellees

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONS; BURL CAIN, WARDEN, LOUISIANA STATE
PENITENTIARY; ANGELA NORWOOD, Warden of Death Row;
LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

      Defendants - Appellants

---

Appeal from the United States District Court for the
Middle District of Louisiana, Baton Rouge

---

Before JONES, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:

    IT IS ORDERED that appellants' opposed motion to stay the District
Court proceedings is DENIED as premature.  The District Court is cautioned
that any action requiring implementation of relief beyond the current
deadlines for submitting a plan, before the state has a reasonable chance to
appeal and seek a stay, will be deemed an appealable final order.  Upon entry
of such an order, the Defendants may re-urge their stay request in light of
*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004).

A true copy
Attest:

Clerk, U. S. Court of Appeals, Fifth Circuit

By _Sabrina B Short_
          Deputy
New Orleans, Louisiana  FEB 1 3 2014

Exhibit 9

## *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 24, 2014

Mr. James Leslie Hilburn
Parish Attorney's Office
for East Baton Rouge Parish
10500 Coursey Boulevard
Suite 205
Baton Rouge, LA 70816-0000

      **No. 14-30067    Elzie Ball, et al v. James LeBlanc, et al**
         USDC No. 3:13-CV-368

Dear Mr. Hilburn,

We have docketed the appeal as shown above, and ask you to use the case number in future inquiries.  You can obtain a copy of our briefing checklist on the Fifth Circuit's website, www.ca5.uscourts.gov/clerk/docs/brchecklist.pdf.

Briefing Notice. The record is complete for purposes of the appeal, see FED R. APP. P. 12.  Appellant's brief and record excerpts are due within 40 days of the date shown above, see FED R. APP. P. & 5TH CIR. R. 28, 30, and 31.  See also 5TH CIR. R. 30.1.2 and 5TH CIR. R. 31.1 to determine if you have to file electronic copies of the brief and record excerpts. [If required, **electronic copies MUST be in Portable Document Format (PDF).**]

Policy on Extensions. The court grants extensions sparingly and under the criteria of 5TH CIR. R. 31.4.  You must contact opposing counsel and tell us if the extension is opposed or not.  5TH CIR. R. 31.4 and the Internal Operating Procedures following rules 27 and 31 state that except in the most extraordinary circumstances, the maximum extension for filing briefs is 30 days in criminal cases and 40 days in civil cases.

Reply Brief. We do not send cases to the court until all briefs are filed, except in criminal appeals.  Reply briefs must be filed within the 14 day period of FED R. APP. P. 31(a)(1).  See 5TH CIR. R. 31.1 to determine if you have to file electronic copies of the brief, and the format.

**Brief Covers.** THE CASE CAPTION(S) ON BRIEF COVERS MUST BE EXACTLY THE SAME AS THE CASE CAPTION(S) ON THE ENCLOSED TITLE CAPTION SHEET(S).  **YOU WILL HAVE TO CORRECT ANY MODIFICATIONS YOU MAKE TO THE CAPTION(S) BEFORE WE SUBMIT YOUR BRIEF TO THE COURT.**

Dismissal of Appeals. The clerk may dismiss appeals **without notice** if you do not file a brief on time.

Appearance Form. If you have not electronically filed a "Form for Appearance of Counsel", you must do so within 14 days from this

date.  You must name each party you represent, See FED R. APP. P.
and 5TH CIR. R. 12.  The form is available from the Fifth Circuit's
website, www.ca5.uscourts.gov.

**New Guidance Regarding Citations in Pleadings.**

The court has approved an amendment to 5TH CIR. R. 28.2.2 granting
the Clerk the authority to create a standard format for citation
to the electronic record on appeal.  You must use the new citation
format when citing to the electronic record on appeal.

  A.  In single record cases, use the short citation form, "ROA"
      followed by a period, followed by the page number.  For
      example, "ROA.123."

  B.  For multiple record cases, cite "ROA" followed by a period,
      followed by the Fifth Circuit appellate case number of the
      record referenced, followed by a period, followed by the
      page of the record.  For example, "ROA.13-12345.123."

To receive the record for preparing your brief, counsel, including
CJA attorneys, must provide the appropriate district court with a
United Parcel Service, or similar commercial delivery service,
account number.  If you wish to receive exhibits, you must
specifically request them.  The district court will charge your
account for shipping you the record on appeal.  In the alternative,
you may contact a local courier or attorney support services firm
to pick up the record and ship it to you.  CJA counsel may add
these shipping fees to their vouchers.

**Once you obtain the record, you should check it within 14 days of
receipt for any missing or incomplete items.  If you need to
request a supplemental record or order transcripts, do so promptly.
The court will not grant extensions of time to file your brief
because you did not timely check the record.**

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              _Sabrina B. Short_

                              By: _____
                              Sabrina B. Short, Deputy Clerk
                              504-310-7817

Enclosure(s)

cc w/encl:
      Ms. Mercedes Hardy Montagnes
      Ms. Cecelia Trenticosta
      Mr. Nilay U. Vora

Case No. 14-30067

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE,

                    Plaintiffs - Appellees

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS; BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY;
ANGELA NORWOOD, Warden of Death Row; LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS,

                    Defendants - Appellants

Exhibit 10

APPEAL

# U.S. District Court
# Middle District of Louisiana (Baton Rouge)
# CIVIL DOCKET FOR CASE #: 3:13-cv-00368-BAJ-SCR
# Internal Use Only

Ball et al v. LeBlanc et al
Assigned to: Chief Judge Brian A. Jackson
Referred to: Magistrate Judge Stephen C. Riedlinger
Demand: $0
 Related Case:  3:12-cv-00508-BAJ-SCR
Cause: 42:1983 Civil Rights Act

Date Filed: 06/10/2013
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Elzie Ball**                          represented by    **Mercedes Hardy Montagnes**
                                                          The Promise of Justice Initiative
                                                          636 Baronne St
                                                          New Orleans, LA 70113
                                                          (504) 529-5955
                                                          Email: mercedesm@thejusticecenter.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Elizabeth Claire O'K Compa**
                                                          The Promise of Justice Initiative
                                                          636 Baronne St
                                                          New Orleans, LA 70113
                                                          (504) 529-5955
                                                          Email: bethc@thejusticecenter.org
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jessica C. Kornberg**
                                                          Bird Marella Boxer Wolpert Nessim Drooks
                                                          & Lincenberg
                                                          1875 Century Park East
                                                          23rd Floor
                                                          Los Angeles, CA 90067
                                                          310-201-2100
                                                          Fax: 310-201-2100
                                                          Email: jck@birdmarella.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Mitchell A. Kamin**
                                                          Bird Marella Boxer Wolpert Nessim Drooks
                                                          & Lincenberg
                                                          1875 Century Park East
                                                          23rd Floor
                                                          Los Angeles, CA 90067
                                                          310-201-2100
                                                          Fax: 310-201-2100

Email: mak@birdmarella.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nilay U. Vora**
Bird Marella Boxer Wolpert Nessim Drooks
& Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
310-201-2100
Fax: 310-201-2110
Email: nuv@birdmarella.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Robert Scheckman**
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA 70113
504-581-9322
Email: steve@sswethicslaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nathaniel Code**                    represented by   **Mercedes Hardy Montagnes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica C. Kornberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mitchell A. Kamin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nilay U. Vora**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Robert Scheckman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Magee**                                    represented by    **Mercedes Hardy Montagnes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica C. Kornberg**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mitchell A. Kamin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nilay U. Vora**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Robert Scheckman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**James M. LeBlanc**                               represented by    **Edmond Wade Shows**
*Secretary of the Louisiana Department of*                          Shows, Cali, Berthelot & Walsh, LLp
*Public Safety and Corrections*                                     P. O. Drawer 4425
628 St. Louis Street
Baton Rouge, LA 70821
225-346-1461
Fax: 225-346-1467
Email: wade@scwllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. McInnis**
Shows. Cali, Berthelot & Walsh, LLP
P.O. Box 4425
Baton Rouge, LA 70821
225-346-1461
Fax: 225-346-1467
Email: amym@scwllp.com
*ATTORNEY TO BE NOTICED*

**Carlton Jones , III**
Roedel, Parsons, Koch, Blache, Balhoff &
McCollister
8440 Jefferson Highway
Suite 301
Baton Rouge, LA 70809
225-929-7033
Fax: 225-928-4925
Email: cjones@roedelparsons.com
*ATTORNEY TO BE NOTICED*

**Jacqueline B. Wilson**
Shows, Cali, Berthelot & Walsh, LLP
628 St. Louis Street
Baton Rouge, LA 70802
225-346-1461
Fax: 225-346-1467
Email: jbw@scwllp.com
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
Shows, Cali & Walsh, LLP
628 St. Louis Street
P.O. Drawer 4425
Baton Rouge, LA 70821
225-346-1461
Fax: 225-346-1467
Email: jhilburn@brgov.com
*ATTORNEY TO BE NOTICED*

**Judith R. E. Atkinson**
Roedel, Parsons, Koch, Blache, Balhoff &
McCollister
8440 Jefferson Highway
Suite 301
Baton Rouge, LA 70809
225-929-7033
Fax: 929-6942
Email: jatkinson@roedelparsons.com
*ATTORNEY TO BE NOTICED*

**Thomas E. Balhoff**
Roedel, Parsons, Koch, Blache, Balhoff &
McCollister
8440 Jefferson Highway
Suite 301
Baton Rouge, LA 70809
225-929-7033
Fax: 225-928-6045 FAX
Email: tbalhoff@roedelparsons.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Burl Cain**
*Warden of the Louisiana State Penitentiary*

represented by **Edmond Wade Shows**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. McInnis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlton Jones , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacqueline B. Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Judith R. E. Atkinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas E. Balhoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Angela Norwood**
*Warden of Death Row*

represented by **Edmond Wade Shows**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. McInnis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlton Jones , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacqueline B. Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Judith R. E. Atkinson**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Thomas E. Balhoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Louisiana Department of Public Safety**          represented by   **Edmond Wade Shows**
**and Corrections**                                                (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Amy L. McInnis**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Carlton Jones , III**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jacqueline B. Wilson**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **James L. Hilburn**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Judith R. E. Atkinson**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Thomas E. Balhoff**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Amicus**

**United States**                                  represented by   **Catherine M. Maraist**
                                                                   United States Attorney's Office
                                                                   Middle District of Louisiana
                                                                   777 Florida Street
                                                                   Suite 208
                                                                   Baton Rouge, LA 70801
                                                                   225-389-0443
                                                                   Fax: 225-389-0685
                                                                   Email: catherine.maraist@usdoj.gov
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**Edward Wade Shows**                    represented by    **S. Brooke Barnett-Bernal**
Long Law Firm, LLP
One United Plaza
4041 Essen Lane
Suite 500
Baton Rouge, LA 70809
225-922-5110
Fax: 225-922-5105
Email: brooke@longlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Lane Ewing , Jr.**
Cazayoux & Ewing, LLC
257 Maximilian Street
Baton Rouge, LA 70802
225-650-7400
Fax: 225-650-7401
Email: lane@cazayouxewing.com
*ATTORNEY TO BE NOTICED*

**LaToya D Jordan**
Long Law Firm LLP
4041 Essen Lane
Ste. 500
Baton Rouge, LA 70809
(225) 922-5110
Fax: (225)922-5105
Email: ldj@longlaw.com
*ATTORNEY TO BE NOTICED*

**Michael A. Patterson**
Long Law Firm, LLP
One United Plaza
4041 Essen Lane
Suite 500
Baton Rouge, LA 70809
225-922-5110
Fax: 225-922-5105 FAX
Email: map@longlaw.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Amy L McInnis**                    represented by    **S. Brooke Barnett-Bernal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Lane Ewing , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LaToya D Jordan**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael A. Patterson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Jacqueline B Wilson**                 represented by    **S. Brooke Barnett-Bernal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Lane Ewing , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LaToya D Jordan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael A. Patterson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/10/2013 | 1 (p.24) | COMPLAINT against Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood ( Filing fee $ 400 receipt number 053N-956181.), filed by Elzie Ball, James Magee, Nathaniel Code. (Attachments: # 1 (p.36) Cover sheet, # 2 Related case)(Montagnes, Mercedes) (Entered: 06/10/2013) |
| 06/10/2013 | 2 (p.39) | NOTICE of Civil Cover Sheet by Elzie Ball, Nathaniel Code, James Magee (Montagnes, Mercedes) (Entered: 06/10/2013) |
| 06/10/2013 | 3 (p.40) | NOTICE of Summons by Elzie Ball, Nathaniel Code, James Magee (Attachments: # 1 (p.42) Summons, # 2 (p.44) Summons, # 3 (p.46) Summons)(Montagnes, Mercedes) (Entered: 06/10/2013) |
| 06/10/2013 | 4 (p.48) | Summons Issued as to All Defendants. (NOTICE: Counsel shall print and serve both the summons and all attachments in accordance with Federal Rule of Civil Procedure 4.) (SMG) (Entered: 06/10/2013) |
| 06/10/2013 | 5 (p.56) | MOTION for Mitchell A. Kamin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-956260) by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Affidavit, # 2 Certificates)(Montagnes, Mercedes) Modified to edit text on 6/10/2013 (SMG). (Entered: 06/10/2013) |
| 06/10/2013 | 6 (p.62) | MOTION for Nilay U Vora to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-956279) by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Affidavit, # 2 Certificates)(Montagnes, Mercedes) (Entered: 06/10/2013) |

| | | |
|---|---|---|
| 06/10/2013 | 7 | ORDER granting 6 (p.62) Ex Parte Motion for Admission Pro Hac Vice. Nilay U. Vora admitted pro hac vice as attorney for the plaintiffs. Signed by Magistrate Judge Stephen C. Riedlinger on 6/10/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 06/10/2013) |
| 06/10/2013 | | MOTION(S) REFERRED: 5 (p.56) MOTION for Mitchell A. Kamin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-956260). This motion is now pending before the USMJ. (SMG) (Entered: 06/10/2013) |
| 06/10/2013 | 8 | ORDER granting 5 (p.56) Ex Parte Motion for Admission Pro Hac Vice. Mitchell A. Kamin admitted pro hac vice as attorney for the plaintiffs. Signed by Magistrate Judge Stephen C. Riedlinger on 6/10/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 06/10/2013) |
| 06/11/2013 | 9 (p.68) | SUMMONS Returned Executed by Elzie Ball, James Magee, Nathaniel Code. All Defendants. (Attachments: # 1 Proof of Service, # 2 Proof of Service, # 3 Proof of Service)(Montagnes, Mercedes) (Entered: 06/11/2013) |
| 06/11/2013 | 10 (p.72) | MOTION for Jessica Kornberg to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-956782) by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Certificates, # 2 Affidavit)(Montagnes, Mercedes) (Entered: 06/11/2013) |
| 06/11/2013 | 11 | ORDER granting 10 (p.72) Ex Parte Motion for Admission Pro Hac Vice. Jessica Kornberg admitted pro hac vice as attorney for the plaintiffs. Signed by Magistrate Judge Stephen C. Riedlinger on 6/11/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 06/11/2013) |
| 06/18/2013 | 12 (p.76) | MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 (p.79) Memorandum in Support, # 2 (p.111) Exhibit, # 3 (p.311) Exhibit, # 4 (p.448) Exhibit, # 5 (p.457) Exhibit, # 6 (p.464) Exhibit, # 7 (p.474) Exhibit, # 8 (p.481) Exhibit, # 9 (p.483) Exhibit, # 10 (p.485) Exhibit, # 11 (p.487) Exhibit, # 12 (p.489) Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit)(Montagnes, Mercedes) (Entered: 06/18/2013) |
| 06/18/2013 | 13 (p.568) | MOTION for Expedited Hearing on 12 (p.76) MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) (Entered: 06/18/2013) |
| 06/24/2013 | 14 (p.572) | ORDER granting 13 (p.568) Motion for Expedited Hearing on Motion for Preliminary Injunction. Hearing on 12 (p.76) MOTION for Preliminary Injunction set for 7/2/2013 at 09:00 AM in Courtroom 2 before Chief Judge Brian A. Jackson. Plaintiffs' request that the Court waive the security requirement of FRCP 65 shall also be heard at this time. Defendants shall file memo in opposition to Motion for Preliminary Injunction no later than 6/28/2013 at 5:00 p.m. Signed by Chief Judge Brian A. Jackson on 6/24/2013. (PJH) (Entered: 06/24/2013) |
| 06/24/2013 | | Set/Reset Deadlines as to 12 (p.76) MOTION for Preliminary Injunction . (PJH) (Entered: 06/24/2013) |

| | | |
|---|---|---|
| 06/28/2013 | 15 (p.573) | MEMORANDUM in Opposition to 12 (p.76) MOTION for Preliminary Injunction filed by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood. (Attachments: # 1 Affidavit Exhibit A)(Wilson, Jacqueline) (Entered: 06/28/2013) |
| 06/28/2013 | 16 (p.624) | MOTION to Strike by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Proposed Order)(Wilson, Jacqueline) (Entered: 06/28/2013) |
| 06/28/2013 | 17 (p.638) | MOTION for Expedited Hearing on 16 (p.624) MOTION to Strike by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) (Entered: 06/28/2013) |
| 06/28/2013 | 18 (p.641) | MOTION for Extension of Time to File Responsive Pleadings by All Defendants. (Attachments: # 1 Proposed Order)(Jones, Carlton) (Entered: 06/28/2013) |
| 06/28/2013 | 19 | ORDER granting 18 (p.641) Ex Parte Motion for Extension of Time to File Responsive Pleadings. Defendants' responsive pleadings due by 7/23/2013. Signed by Magistrate Judge Stephen C. Riedlinger on 6/28/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 06/28/2013) |
| 06/28/2013 | | Set/Reset Deadlines: Burl Cain answer due 7/23/2013; James M. LeBlanc answer due 7/23/2013; Louisiana Department of Public Safety and Corrections answer due 7/23/2013; Angie Norwood answer due 7/23/2013. (JDL) (Entered: 07/01/2013) |
| 07/01/2013 | 20 (p.646) | RESPONSE in Opposition to 16 (p.624) MOTION to Strike filed by All Plaintiffs. (Attachments: # 1 (p.655) Exhibit, # 2 (p.656) Exhibit, # 3 (p.659) Exhibit, # 4 (p.660) Exhibit, # 5 (p.753) Exhibit, # 6 (p.900) Exhibit, # 7 (p.1008) Exhibit, # 8 (p.1163) Exhibit, # 9 (p.1329) Exhibit, # 10 (p.1515) Exhibit, # 11 (p.1614) Exhibit, # 12 (p.1706) Exhibit, # 13 (p.1793) Exhibit, # 14 (p.1885) Exhibit, # 15 (p.1957) Exhibit, # 16 (p.2120) Exhibit, # 17 (p.2203) Exhibit, # 18 (p.2382) Exhibit, # 19 (p.2494) Exhibit, # 20 (p.2512) Exhibit)(Montagnes, Mercedes) (Entered: 07/01/2013) |
| 07/01/2013 | 21 (p.2523) | Proposed Findings of Fact by Elzie Ball, Nathaniel Code, James Magee. (Montagnes, Mercedes) (Entered: 07/01/2013) |
| 07/01/2013 | 22 (p.2528) | MOTION for Leave to File Supplemental Affidavits in Opposition to 12 (p.76) Motion for Preliminary Injunction and Incorporated Memorandum by All Defendants. (Attachments: # 1 Proposed Pleading; Order, # 2 Proposed Pleading; Supplemental Affidavit of Vannoy, # 3 Proposed Pleading; Singh Affidavit)(Wilson, Jacqueline) Modified to edit text and docket relationship on 7/2/2013 (SMG). (Entered: 07/01/2013) |
| 07/01/2013 | 23 (p.2555) | MOTION for Expedited Hearing on 22 (p.2528) MOTION for Leave to File Supplemental Affidavits by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) (Entered: 07/01/2013) |
| 07/02/2013 | 24 (p.2558) | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Motion Hearing held on 7/2/2013 re 12 (p.76) MOTION for Preliminary Injunction filed by Nathaniel Code, Elzie Ball, James Magee, 16 (p.624) MOTION to Strike Exhibits filed by Burl Cain, Angie Norwood, James M. LeBlanc, Louisiana Department of Public Safety and Corrections. Counsel presents oral argument to |

| | | |
|---|---|---|
| | | the Court. The Court defers ruling on Motion for Preliminary Injunction and Motion to Strike Exhibits until the evidentiary hearing scheduled for 8/5/2013 at 2:00 p.m., in Courtroom 2. Trial of this matter on the merits will commence immediately following the evidentiary hearing. Parties shall meet, confer, and develop a joint proposed discovery plan, as stated herein, and submitted their joint proposed discovery plan to the Court no later than 5:00 p.m. on 7/9/2013. Court will issue discovery order by 7/10/2013. Defendants shall begin 21 day collection of data on 7/15/2013. Matter will be scheduled for ptrl cnf prior to the 8/5/2013 hearing.(Court Reporter C. Smith-Neely.) (PJH) (Entered: 07/02/2013) |
| 07/02/2013 | | Set/Reset Deadlines: Joint Proposed Discovery Plan due no later than 5:00 PM on 7/9/2013. (JDL) (Entered: 07/03/2013) |
| 07/09/2013 | 25 (p.2561) | MOTION to Enroll Amy L. McInnis as Additional Attorney by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) (Entered: 07/09/2013) |
| 07/09/2013 | 26 (p.2564) | Proposed Scheduling Order by All Plaintiffs. (Montagnes, Mercedes) (Entered: 07/09/2013) |
| 07/09/2013 | 27 | ORDER granting 25 (p.2561) Motion to Enroll as Additional Counsel. Added attorney Amy L. McInnis for James M. LeBlanc, Burl Cain, Angie Norwood and Louisiana Department of Public Safety and Corrections. Signed by Magistrate Judge Stephen C. Riedlinger on 7/9/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 07/09/2013) |
| 07/10/2013 | 28 (p.2569) | SCHEDULING ORDER: Discovery deadlines are established as stated herein. Proposed Pretrial Order due by 7/30/2013. Pretrial Conference set for 7/31/2013 at 03:30 PM in chambers before Chief Judge Brian A. Jackson. Discovery conference with United States Magistrate Judge Stephen C. Riedlinger is scheduled for 7/23/2013. Parties shall be responsible for contacting Judge Riedlinger's chambers to set the time and location of the conference.. Signed by Chief Judge Brian A. Jackson on 7/10/2013. (PJH) (Entered: 07/10/2013) |
| 07/10/2013 | 29 (p.2573) | MOTION to Appoint Third Party Expert /Proposed Expert Data Collection by All Plaintiffs. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(Montagnes, Mercedes) Modified to edit text on 7/11/2013 (SMG). Modified on 7/11/2013 to edit event type to a motion (NLT). (Entered: 07/10/2013) |
| 07/10/2013 | | Set/Reset Deadlines/Hearings: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry) Proposed Pretrial Order due by 7/30/2013 at 12:00 PM. Evidentiary Hearing and Trial set for 8/5/2013 at 2:00 PM in Courtroom 2 before Chief Judge Brian A. Jackson. (JDL) (Entered: 07/11/2013) |
| 07/10/2013 | | Set/Reset Deadlines: Daubert Motions and Motions In Limine shall be filed by 7/26/2013. (JDL) (Entered: 07/11/2013) |
| 07/11/2013 | 30 (p.2603) | MOTION to Substitute 29 (p.2573) MOTION to Appoint Third Party Expert *To Address Typographical Errors* by All Plaintiffs. (Attachments: # 1 Attachment Corrected document)(Montagnes, Mercedes) Modified to edit text on 7/11/2013 (SMG). (Entered: 07/11/2013) |
| 07/11/2013 | 31 (p.2611) | Emergency Brief regarding *Defendants Submission of Proposed Independent* |

| | | |
|---|---|---|
| | | *Expert.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Wilson, Jacqueline) (Entered: 07/11/2013) |
| 07/11/2013 | 32 (p.2757) | MOTION for Expedited Consideration on 31 (p.2611) Emergency Brief regarding Defendants Submission of Proposed Independent Expert by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) Modified to edit text on 7/11/2013 (SMG). (Entered: 07/11/2013) |
| 07/11/2013 | 33 (p.2760) | ORDER regarding 29 (p.2573) Plaintiff's Proposed Expert Data Collection filed by Nathaniel Code, Elzie Ball, James Magee: The Defendants shall file a memorandum in response no later than 5:00 p.m. on 7/11/2013. Signed by Chief Judge Brian A. Jackson on 07/11/2013. (SMG) (Entered: 07/11/2013) |
| 07/12/2013 | 34 (p.2761) | ORDER... Defendants Motion for Expedited Consideration (Doc. 32)is GRANTED. Plaintiffs Proposed Expert Data Collection(Doc. 29) and Defendants Submission of Proposed Independent Expert (Doc. 31) shall be heard with oral argument on Friday, July 12, 2013 at 11:30 a.m. via a telephone conference. Counsel for Defendants shall be responsible for initiating the conference call to opposing counsel and the Court, or in the alternative, obtaining a conference call-in number, and notifying the Court and opposing counsel of the conference call-in number and pass code.. Signed by Chief Judge Brian A. Jackson on 7/12/2013. (PJH) (Entered: 07/12/2013) |
| 07/12/2013 | | Set/Reset Deadlines/Hearings: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry) Telephone Conference set for 7/12/2013 at 11:30 AM before Chief Judge Brian A. Jackson. Counsel for Defendants shall be responsible for initiating the conference call toopposing counsel and the Court, or in the alternative, obtaining a conference call-innumber, and notifying the Court and opposing counsel of the conference call-in number andpass code.(PJH) (Entered: 07/12/2013) |
| 07/12/2013 | 35 (p.2762) | MOTION for emergency status Conference by All Plaintiffs. (Montagnes, Mercedes) (Entered: 07/12/2013) |
| 07/12/2013 | 36 (p.2765) | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Telephone Conference held on 7/12/2013. Counsel for Plaintiffs agreed toDefendants proposed expert, U.S. Risk Management. Counsel for Defendants further agreed to confirm with Defendants that they will seek no more than $10,000.00 in related expert costs at the conclusion of this litigation, if permitted. Parties also agreed to contact United States Magistrate Judge Stephen Riedlinger to schedule a settlement conference. Defendants Submission of Proposed Independent Expert (Doc. 31) is GRANTED. Plaintiffs Proposed Expert Data Collection (Doc. 29) is DENIED. Defendants are authorized to retain U.S. Risk Management for the purposes of i nstalling the necessary equipment, collecting the required data, and disseminating such data, as ordered by theCourt. See Docs. 24, 28. Defendants are authorized to retain U.S.Risk Management for the purposes of installing the necessary equipment, collecting the required data, and disseminating such data, as ordered by the Court. See Docs. 24, 28. Defendants shall ensure that the necessary equipment is installed in each of the death row tiers and in multiple locations throughout each tier, including empty inmate cells and/or inmate cells numbered six or higher, so that the most accurate data can be collected. Plaintiffs shall be permitted to retain an own expert to shadow U.S. Risk Management. Plaintiffs shall identify one individual, who shall be permitted to shadow U.S. Risk Management during the installation of the necessary equipment, and inspect |

| | | |
|---|---|---|
| | | the equipment at least once per week. However, Plaintiffs shall bear all costs of retaining such expert. (PJH) (Main Document 36 replaced on 7/15/2013) (PJH). Modified on 7/15/2013 to replace with signed document (PJH). Modified on 8/29/2013 to edit text (PJH). (Entered: 07/12/2013) |
| 07/12/2013 | 37 (p.2768) | ORDER denying 35 (p.2762) Emergency Motion for Status Conference, without prejudice to Plaintiff's right to re-file the motion, as stated herein. The parties are cautioned, once again, that the Court is not inclined to be involved in each and every dispute that the parties have over the coming weeks. The parties are further encouraged to do everything within their power to resolve such issues before taking up the limited resources of the Court. Signed by Chief Judge Brian A. Jackson on 7/12/2013. (PJH) (Entered: 07/12/2013) |
| 07/13/2013 | 38 (p.2770) | ANSWER to 1 (p.24) Complaint, by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood.(Wilson, Jacqueline) (Entered: 07/13/2013) |
| 07/16/2013 | 39 (p.2784) | Unopposed MOTION for Leave to Depose the Plaintiffs Pursuant to Rule 30(a)(2)(B) by All Defendants. (Attachments: # 1 Proposed Order)(Jones, Carlton) (Entered: 07/16/2013) |
| 07/17/2013 | | MOTION(S) REFERRED: 39 (p.2784) Unopposed MOTION for Leave to Depose the Plaintiffs Pursuant to Rule 30(a)(2)(B) . This motion is now pending before the USMJ. (SMG) (Entered: 07/17/2013) |
| 07/17/2013 | 40 (p.2788) | ORDER granting 39 (p.2784) MOTION for Leave to Depose the Plaintiffs Pursuant to Rule 30(a)(2)(B) on 7/19/2013. Signed by Magistrate Judge Stephen C. Riedlinger on 07/17/2013. (SMG) Modified to edit text on 7/17/2013 (SMG). (Entered: 07/17/2013) |
| 07/18/2013 | 41 (p.2789) | ORDER Setting Discovery Conference for July 23, 2013 at 1:00 p.m. Counsel for the plaintiffs shall arrange a conference call and provide the court and counsel for the defendants with the call-in number or other instructions. The conference will be canceled if counsel for the parties agree and advise the court that it is not needed. Signed by Magistrate Judge Stephen C. Riedlinger on 7/18/2013. (LLH) (Entered: 07/18/2013) |
| 07/18/2013 | | Set/Reset Deadlines/Hearings: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry) Discovery Conference set for 7/23/2013 at 01:00 PM before Magistrate Judge Stephen C. Riedlinger. (LLH) (Entered: 07/18/2013) |
| 07/23/2013 | 42 (p.2790) | Joint MOTION for Protective Order by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Protective Order)(Wilson, Jacqueline) (Main Document 42 replaced on 7/25/2013) (SMG). (Entered: 07/23/2013) |
| 07/23/2013 | 49 (p.2808) | MINUTE ENTRY/RULING ON DISCOVERY DISPUTE: Discovery Conference held on 7/23/2013 before Magistrate Judge Stephen C. Riedlinger. Several discovery disputes were resolved at the conference, and three matters were held over until 7/25/2013. Following the settlement conference held on that date, the three remaining discovery disputes were resolved. Dfts were ordered to file their supplemental discovery responses by 5:00 p.m. on 7/29/2013. This ruling briefly recounts those discovery requests as to which a supplemental response is due... (BNW) (Entered: 07/29/2013) |
| 07/24/2013 | | MOTION(S) REFERRED: 42 (p.2790) Joint MOTION for Protective Order . This |

| | | |
|---|---|---|
| | | motion is now pending before the USMJ. (SMG) (Entered: 07/24/2013) |
| 07/24/2013 | 43 (p.2795) | ORDER granting 42 (p.2790) Motion for Protective Order. Signed by Magistrate Judge Stephen C. Riedlinger on 07/24/2013. (SMG) (Entered: 07/24/2013) |
| 07/24/2013 | 44 | NOTICE TO COUNSEL: STATUS CONFERENCE/SETTLEMENT CONFERENCE set for 7/25/2013 at 1:00 PM in chambers before Magistrate Judge Stephen C. Riedlinger. [PLEASE NOTE: There will be NO CONFERENCE on this date at 10:30 a.m.] (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BNW) Modified on 7/24/2013 (BNW). (Entered: 07/24/2013) |
| 07/25/2013 | 45 (p.2798) | MOTION for Writ of Habeas Corpus ad testicandum by Elzie Ball. (Compa, Elizabeth) (Entered: 07/25/2013) |
| 07/25/2013 | 46 (p.2801) | MOTION for Writ of Habeas Corpus ad testicandum by Nathaniel Code. (Compa, Elizabeth) (Entered: 07/25/2013) |
| 07/25/2013 | 47 (p.2804) | MOTION for Writ of Habeas Corpus ad testicandum by James Magee. (Compa, Elizabeth) (Entered: 07/25/2013) |
| 07/25/2013 | | MOTION(S) REFERRED: 45 (p.2798) MOTION for Writ of Habeas Corpus ad testicandum . This motion is now pending before the USMJ. (CGP) (Entered: 07/25/2013) |
| 07/25/2013 | | MOTION(S) REFERRED: 46 (p.2801) MOTION for Writ of Habeas Corpus ad testicandum . This motion is now pending before the USMJ. (CGP) (Entered: 07/25/2013) |
| 07/25/2013 | | MOTION(S) REFERRED: 47 (p.2804) MOTION for Writ of Habeas Corpus ad testicandum . This motion is now pending before the USMJ. (LLH) (Entered: 07/25/2013) |
| 07/25/2013 | 48 (p.2807) | MINUTE ENTRY/SETTLEMENT CONFERENCE REPORT: Settlement Conference held on 7/25/2013 before Magistrate Judge Stephen C. Riedlinger. No settlement was reached at the conference. Case remains assigned for a preliminary injunction hearing and trial beginning August 5, 2013. (BNW) (Entered: 07/26/2013) |
| 07/26/2013 | | Motions No Longer Referred: 47 (p.2804) MOTION for Writ of Habeas Corpus ad testicandum , 45 (p.2798) MOTION for Writ of Habeas Corpus ad testicandum , 46 (p.2801) MOTION for Writ of Habeas Corpus ad testicandum . This motion is now pending before the USDJ. (NLT) (Entered: 07/26/2013) |
| 07/29/2013 | 50 (p.2811) | Supplemental RESPONSE to Discovery Request by All Defendants.(McInnis, Amy) Modified on 7/30/2013 (LLH). (Entered: 07/29/2013) |
| 07/30/2013 | 51 | Notice to Counsel: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) Bench Trial in this matter is reset for 8/5/2013 at 08:30 AM in Courtroom 2 before Chief Judge Brian A. Jackson. *** THIS IS A TIME CHANGE ONLY.(PJH) (Entered: 07/30/2013) |
| 07/30/2013 | 52 (p.2821) | Joint MOTION to Extend Deadline *to File Pre-Trial Order* by All Defendants. (McInnis, Amy) Modified on 7/30/2013 to edit text (CGP). (Entered: 07/30/2013) |
| 07/30/2013 | 53 (p.2825) | Proposed Pretrial Order by All Plaintiffs. (Attachments: # 1 Statement of Undisputed Facts, # 2 Def. Statement, # 3 Pl. Statement, # 4 Exhibit List Def., # 5 Pl. Obj. Exhibit List, # 6 Exhibit List Pl., # 7 Def. Obj. Exhibit List, # 8 Def. |

| | | |
|---|---|---|
| | | Findings of Fact and Conclusions of Law, # 9 Pl. Findings of Fact and Conclusions of Law, # 10 Joint Stip # 1, # 11 Joint Stip # 2)(Montagnes, Mercedes) (Entered: 07/30/2013) |
| 07/30/2013 | 54 (p.2900) | ORDER granting 52 (p.2821) Motion to Extend Discovery Deadlines. Final Pretrial Order due by 5:00 p.m. on July 30, 2013. Signed by Chief Judge Brian A. Jackson on 7/30/2013. (LLH) (Entered: 07/30/2013) |
| 07/30/2013 | 55 (p.2901) | MOTION to Request Judicial Notice of Administrative Prison Regulations and Louisiana Laws Requiring Climate Control by All Plaintiffs. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit)(Montagnes, Mercedes) Modified to edit text on 7/31/2013 (SMG). (Entered: 07/30/2013) |
| 07/31/2013 | 57 (p.3187) | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Final Pretrial Conference held on 7/31/2013. The Court encouraged Counsel to confer and try to reach stipulations on the disputed issues included in the Proposed Pretrial Order. Defendants memorandum in opposition to plaintiffs motion to request judicial notice (doc. 55), if any, shall be filed no later than 12:00 p.m. on Friday, August 2, 2013. Counsel shall file a pre-trial brief, limited to 5 pages in length, no later than 12:00 p.m. on Friday, August 2, 2013. The pretrial brief shall address the following: 1. The effect of the remedial measures (i.e. installation of awnings, misting of the buildings, etc.) allegedly taken by Defendants on the data collected between July 15, 2013 and August 5, 2013. 2. Whether it is possible for the Court to isolate the data collected before remedial measures were allegedly taken. The Court granted plaintiffs leave to file one or more motions, related to the evidentiary and discovery issues discussed during the pretrial conference, by 12:00 p.m. on Friday, August 2, 2013. The Parties shall submit separate bench books of exhibits to the Court by 12:00 p.m. on Friday, August 2, 2013. The bench books shall also include an exhibit list and witness list. Counsel may also submit the bench books on disk. Counsel shall report to Courtroom 2 at 8:15 a.m. on Monday, August 5, 2013. (PJH) (Entered: 08/01/2013) |
| 08/01/2013 | 56 (p.5424) | SEALED ORDER granting 47 (p.2804) MOTION for Writ of Habeas Corpus ad testificandum filed by James Magee, 45 (p.2798) MOTION for Writ of Habeas Corpus ad testificandum filed by Elzie Ball, 46 (p.2801) MOTION for Writ of Habeas Corpus ad testificandum filed by Nathaniel Code. Signed by Chief Judge Brian A. Jackson on 08/04/2013. (NLT) (Entered: 08/01/2013) |
| 08/02/2013 | 58 (p.5427) | SEALED DOCUMENT Return on Service on Order and Writ to the Warden at LSP - Served on 08/02/2013.. (Attachments: # 1 Return)(NLT) (Entered: 08/02/2013) |
| 08/02/2013 | 59 (p.3190) | Brief regarding *Remedial Measures*. (Attachments: # 1 Exhibit, # 2 Exhibit)(Wilson, Jacqueline) (Attachment 1 replaced on 8/2/2013) (SMG). (Attachment 2 replaced on 8/2/2013) (SMG). (Entered: 08/02/2013) |
| 08/02/2013 | 60 (p.3214) | MEMORANDUM in Opposition to 55 (p.2901) MOTION to Request Judicial Notice of Administrative Prison Regulations and Louisiana Laws Requiring Climate Control filed by All Defendants. (Wilson, Jacqueline) (Entered: 08/02/2013) |

| 08/02/2013 | 61 (p.3221) | Plaintiffs' Brief on the Reliability of USRM Data by Elzie Ball, Nathaniel Code, James Magee. (Montagnes, Mercedes) Modified to edit text on 8/2/2013 (SMG). (Entered: 08/02/2013) |
|---|---|---|
| 08/02/2013 | 62 (p.3226) | First MOTION and Incorporated Memorandum for Evidentiary Sanctions Against Defendants Re: Costs of Air Conditioning and Balance of Harms to Defendants from Injunctive Relief Sought by Plaintiffs by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6A, # 7 Exhibit 6B, # 8 Exhibit 7, # 9 Exhibit 8A, # 10 Exhibit 8B)(Montagnes, Mercedes) Modified to edit text on 8/2/2013 (SMG). (Entered: 08/02/2013) |
| 08/02/2013 | 63 (p.3482) | MOTION and Incorporated Memorandum in Support of a Motion for Imposition of Sanctions for Defendants' Spoliation of Evidence by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3A, # 4 Exhibit 3B, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6A, # 8 Exhibit 6B, # 9 Exhibit 6C, # 10 Exhibit 6D, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14A, # 19 Exhibit 14B, # 20 Exhibit 14C, # 21 Exhibit 14D)(Montagnes, Mercedes) Modified to edit text on 8/2/2013 (SMG). Modified to correct spelling on 8/5/2013 (SMG). (Entered: 08/02/2013) |
| 08/02/2013 | 64 (p.4361) | NOTICE of Statement of Interest by United States (Maraist, Catherine) (Entered: 08/02/2013) |
| 08/04/2013 | 65 (p.4371) | MOTION to Enroll James L. Hilburn as Additional Attorney by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) (Entered: 08/04/2013) |
| 08/04/2013 | 66 (p.4374) | RESPONSE in Opposition to 63 (p.3482) MOTION and Incorporated Memorandum in Support of a Motion for Imposition of Sanctions for Defendants' Spoliation of Evidence filed by All Defendants. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Wilson, Jacqueline) Modified to edit text on 8/5/2013 (SMG). (Entered: 08/04/2013) |
| 08/05/2013 | 67 | ORDER granting 65 (p.4371) Motion to Enroll as Additional Counsel. Added attorney James L. Hilburn for defendants Louisiana Department of Public Safety and Corrections, James M. LeBlanc, Burl Cain and Angie Norwood. Signed by Magistrate Judge Stephen C. Riedlinger on 8/5/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 08/05/2013) |
| 08/05/2013 | 75 (p.4736) | Minute Entry. Evidentiary hearing on Plaintiffs Motion forInjunctive Relief and trial on the merits held before Chief Judge Brian A. Jackson held on 8/5/2013. Counsel for the United States corrects error on page 3 of documents entitled Statement of Interest filed by United States (doc. 64). Court grants the Defendants Motion to Strike (doc. 16), as to temperature data only, the Defendants Motion for Leave to File Supplemental Affidavits in Opposition to Motion for Preliminary Injunction (doc. 22), and the Defendants Motion for Expedited Hearing on Motion for Leave to File Supplemental Affidavits (doc. 23). The Court hears oral argument on the Plaintiffs Motion to Request Judicial Notice of Administrative Prison Regulations and Louisiana Laws Regarding Climate Control (doc. 55), Plaintiffs Motion and Incorporated Memorandum for Evidentiary Sanctions Against Defendants re: costs of Air Conditioning and Balance of Harms to Defendants from Injunctive Relief Sought by Plaintiffs (doc. 62), and the Plaintiffs |

| | | |
|---|---|---|
| | | Motion and Incorporated Memorandum in Support of a Motion for Imposition of Sanctions for Defendants Spoliation of Evidence (doc. 63). The Court defers ruling on the Plaintiffs Motion to Request Judicial Notice of Administrative Prison Regulations and Louisiana Law Requiring Climate Control (doc. 55), and the Plaintiffs Motion and Incorporated Memorandum in Support of a Motion for Imposition of Sanctions for Defendants Spoliation of Evidence (doc. 63). Counsel for defendants shall file an opposition to the Plaintiffs Motion and Incorporated Memorandum for Evidentiary Sanctions Against Defendants re: costs. of Air Conditioning and Balance of Harms to Defendants from Injunctive Relief Sought by Plaintiffs (doc. 62) by 5:00 p.m. on Tuesday, August 6, 2013. The Court imposes an order of sequestration. Counsel present opening statements to the Court. Parties stipulate that not all plaintiffs will be present for the duration of the trial. Nathaniel Code, Jr. Frank Thompson, Brandy Perry, Elzie Ball, Angela Norwood, David Garon are sworn and testify on behalf of Plaintiff. Exhibits filed. Matter will continue on 8/6/2013 at 9:30 a.m.(Court Reporter C. Smith-Neely.) (PJH) (Entered: 08/28/2013) |
| 08/06/2013 | 68 (p.4412) | RESPONSE in Opposition to 62 (p.3226) First MOTION and Incorporated Memorandum for Evidentiary Sanctions Against Defendants Re: Costs of Air Conditioning and Balance of Harms to Defendants from Injunctive Relief Sought by Plaintiffs filed by All Defendants. (Jones, Carlton) (Entered: 08/06/2013) |
| 08/06/2013 | 76 (p.4739) | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Evidentiary Hearing on Pltfs Motion for Injunctive Relief and trial on the merits held on 8/6/2013. Stipulation as to the testimony of Secretary J ames LeBlanc and Warden Richard Peabody is read into the record. Disk containing USRM Data (P137) is filed into the record. The following witnesses are sworn and testify on behalf of the Plaintiffs. Dr. Susi Vassallo James J. Balsamo, Jr. Mary Katherine McCarthy Warden Burl Cain James C. Magee Exhibits P98,CV of James J. Balsamo, Jr. (0001-0031 only), and P138 (disk containing charts) are admitted. The Court defers ruling on the admission of exhibit P99, Expert Report of Dr. Vassallo and exhibit P98 (0032 - 0304) the Expert Report of James J. Balsamo, Jr. Plaintiffs rests. Counsel for the Defendants moves for dismissal under Rule 52. For reasons stated herein, the Court defers ruling on the Defendants Motion for Dismissal at this time. The following witnesses are sworn and testify on behalf of defendants: Stephen Trauth John M. Grimes, III Henry Eyre, III Dr. Raman Singh Exhibit D1, CV of John M. Grimes, III is admitted. The evidentiary hearing on the Plaintiffs Motion for Injunctive Relief and trial on the merits will resume on Wednesday, August 7, 2013 at 8:00 a.m., in Courtroom 2. (Court Reporter C. Smith-Neely.) (Main Document 76 replaced on 8/29/2013) (PJH). (PJH). Modified on 8/29/2013 to edit text (PJH). Modified on 8/29/2013 to edit text (JDL). (Entered: 08/28/2013) |
| 08/07/2013 | 77 (p.4742) | Minute Entry for proceedings held before Chief Judge Brian A. Jackson on 8/7/2013: Evidentiary hearing on Plaintiffs Motion for Injunctive Relief and trial on the merits continues in this matter from August 6, 2013. James M. LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections, is sworn and testifies on behalf of the Defendants. Angie Norwood, having been previously sworn, testifies on behalf of Defendants. Dr. Hal David Macmurdo is sworn and testifies on behalf of Defendants. Exhibits filed. Defts rest. Proffer read in the record by Counsel for the Plaintiffs. Pltfs rest in rebuttal. The Court admits all expert reports into evidence. Counsel presents closing arguments to the Court. Counsel shall file Supplemental and Proposed Findings Of Fact and Conclusions Of Law, limited to 5 pages in length, by August 16, 2013 at 5:00 p.m. The Court |

| | | |
|---|---|---|
| | | defers its ruling on Plaintiffs Application For Preliminary Injunction at this time. For reasons stated herein, the Court denies Plaintiffs Motion to Enjoin Defendants and Their Staff From Retaliation Against Plaintiffs In Any Manner For Filing This Complaint.(Court Reporter C. Smith-Neely.) (PJH) (Entered: 08/30/2013) |
| 08/08/2013 | 69 | Notice to Counsel: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)Telephone Conference set for 8/9/2013 at 11:00 AM (CST) before Chief Judge Brian A. Jackson. The Court will initiate the call to counsel.(PJH) (Entered: 08/08/2013) |
| 08/09/2013 | 80 | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Telephone Conference held on 8/9/2013. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) Modified on 9/17/2013 to add text (JDL). (Entered: 09/16/2013) |
| 08/16/2013 | 70 (p.4419) | Joint STIPULATION *Regarding Tier Measurements* by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood. (Wilson, Jacqueline) (Entered: 08/16/2013) |
| 08/16/2013 | 71 (p.4422) | Proposed Findings of Fact by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angie Norwood. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Wilson, Jacqueline) (Entered: 08/16/2013) |
| 08/16/2013 | 72 (p.4443) | Notice of Filing by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Attachment Proposed Findings of Fact and Conlcusions of Law, # 2 Attachment Joint Stipulations, # 3 Attachment Redacted expert report of James Balsamo, # 4 Attachment Email correspondence re Balsamo report, # 5 Attachment Email correspondence re Balsamo report, # 6 Attachment Email correspondence re Balsamo report, # 7 Attachment Email correspondence re Balsamo report, # 8 Attachment Email correspondence re Balsamo report, # 9 Attachment Email correspondence re Balsamo report, # 10 Attachment Email correspondence re Balsamo report, # 11 Attachment Email correspondence re Balsamo report, # 12 Attachment Email correspondence re Balsamo report, # 13 Attachment Email correspondence re Balsamo report)(Montagnes, Mercedes) Modified to edit text on 8/19/2013 (SMG). (Entered: 08/16/2013) |
| 08/20/2013 | 73 (p.4552) | MOTION for Leave to File Reply *to Defendants Opposition to Motion for Evidentiary Sanctions Against Defendants RE: Cost of Air Conditioning and Balance of Harms* by All Plaintiffs. (Attachments: # 1 Proposed Pleading;)(Montagnes, Mercedes) (Entered: 08/20/2013) |
| 08/20/2013 | 74 (p.4564) | MOTION for Leave to File Reply *to Defendants Opposition to Motion for Imposition of Sanctions for Defendants Spoliation of Evidence* by All Plaintiffs. (Attachments: # 1 Proposed Pleading;, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit)(Montagnes, Mercedes) (Entered: 08/20/2013) |
| 09/03/2013 | 78 (p.4745) | MEMORANDUM in Opposition to 72 (p.4443) Plaintiff's Attempt to Introduce Expert Report of James Balsamo filed by All Defendants. (Attachments: # 1 Exhibit)(Wilson, Jacqueline) Modified to edit text on 9/3/2013 (SMG). (Entered: 09/03/2013) |
| 09/06/2013 | 79 (p.4763) | MOTION for Leave to Remove Awnings and Incorporated Memorandum by All Defendants. (Attachments: # 1 Exhibit, # 2 Proposed Pleading;)(Wilson, Jacqueline) Modified on 9/9/2013 to edit text (CGP). (Entered: 09/06/2013) |

| 09/16/2013 | 81 (p.4770) | RESPONSE in Opposition to 79 (p.4763) MOTION for Leave to Remove Awnings filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 09/16/2013) |
|---|---|---|
| 09/17/2013 | 82 (p.4774) | ORDER denying 79 (p.4763) MOTION for Leave to Remove Awnings and Incorporated Memorandum. Signed by Chief Judge Brian A. Jackson on 9/17/2013. (LLH) (Entered: 09/17/2013) |
| 10/10/2013 | 83 (p.4775) | ORDER granting 73 (p.4552) MOTION for Leave to File Reply *to Defendants Opposition to Motion for Evidentiary Sanctions Against Defendants RE: Cost of Air Conditioning and Balance of Harms* filed by Nathaniel Code, Elzie Ball, James Magee and granting 74 (p.4564) MOTION for Leave to File Reply *to Defendants Opposition to Motion for Imposition of Sanctions for Defendants Spoliation of Evidence* filed by Nathaniel Code, Elzie Ball, James Magee. The Clerk of Court shall enter both the reply memoranda into the record. Signed by Chief Judge Brian A. Jackson on 10/9/2013. (LLH) (Entered: 10/10/2013) |
| 10/10/2013 | 84 (p.4776) | REPLY to 68 (p.4412) Response in Opposition to 62 (p.3226) First MOTION and Incorporated Memorandum for Evidentiary Sanctions Against Defendants Re: Costs of Air Conditioning and Balance of Harms to Defendants from Injunctive Relief Sought by Plaintiffs, filed by Elzie Ball, Nathaniel Code, James Magee. (LLH) (Entered: 10/10/2013) |
| 10/10/2013 | 85 (p.4785) | REPLY to 66 (p.4374) Response in Opposition to 63 (p.3482) MOTION and Incorporated Memorandum in Support of a Motion for Imposition of Sanctions for Defendants' Spoliation of Evidence, filed by Elzie Ball, Nathaniel Code, James Magee. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(LLH) (Entered: 10/10/2013) |
| 12/19/2013 | 86 (p.4954) | RULING AND ORDER... For reasons stated herein, IT IS ORDERED that Plaintiffs' Motion and Incorporated Memorandum to Request Judicial Notice of Administrative Prison Regulations and Louisiana Laws Requiring Climate Control (Doc. 55) is GRANTED. Signed by Chief Judge Brian A. Jackson on 12/19/2013. (PJH) (Entered: 12/19/2013) |
| 12/19/2013 | 87 (p.4957) | RULING AND ORDER denying as moot 12 (p.76) Plaintiffs' Motion for a Preliminary Injunction and granting in part and denying in part Plaintiffs' request for declaratory and injunctive relief. For the reasons stated herein; IT IS FURTHER ORDERED that Defendants shall immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit. IT IS FURTHER ORDERED that Defendants shall submit their plan to the Court no later than February 17, 2014 at 5:00 p.m. IT IS FURTHER ORDERED that Defendants shall immediately add Plaintiff James Magee to Angola's "Heat Precautions List." IT IS FURTHER ORDERED that Plaintiffs shall file a response to Defendants' proposed plan no later than March 10, 2014 at 5:00 p.m. IT IS FURTHER ORDERED that Plaintiffs and Defendants shall jointly or separately recommend candidates for appointment as Special Master no later than March 10, 2014 at 5:00 p.m. The parties' recommendations shall be filed into the record of this matter and shall set out the qualifications of the persons so recommended. IT IS FURTHER ORDERED that Plaintiffs and Defendants shall jointly or separately file a response to the United States Department of Justice's submission no later than March 10, 2014 at 5:00 p.m. IT IS FURTHER ORDERED that Plaintiffs are awarded reasonable attorneys' fees and costs. Plaintiffs shall file their motion for attorneys' fees and costs on a date to be fixed by the Court. IT IS FURTHER ORDERED that the Clerk of Court shall |

| | | |
|---|---|---|
| | | serve a copy of this Ruling and Order on the United States Attorney for the Middle District of Louisiana and the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice. Signed by Chief Judge Brian A. Jackson on 12/19/2013. (PJH) (Entered: 12/19/2013) |
| 12/19/2013 | 88 (p.5059) | RULING AND ORDER granting in part and denying in part 62 (p.3226) 63 (p.3482) Plaintiffs' Motions for Sanctions. Plaintiffs' Motions are GRANTED to the extent that they seek reimbursement of attorney's fees and costs. IT IS ORDERED that Defendants SHALL REIMBURSE Plaintiffs the full value of all attorney's fees and costs associated with the evidentiary and discovery violations described in this Order. Plaintiff's Motions are DENIED to the extent that they seek additional relief. IT IS FURTHER ORDERED that Plaintiffs' shall file a motion for attorneys' fees and costs within 30 days of the date of this Order. IT IS FURTHER ORDERED that Defendants' counsel E. WADE SHOWS, AMY L. MCINNIS, and JACQUELINE B. WILSON SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED against each personally, under Fed. R. Civ. P. 37(c); M.D. La. LR83.2.4 and LR83.2.8; Louisiana Professional Conduct Rules related to candor to the tribunal and honesty and fair dealing to opposing counsel; and this Court's inherent powers. An order setting a date for a hearing on this Order to Show Cause shall follow. Signed by Chief Judge Brian A. Jackson on 12/19/2013. (PJH) (Entered: 12/19/2013) |
| 12/19/2013 | | Set/Reset Deadlines/Hearings: Defendants Plan is due no later than 5:00 pm on 2/17/2014. Plaintiffs Response to the Defendants Plan is due no later than 5:00 pm on 03/10/2014. Plaintiffs and Defendants shall jointly or separately recommend candidates for appointment as Special Master no later than 5:00 pm on 03/10/2014. Plaintiffs and Defendants shall jointly or separately file a response to the US Department of Justice's submission no later than 5:00 pm on 03/10/2014. Motion for Attorney's Fees shall be filed by 1/21/2014. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry) (NLT) (Entered: 12/20/2013) |
| 12/23/2013 | 89 (p.5110) | TRANSCRIPT REQUEST by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angela Norwood for proceedings held on 8/5/2013-8/7/2013 before Judge Jackson.. (Wilson, Jacqueline) (Entered: 12/23/2013) |
| 12/23/2013 | 90 (p.5111) | NOTICE of Service of Record Doc. 87 upon the Acting U.S Attorney for the Middle District of Louisiana (SMG) Modified on 1/6/2014 to edit the text (NLT). (Entered: 12/23/2013) |
| 12/26/2013 | 91 (p.5112) | MOTION Entry of Final Judgment by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Proposed Final Judgment)(Wilson, Jacqueline) (Entered: 12/26/2013) |
| 12/26/2013 | 92 (p.5123) | MOTION for Expedited Hearing on 91 (p.5112) MOTION Entry of Final Judgment by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Wilson, Jacqueline) (Entered: 12/26/2013) |
| 12/31/2013 | 93 (p.5126) | RESPONSE in Opposition to 92 (p.5123) MOTION for Expedited Hearing on 91 (p.5112) MOTION Entry of Final Judgment filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 12/31/2013) |
| 12/31/2013 | 94 (p.5130) | MOTION for Leave to File Reply Memorandum in Support of Defendants' Motion for Expedited Consideration of Motion for Entry of Final Judgment Pursuant to FRCP 58(d) by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 |

| | | Proposed Pleading; Order, # 3 Proposed Pleading; Reply Brief)(Wilson, Jacqueline) Modified to edit docket entry relationship and text on 1/2/2014 (SMG). (Entered: 12/31/2013) |
|---|---|---|
| 01/06/2014 | 95 (p.5140) | ORDER denying 92 (p.5123) Motion for Expedited Consideration of Motion for Entry of Final Judgment and denying as moot 94 (p.5130) MOTION for Leave to File Reply Memorandum in Support of Defendants' Motion for Expedited Consideration of Motion for Entry of Final Judgment Pursuant to FRCP 58(d). The plaintiffs shall file a response to Defendants' Motion for Expedited Consideration of Motion for Entry of Final Judgment Pursuant to FRCP 58(d)no later than 01/16/2014. Signed by Chief Judge Brian A. Jackson on 01/06/2014. (NLT) (Entered: 01/06/2014) |
| 01/06/2014 | | Set/Reset Deadlines as to 91 (p.5112) MOTION Entry of Final Judgment . (NLT) (Entered: 01/06/2014) |
| 01/06/2014 | 96 (p.5141) | Return on Case 13-368 Certified Mail Return Receipt re: Ruling #87. (CGP) (Entered: 01/07/2014) |
| 01/13/2014 | 97 (p.5142) | MOTION to Stay *Pending Appeal* by All Defendants. (Attachments: # 1 Memorandum in Support)(Jones, Carlton) (Entered: 01/13/2014) |
| 01/13/2014 | 98 (p.5155) | MOTION for Expedited Consideration of 97 (p.5142) MOTION to Stay Pending Appeal by All Defendants. (Jones, Carlton) Modified on 1/14/2014 to edit text (JDL). (Entered: 01/13/2014) |
| 01/16/2014 | 99 (p.5159) | RESPONSE in Opposition to 91 (p.5112) MOTION Entry of Final Judgment filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 01/16/2014) |
| 01/17/2014 | 100 (p.5166) | RULING AND ORDER granting 98 (p.5155) Motion for Expedited Consideration and denying 97 (p.5142) Motion to Stay Pending Appeal. Signed by Chief Judge Brian A. Jackson on 01/17/2014. (CGP) (Entered: 01/17/2014) |
| 01/17/2014 | 101 (p.5172) | ORDER setting EVIDENTIARY HEARING. IT IS ORDERED that Defendants' counsel, Mr. Edward Wade Shows, Ms. Amy L. McInnis, and Ms. Jacqueline B. Wilson SHOW CAUSE on February 20, 2014 at 2:00 p.m. in Courtroom 2 as to why SANCTIONS should not be imposed against each personally, pursuant to the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the Middle District of Louisiana, Louisiana Rules of Professional Conduct, and/or this Court's inherent powers. See Docs. 87, 88. Possible SANCTIONS include, but are not limited to, reprimand, ethics training, suspension, disbarment, and/ or the payment of attorneys' fees to Plaintiffs' counsel. Signed by Chief Judge Brian A. Jackson on 1/17/2014. (PJH) (Entered: 01/17/2014) |
| 01/17/2014 | 102 (p.5173) | MOTION to Enroll Michael A. Patterson, S. Brooke Barnett-Bernal and J. Lane Ewing, Jr. as Attorney And Re-Set Show Cause Hearing by Edward Wade Shows, Amy L McInnis, Jacqueline B Wilson. (Attachments: # 1 Attachment)(Barnett-Bernal, S.) Added MOTION to Re-Set Show Cause Hearing for a on 1/21/2014 (JDL). (Entered: 01/17/2014) |
| 01/21/2014 | 103 (p.5178) | NOTICE OF APPEAL to the USCA for the 5th Circuit of 87 (p.4957) Ruling and Order on Motion for Preliminary Injunction, by Burl Cain, James M. LeBlanc, Louisiana Department of Public Safety and Corrections, Angela Norwood. Filing fee $ 505, receipt number 053N-1037089. (Hilburn, James) Modified on 1/21/2014 to edit text (jdl) (Entered: 01/21/2014) |
| 01/21/2014 | 104 (p.5181) | |

|  |  | MOTION to Set Attorney Fees and Costs Regarding Sanctions Pursuant to Rule 37(A)(5)(A) and This Court's 88 (p.5059) Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Affidavit, # 3 Attachment, # 4 Attachment, # 5 Attachment, # 6 Attachment, # 7 Attachment, # 8 Attachment, # 9 Affidavit, # 10 Attachment, # 11 Affidavit, # 12 Attachment, # 13 Affidavit, # 14 Affidavit, # 15 Affidavit, # 16 Attachment, # 17 Attachment, # 18 Attachment, # 19 Attachment, # 20 Attachment, # 21 Attachment)(Montagnes, Mercedes) (Attachment 17 replaced on 1/22/2014) (JDL). Modified on 1/22/2014 to correct document orientation and edit text (JDL). (Entered: 01/21/2014) |
| 01/22/2014 | 105 (p.5282) | MOTION for Status Conference by Edward Wade Shows. (Attachments: # 1 Attachment)(Barnett-Bernal, S.) (Entered: 01/22/2014) |
| 01/22/2014 | 106 (p.5287) | ORDER granting 102 (p.5173) Motion to Enroll as Counsel of Record and Motion to Re-Set Show Cause Hearing. The Evidentiary Hearing in this matter is CONTINUED and RESET to 3/7/2014 at 09:30 AM in Courtroom 2. Signed by Chief Judge Brian A. Jackson on 01/22/2014. (CGP) (Entered: 01/22/2014) |
| 01/30/2014 | 107 (p.5288) | RULING AND ORDER denying as moot 105 (p.5282) Motion for Status Conference. To repeat, The Show Cause Hearing scheduled for 3/7/2014 shall proceed in accordance with U.S. Fifth Circuit precedent and this Court's Local Rules. Signed by Chief Judge Brian A. Jackson on 1/28/2014. (LLH) (Entered: 01/30/2014) |
| 01/31/2014 | 108 (p.5291) | MOTION to Re-Set Show Cause Hearing (Barnett-Bernal, S.) Modified on 1/31/2014 to edit text (JDL). (Entered: 01/31/2014) |
| 02/04/2014 | 109 (p.5294) | MOTION for Guidance From The Court by Edward Wade Shows. (Attachments: # 1 Attachment)(Barnett-Bernal, S.) Modified to edit text on 2/4/2014 (SMG). (Entered: 02/04/2014) |
| 02/06/2014 | 110 (p.5298) | MOTION to Enroll LaToya D. Jordan as Additional Attorney by Edward Wade Shows. (Attachments: # 1 Attachment)(Barnett-Bernal, S.) (Entered: 02/06/2014) |
| 02/06/2014 |  | MOTION(S) REFERRED: 110 (p.5298) MOTION to Enroll LaToya D. Jordan as Additional Attorney . This motion is now pending before the USMJ. (SMG) (Entered: 02/06/2014) |
| 02/06/2014 | 111 | ORDER granting 110 (p.5298) Motion to Enroll Additional Counsel of Record for Shows Attorneys. Added attorney LaToya D. Jordan for Amy L. McInnis, Edward Wade Shows and Jacqueline B. Wilson. Signed by Magistrate Judge Stephen C. Riedlinger on 2/6/2014. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 02/06/2014) |
| 02/11/2014 | 112 (p.5301) | MOTION for Extension of Time Response to Plaintiffs' Motion for Attorneys' Fees and Costs by All Defendants. (Hilburn, James) (Entered: 02/11/2014) |
| 02/11/2014 | 113 (p.5305) | MOTION to Take Deposition from Magistrate Judge Stephen Riedlinger by Edward Wade Shows. (Attachments: # 1 Attachment, # 2 Exhibit)(Barnett-Bernal, S.) (Attachment 1 replaced on 2/11/2014 to correct document format) (JDL). (Entered: 02/11/2014) |
| 02/11/2014 | 114 (p.5328) | RULING AND ORDER granting 108 (p.5291) Motion to Re-Set Show Cause Hearing. The Evidentiary Hearing is reset for 3/12/2014 at 08:00 AM in Courtroom 2 before Chief Judge Brian A. Jackson. No further continuances will be allowed. Signed by Chief Judge Brian A. Jackson on 02/11/2014. (NLT) |

| | | (Entered: 02/11/2014) |
|---|---|---|
| 02/11/2014 | 115 (p.5330) | MEMORANDUM in Opposition to 104 (p.5181) MOTION to Set Attorney Fees and Costs Regarding Sanction Pursuant to Rule 37(A)(5)(A) and This Court's 88 (p.5059) Order filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Hilburn, James) (Entered: 02/11/2014) |
| 02/13/2014 | 116 (p.5388) | ORDER denying as moot 112 (p.5301) Motion for Enlargement of Time to File Response to Plaintiff's Motion for Attorney's Fees and Costs. Signed by Chief Judge Brian A. Jackson on 02/12/2014. (CGP) (Entered: 02/13/2014) |
| 02/14/2014 | 117 (p.5389) | RULING AND ORDER denying 109 (p.5294) Motion for Guidance from the Court. Signed by Chief Judge Brian A. Jackson on 02/13/2014. (NLT) (Entered: 02/14/2014) |
| 02/17/2014 | 118 (p.5393) | NOTICE of Submission of Heat Remediation Plan by Burl Cain, James M. LeBlanc, Angela Norwood re 87 (p.4957) Order on Motion for Preliminary Injunction, (Attachments: # 1 Exhibit "A" Frank Thompson, PE, CV, # 2 Exhibit "B" Remediation Plan with Exhibits, # 3 Exhibit "C" ACA Standard for Showers)(Hilburn, James) (Attachment 1 replaced on 2/18/2014 to correct page orientation) (JDL). (Entered: 02/17/2014) |
| 02/18/2014 | 119 (p.5422) | Letter dated 02/13/2014 from Lyle W. Cayce, Clerk - U.S. Court of Appeals for the 5th Circuit to Counsel or Parties Listed Re: Motion to Stay is Denied (CGP) (Entered: 02/18/2014) |

**Case #: 3:13-cv-00368-BAJ-SCR**